Katherine B. Forrest (NY Bar No. 2381457)
Max R. Shulman (NY Bar No. 1473982)
Stuart W. Gold (NY Bar No. 1639434)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
Email: kforrest@cravath.com
        mshulman@cravath.com
        sgold@cravath.com
Admitted *Pro Hac Vice*

Attorneys for Defendants UAL Corporation and United Air Lines, Inc.

Paul L. Yde (D.C. Bar No. 449751)
Timothy J. Coleman (D.C. Bar No. 436415)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
701 Pennsylvania Ave., NW. Suite 600
Washington, DC 20004
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
Email: paul.yde@freshfields.com
        tim.coleman@freshfields.com
Admitted *Pro Hac Vice*

Attorneys for Defendant Continental Airlines, Inc.

[Names and Addresses of Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Michael C. Malaney, et al.,<br><br>                                  Plaintiffs,<br><br>                    vs.<br><br>UAL CORPORATION, UNITED AIR LINES, INC., and CONTINENTAL AIRLINES, INC.,<br><br>                                  Defendants. | CASE NO. 3:10-CV-02858-RS<br><br><br>DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION<br><br>Dates:        August 31- Sept. 1, 2010<br>Time:         9:30 a.m.- 4:30 p.m.<br>Judge:        Hon. Richard Seeborg<br>Courtroom:    3 |

# TABLE OF CONTENTS

Page

Preliminary Statement.................................................................................................... 1

Background ..................................................................................................................... 5

Argument ...................................................................................................................... 12

I.     THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A
    PRELIMINARY INJUNCTION ..................................................................... 12

    A.     Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits ......... 13

        1.     Plaintiffs Have Not Alleged and Do Not Support A Plausible
            Relevant Market.................................................................................. 13

        2.     Plaintiffs Cannot Demonstrate A Substantial
            Lessening of Competition .................................................................. 16

        3.     The Merger's Significant Benefits Far Outweigh Any
            (Speculative) Adverse Competitive Effect ........................................ 20

    B.     Plaintiffs Cannot Demonstrate Irreparable Harm ........................................... 21

    C.     Plaintiffs Cannot Demonstrate Antitrust Injury.............................................. 24

    D.     Plaintiffs Cannot Demonstrate That The Balance of Hardships Favors An
        Injunction ....................................................................................................... 24

    E.     Plaintiffs Cannot Demonstrate That An Injunction Would Serve The
        Public Interest ................................................................................................ 27

    F.     Plaintiffs Cannot Demonstrate Likelihood of Success Under Section 16 of
        the Clayton Act .............................................................................................. 29

II.     IF THE COURT GRANTS INJUNCTIVE RELIEF, IT SHOULD REQUIRE
    PLAINTIFFS TO POST A BOND ................................................................. 29

Conclusion ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocacy Org. For Patients and Providers v. Mercy Health Servs.*,
    987 F. Supp. 967 (E.D. Mich. 1997)........................................................................16

*Alliance for the Wild Rockies v. Cottrell*,
    No. 09-35756, --- F.3d ---, 2010 WL 2926463 (9th Cir. July 28, 2010) .........................12, 13

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ........................................................................20

*American Tunaboat Ass'n v. Brown*,
    67 F.3d 1404 (9th Cir. 1995) ........................................................................21

*Antoninetti v. Chipotle Mexican Grill, Inc.*,
    No. 08-55867, 2010 U.S. App. LEXIS 15247 (9th Cir. 2010) ................................12

*Ashker v. Schwarzenegger*,
    2010 U.S. Dist. LEXIS 25660 (N.D. Cal. Mar. 18, 2010).......................................12

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007).........................................................................22

*Buddy Sys., Inc. v. Exer-Genie, Inc.*,
    545 F.2d 1164 (9th Cir. 1976) ........................................................................29

*Cal. v. Sutter Health Sys.*,
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) .............................................................13

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)...................................................................................23

*Cargill, Inc. v. Monfort of Colo.*,
    479 U.S. 104 (1986)...................................................................................24

*Delco LLC v. Giant of Maryland, LLC*,
    Civil No. 07-3522, 2007 WL 3307018 (D.N.J. Nov. 8, 2007) ................................15

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...............................................................................12, 29

*Fount-Wip, Inc. v. Reddi-Wip, Inc.*,
    568 F.2d 1296 (9th Cir. 1978) ........................................................................15

*FTC v. Butterworth Health Corp.*,
    121 F.3d 708, 1997 WL 420543 (6th Cir. 1997 July 8, 1997) (unpublished) ........................27

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ...................................................................................20, 26

*Ginsberg v. InBev SA/NV*,
    No. 4:08CV01375, 2008 WL 4965859 (E.D. Mo. Nov. 18, 2008) ..........................................22

*Go-Video III v. Matsushita Elec.*,
    No. CIV 90-1864-PHX-RCB, 1990 WL 259684 (D. Ariz. Dec. 20, 1990) ...........................16

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1989) ..................................................................................21, 24

*Mahroom v. Best Western Int'l, Inc.*,
    No. C 07-2351 JF, 2009 WL 248262 (N.D. Cal. Feb. 2, 2009)..............................................21

*Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ....................................................................................23, 24

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
    16 F.3d 1032 (9th Cir. 1994) ...........................................................................................30

*U.S. v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) .....................................................................16, 20

*Pearl Brewing Co. v. Miller Brewing Co.*,
    Civ. No. SA-93-CA-205, 1993 WL 424236 (W.D. Tex. Mar. 31, 1993)..............................16

*Reilly v. MediaNews Group, Inc.*,
    No. C 06-04336, 2006 WL 2419100 (N.D. Cal. July 28, 2006)..............................21, 23, 24

*Town of Norwood v. New England Power Co.*,
    202 F.3d 408 (1st Cir. 2000)............................................................................................16

*United States v. E.I. du Pont de Nemours & Co.*,
    366 U.S. 316 (1961)..........................................................................................................23

*Western Airlines, Inc. v. Int'l Bhd. of Teamsters*,
    480 U.S. 1301 (1987)..................................................................................................25, 27

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. ---, 129 S. Ct. 365 (2008)........................................................................12, 27, 29

**Statutes & Rules**

15 U.S.C. § 18.................................................................................................................13

15 U.S.C. § 26.................................................................................................................29

Fed. R. Civ. P. 65(c) .......................................................................................................29

**Other Authorities**

*Airline Mergers: Issues Raised by the Proposed Merger of United and Continental Airlines*
    *Before the S. Comm. on Commerce, Science, and Transportation*, 111th Cong. 19 (2010)
    (Statement for the Record by Susan Fleming, Director, Physical Infrastructure Issues,
    Government Accountability Office), *available at*
    http://www.gao.gov/new.items/d10778t.pdf.........................................................26

Dep't of Justice, "Statement of the Dep't of Justice's Antitrust Division on its Decision to
    Close its Investigation of the Merger of Delta Air Lines Inc. and Northwest Airlines
    Corporation" (Oct. 29, 2008) ...............................................................................27

Ken Heyer, Carl Shapiro, and Jeffrey Wilder, *The Year in Review: Economics at the Antitrust
    Division, 2008-2009*..............................................................................................27

Horizontal Merger Guidelines, *available at*
    http://www.justice.gov/atr/public/guidelines/hmg-2010.html ........................................ *passim*

Wright, Miller & Kaye, 11A Fed. Prac. & Proc. Civ. § 2948.2 (2d ed.)......................................24

1    Defendants UAL Corporation, United Air Lines, Inc. ("United") and Continental

2    Airlines, Inc. ("Continental") submit this memorandum of law in opposition to plaintiffs' motion for

3    a preliminary injunction.

### Preliminary Statement

5    On May 3, 2010, United and Continental announced plans to merge and create a

6    world class global network that will provide enormous benefits to the flying public, the employees of

7    both companies and their shareholders.  On August 9, 2010, plaintiffs moved for a preliminary

8    injunction seeking to block the merger.  To prevail on that motion under Sections 7 and 16 of the

9    Clayton Act, plaintiffs must, *inter alia*, make a strong showing that the merger might substantially

10   lessen competition and demonstrate that they will be irreparably harmed by the merger.  They can do

11   neither.

12   *First*, not only can plaintiffs not make a strong showing that the merger might

13   substantially lessen competition, the record in fact overwhelmingly establishes just the opposite—

14   *i.e.*, that the merger will be pro-competitive.  On the most basic level, the networks of United and

15   Continental are largely complementary rather than overlapping.  For example, United and

16   Continental have no overlapping hubs and, out of 889 nonstop city pair routes that they fly, only

17   fifteen (or 1.7 percent) overlap.  United and Continental have less overlap (and have more

18   complementarity) than any two other airlines with extensive route networks (referred to generally as

19   "network carriers").

20   There is no dispute (indeed, plaintiffs' proposed expert Darren Bush concedes) that

21   the combination of United's and Continental's highly complementary networks will result in more

22   than one thousand new online connections (*i.e.*, routes that previously required a switch in airlines

23   but, after the merger, can be flown in their entirety on the new United), more than one hundred

24   destinations that will be completely new to United or Continental passengers (of which ninety-three

25   are small communities), more than two dozen new routes that will be made possible by the merger

26   and more than a billion dollars a year in annual steady state revenue synergies and cost savings (not

27   a penny of which is premised in any way upon fare increases or capacity reductions).  In addition,

28

the merger will lead to improvements in the quality of service without an increase in fare levels (and hence an actual reduction in what economists refer to as "quality adjusted fares") and elimination of what are called "double mark ups" (*i.e.*, a mark up by each of the airlines providing a link on a route that, after the merger, will be served by the new United)—which will provide substantial additional incentive and competitive ability to reduce fares.  The new United will be a more financially stable airline—better able to withstand economic shocks (such as extreme increases in fuel prices), better positioned to provide stable jobs and benefits for its combined 80,000 plus employees and better able to maintain high quality service.

The merger is not premised in the slightest upon projected fare increases or capacity reductions.  (*See infra* at 8-9.)  There is not an iota of evidence that suggests otherwise.  In fact, plaintiffs' proposed expert has acknowledged that he has no reason to believe that, after the merger, the new United could implement and maintain a price increase and he has no evidence that, post merger, the new United intends to reduce capacity.  Nor is there any reason to believe that, after the merger, there will be any change in the extremely vigorous competition that has characterized the airline industry since deregulation (which occurred in 1978) and has led—even during a period of major airline consolidation—to significantly lower airfares and increased capacity.  (*See infra* at 8-11.)  Indeed, plaintiffs' proposed expert has agreed that airfares have declined significantly even since the recent Delta/Northwest merger.

That indisputable decline in airfares has coincided with the extraordinary growth of low cost carriers ("LCCs").  For example, as conceded by plaintiffs' proposed expert:  (a) both now and following the merger, Southwest (*i.e.*, an LCC) will have the largest share of passengers; (b) post merger, the new United will have a lower share of passengers than the merged Delta; (c) more than eighty-five percent of United's and Continental's customers flying nonstop routes have the option to use an LCC on those routes; and (d) every one of United's and Continental's hubs already has significant LCC presence.  Plaintiffs' proposed expert has acknowledged that there is no reason to believe that a single LCC will exit a route or a hub as a result of the merger.  (*See infra* at 8, 17-18, 24.)

1    In light of the above, plaintiffs cannot come close to meeting their burden of strongly

2    establishing a substantial lessening of competition.  As plaintiffs' proposed expert has conceded, the

3    Antitrust Division of the Department of Justice (the "DOJ") is tasked with reviewing airline

4    mergers—and, he has agreed, the DOJ staff lawyers and economists assigned to this transaction are

5    skilled at what they do.  United and Continental have been working actively with the DOJ in their

6    investigation and have together produced to the DOJ more than five million of pages of documents

7    and nearly a terabyte of data, made several economic presentations and met with DOJ staff on

8    numerous occasions.  If the DOJ clears the merger, plaintiffs would be entitled to an injunction only

9    if they could convince the Court that the DOJ, in essence, failed in its job.  Put another way,

10   plaintiffs would have to persuade the Court that they are right and the DOJ (despite its expertise)

11   was wrong when it undertook the same competitive analysis and concluded that the merger would

12   *not* result in a substantial lessening of competition.  That is something that plaintiffs will never be

13   able to do.

14   *Second*, plaintiffs are not entitled to a preliminary injunction because they cannot

15   prove that the merger will cause them irreparable harm.  Plaintiffs are forty-nine individuals.  They

16   do not purport to represent anyone but themselves.  They are not bringing a class action on behalf of

17   all domestic passengers.  Their claim (unsupported as it is by any facts or any analysis from their

18   proposed expert) is that the merger is likely to result in their paying higher fares.  Even if credited,

19   this is the sort of classic claim remediable at law through money damages.  Indeed, it is the very

20   claim that these same plaintiffs, represented by the same lawyers, have brought—and had remedied

21   by a financial payment—in the past.  In the identical Section 7 case that they filed challenging the

22   Delta/Northwest merger, plaintiffs settled on the eve of the hearing for a payment of money (and

23   without an injunction).  Money was sufficient for these plaintiffs in that case—just as it would be if

24   they were to prevail here.

25   Moreover, the fact of the matter is that, even in the unlikely event that they did

26   prevail, plaintiffs could establish only the most marginal economic harm.  Their travel records

27   demonstrate that, in the past three years, not a single one of them has flown United or Continental on

28

DEFENDANTS' JOINT MEM. OF LAW IN                                        CASE NO.: 3:10-CV-02858  RS
OPP'N TO PRELIM. INJUNCTION MOT.

-3-

1   any of the thirteen nonstop overlapping routes identified by plaintiffs' proposed expert.  In the past

2   five years, only one plaintiff has flown United or Continental on any of the overlapping routes—and

3   that was a single overlapping route from San Francisco to New York five years ago, which

4   represents 0.000018 percent of all passenger traffic on the thirteen overlapping routes identified by

5   plaintiffs' proposed expert.

6           Given the almost nonexistent impact on plaintiffs detailed above, the balance of

7   hardships tips strongly in favor of denying injunctive relief.  These forty-nine plaintiffs—who rarely,

8   if ever, fly the routes in question, who at best could establish the most marginal economic harm and

9   who, in any event, would be fully protected by an award of money damages even without an

10  injunction—are asking this Court to enjoin a transaction that will provide substantial benefits to tens

11  of millions of airline travelers, tens of thousands of airline employees and millions of airline

12  shareholders.  Merely to state the proposition is to demonstrate its absurdity.  United and Continental

13  have spent substantial time preparing for implementation of the merger.  Delaying its consummation

14  would cost them more than a billion dollars per year in lost synergies.  (*See infra* at 25-26.)  In

15  addition, far from serving the public interest, an injunction would deprive the traveling public of the

16  very significant benefits of the merged carrier's global route structure and improved service, put

17  defendants' current route structure at risk, imperil their financial stability, thereby threatening job

18  security in the face of future oil price and financial shocks, and limit their ability to compete against

19  the mega foreign carriers that are the largest in the global airline industry today.

20          Finally, even if plaintiffs could demonstrate that the merger would cause injury to

21  them (a dubious proposition based upon the current record) or injury to competition (and they

22  cannot), any such impact would be fully correctable through divestiture.  Divestiture is a post-merger

23  remedy that would allow the Court to consider the *actual* anticompetitive effect (if any) of the

24  merger and address it in a direct and targeted way by compelling the merged entity to sell specific

25  assets in the particular affected markets.  That is a common remedy in such cases—and is especially

26  well suited to airline mergers because the industry is generally characterized by vibrant competition

27  among many carriers capable of entering new routes profitably and efficiently.

28

1    For all the above reasons, as discussed more fully below, plaintiffs' motion for a

2    preliminary injunction should be denied.

3    **Background**

4    Rationale for and Benefits of the Merger

5    The CEOs of both United and Continental have testified that the merger is essential to

6    insure their airlines' long-term success in an increasingly competitive domestic and global aviation

7    industry.  (Affidavit of Glenn Tilton, dated Aug. 24, 2010 ("Tilton Aff.") ¶ 3; Affidavit of Jeffrey

8    Smisek, dated Aug. 24, 2010 ("Smisek Aff.") ¶ 4.)  Both CEOs have testified that the merger will

9    provide for a more financially stable company better able to withstand economic shocks (such as the

10   9/11 terrorist attacks, surges in the price of fuel and recessionary economies).  (Tilton Aff. ¶¶ 11, 12;

11   Smisek Aff. ¶ 5.)  A more financially stable company will also be better able to provide secure

12   employment for its more than 80,000 employees, maintain and expand its networks (including its

13   service to underserved small communities) and generate economic returns that will foster capital

14   reinvestment.  (Tilton Aff. ¶¶ 3-7; Smisek Aff. ¶¶ 4, 5, 8, 24.)

15   Plaintiffs' proposed expert has conceded that the merger would allow United and

16   Continental to achieve benefits that they could not achieve on a standalone basis.  (Bush Tr. at

17   161:16-163:13.)  For instance, as a merged entity, the airlines could fully integrate and optimize their

18   airplane fleets—which means that they would be able to put the right sized planes in the right places

19   at the right times so as to meet consumer demand most efficiently.  The merger would also allow the

20   combined entity to rationalize fully its schedule—that is, to determine how frequently to schedule

21   flights on particular routes so as to meet consumer demand most efficiently.  (Expert Report of

22   Daniel Rubinfeld, dated Aug. 19, 2010 ("Rubinfeld Report") ¶¶ 33, 43; Affidavit of Kevin Knight,

23   dated Aug. 24, 2010 ("Knight Aff.") ¶¶ 14-16, 24.)  The merger would also permit fully integrated

24   pricing, the most efficient allocation of seat inventory, a single labor agreement for unionized

25   employees, elimination of corporate redundancies and integration of their purchasing organizations.

26   (Rubinfeld Report ¶¶ 29, 43; Knight Aff. ¶¶ 34-74.)

27

28

United and Continental have one of the most complementary route structures of any two network carriers in the United States today.  (Rubinfeld Report ¶¶ 21, 27.)  They do not have a single overlapping hub.  (Bush Tr. at 63:22-63:25;  Knight Aff. ¶ 17.)  Of 889 nonstop city pair routes that they fly, only fifteen overlap.  (Rubinfeld Report ¶ 103.)[1]  The combination of two such highly complementary route structures would provide enormous benefits to consumers.  Together, the merged carrier would serve 347 worldwide destinations, 148 of which are small communities or small metropolitan areas.  (Rubinfeld Report ¶ 37.)  Of those destinations, 116 would be newly available to United or Continental customers (and of those, ninety-three would be small communities).  (Knight Aff. ¶ 10; Bush Tr. at 157:20-158:6.)  The merger would create more than one thousand new online connections and, as plaintiffs' expert has conceded, would enable twenty-five entirely new routes.  (Bush Tr. at 147:24-148:14; Knight Aff. ¶¶ 12, 16.)  It would also result in increased capacity and an increased number of flights on the merged company's various routes.  (Rubinfeld Report ¶¶ 41, 44.)

Those significant enhancements would provide travelers with an extremely appealing airline.  Using "quality of service" (or "QSI") modeling accepted by the DOJ (*see* Rubinfeld Report 15 n.24; *see also id*. ¶ 51), and a QSI model employed in the ordinary course by United (*id.* ¶ 47), defendants' proposed expert Dr. Daniel Rubinfeld has estimated that the merger will yield more than $400 million in annual benefits to consumers on domestic routes and additional consumer benefits on international routes.  (*Id.* ¶ 32.)[2]  As Dr. Rubinfeld has explained, "the improvement in quality at existing fare levels is appropriately described as a reduction in 'quality adjusted fares'".  (*Id.* ¶ 32.)[3]

---

[1] Plaintiffs' proposed expert actually counts only thirteen nonstop overlaps.  (Bush Tr. at 6:11-6:13.)

[2] Dr. Rubinfeld was the lead economist at the DOJ with responsibility for, *inter alia*, analysis of competitive issues relating to airlines.  He has written numerous articles and worked extensively on economic issues in the airline industry.  (Rubinfeld Report ¶ 1 & App. A.)  In contrast, plaintiffs' proposed expert has never been qualified as an expert economist by any court, is not a professor of economics and has never run an economics course.  (Bush Tr. at 32:3-33:15.)

[3] Plaintiffs' proposed expert has reviewed Dr. Rubinfeld's report and has testified that he has no reason to disagree with the analysis and has not done any analysis of his own to disprove Dr. Rubinfeld's conclusions.  (Bush Tr. at 97:15-97:19, 148:19-149:9.)

1    Dr. Rubinfeld has also concluded that the new online connections will result in

2  elimination of what is known as "double mark ups" or "double marginalization" on connecting

3  routes—which will put further downward pressure on fares.  As Dr. Rubinfeld has stated, "it is

4  well-established in the economics literature that fare savings are realized from more integrated

5  airline service through the elimination of 'double-marginalization'".  (Rubinfeld Report ¶ 24.)

6  Double marginalization occurs because two independent carriers each price their segment of a

7  connecting route separately—each building its own margin into the price.  (*Id.*)  After the merger,

8  there will be only a single mark up—hence, double mark ups will be eliminated.  (*Id.*)  Dr. Rubinfeld

9  has concluded that elimination of double mark ups after the merger will create incentives to reduce

10  nominal fares.  (*Id.* ¶ 28.)[4]

11    The merger will also result in specific annual synergies of $1.4 billion or more.

12  (Knight Aff. ¶¶ 34-36.)  The synergies fall into two broad categories:  revenue synergies (*i.e.*,

13  increased demand and utilization driven by the quality of the combined network) and cost savings.

14  (Knight Aff. ¶ 34.)  United estimates that, by 2014, the merger will yield at least $681 million in

15  annual revenue synergies and at least $789 million in annual cost savings.  (*Id.*)  According to Dr.

16  Rubinfeld, "the cost savings estimated by the parties in this case are cognizable for assessing the

17  competitive effects of this merger".  (Rubinfeld Report ¶ 30.)  The cost savings are merger specific

18  and have been verified using ordinary course of business methods.  (*Id.*)  They were presented to the

19  boards of the two airlines in the course of their assessment of the merger.  (*Id.*)  They are not based

20  upon degradation in the quality or quantity of service.  (*Id.*)  Work to identify and quantify the

21  synergies is ongoing—and even higher synergies are possible.  (*Id.* ¶ 29; Knight Aff. ¶ 36.)[5]

22

23

24    [4] Plaintiffs' proposed expert has testified that he is familiar with the concept that airline mergers permit elimination of double marginalization and he has no reason to doubt that it would occur here. (Bush Tr. at 58:8-59:22.)

25

26    [5] In this regard, it is significant that, as plaintiffs' proposed expert has acknowledged, Delta anticipated $500 million annually in synergies from its merger with Northwest but has substantially exceeded those expectations—with $700 million in 2009 and $600 million in 2010.  (Bush Tr. at 25:23-27:17; Exs. 1007, 1008.)

27

28

DEFENDANTS' JOINT MEM. OF LAW IN          CASE NO.: 3:10-CV-02858 RS
OPP'N TO PRELIM. INJUNCTION MOT.

1    These substantial merger related benefits—*i.e.*, the improved network, the merger

2    enabled routes, the elimination of double marginalization, the $400 million reduction in quality

3    adjusted fares and the $1.4 billion in cost savings and steady state revenue synergies—could not be

4    obtained in the absence of a merger.  Plaintiffs' proposed expert has acknowledged that some of the

5    benefits will occur—and that he has done nothing to disprove any of them.  (Bush Tr. at

6    158:22-160:17, 161:25-163:14.)  Accordingly, the benefits stand unrebutted in the record.

7        The Airline Industry Is Vigorously Competitive

8        From the time of airline deregulation in 1978—and despite substantial airline

9    consolidation since then—domestic airfares have declined by more than forty percent and capacity

10   has steadily increased.  (Tilton Aff. ¶ 25; Rubinfeld Report Exs. 1, 2, 3; Ex. 1023.)  Indeed, after the

11   Delta/Northwest merger in 2009, airfares have continued to decline.  (Ex. 1006.)  There is nothing in

12   the record to suggest that this particular merger would or could reverse that trend.  Plaintiffs'

13   proposed expert has testified that he has done no work that would indicate that, as a result of the

14   merger, a single LCC would exit from a single route.  Nor has he any information that would

15   indicate that a single airline would exit the market altogether.  (*See* Bush Tr. at 94:15-95:21.)  Nor

16   has he seen any information or done any analysis that would suggest that capacity would decline or

17   fares on any route would increase as a result of the merger.  (Bush Tr. at 163:23-164:5.)  In other

18   words, there is no plausible argument that the merger would cause any negative impact upon

19   competition or consumer welfare.  That should end the Court's inquiry.

20       The record shows that the significant competitive forces that have yielded declining

21   prices and increased capacity over the past twenty years will not be impacted by the merger.  As

22   mentioned above, LCCs are strong and stable at every United and Continental hub and at each of the

23   thirteen overlapping city pair routes identified by plaintiffs' proposed expert.[6]  They have been able

24   _____

25   [6] Plaintiffs' proposed expert actually refers to thirteen "airport pairs"—not "city pairs".  (Bush
     Tr. at 104:11-104:24.)  However, the complaint itself alleges that the market should be analyzed by
26   reference to city pairs—not airport pairs.  (*See* Compl. ¶ 85.)  Moreover, plaintiffs' proposed expert
     himself has conceded that he is unaware of a single instance in which the DOJ has used "airport
27   pairs" as the relevant market in a merger analysis or court challenge and that he has not done any
     work to determine whether passengers at any of the city pairs at issue in fact find other local airports
     *not* substitutable.  (Bush Tr. at 90:19-91:7, 109:17-109:22, 117:7-119:9, 120:4-120:6.)  In short, his
28

1    to enter new markets and sustain entry much more successfully than network carriers over the last

2    ten years.  (Rubinfeld Report ¶¶ 18-19; Ex. 1016.)[7]  In 2000, LCCs accounted for only twenty-two

3    percent of air passengers in the United States; in the decade since, that number has grown to

4    thirty-eight percent, and Southwest alone now carries more domestic passengers each year—by a

5    significant margin—than any other U.S. airline.  (*See* Rubinfeld Report Ex. 4.)  United's domestic

6    passenger share has declined from approximately fifteen percent in 1998 to approximately eleven

7    percent at the end of 2009, dropping it to sixth place nationwide behind Southwest, Delta, American

8    and US Airways.  (Tilton Aff. ¶ 49; Rubinfeld Report Ex. 4.)  During that same period, Continental

9    has remained in sixth place.  (Smisek Aff. ¶ 2; Rubinfeld Report Ex. 4.)

10           The share of passengers traveling on routes where LCCs compete has increased from

11    forty-six percent at the beginning of 2000 to approximately seventy percent at the end of 2009.

12    (Rubinfeld Report ¶ 17 & Ex. 6.)  More than eighty-five percent of passengers traveling nonstop on

13    either United or Continental have at least one LCC alternative.  (Tilton Aff. ¶ 20 & Ex. 5.)

14           LCCs compete fiercely at all eight United and Continental domestic hubs.  (Rubinfeld

15    Report ¶ 66; Ex. 1024.)  For instance, Southwest competes at all the hubs and it is, today at LAX, the

16    largest carrier in terms of passenger share—and will continue to be the largest carrier even after the

17    merger.  (Exs. 1022, 1024.)  In addition, during the past ten years:  (a) Frontier has increased the

18    number of destinations that it serves from nineteen to sixty; (b) jetBlue has added more than fifty

19    destinations in New York and twelve destinations in Los Angeles; and (c) Air Tran has increased the

20    number of destinations that it serves from Washington, D.C., from one to twenty-six.  (Ex. 1022.)

21    During this same period of time, LCCs have increased their share from eighteen percent to

22    twenty-eight percent in Cleveland, from nine percent to twenty-nine percent in New York and from

23    twenty-seven percent to thirty-two percent in Chicago; and they have maintained a thirty-five

---

25    assertion that the appropriate market is airport pairs is contradicted by his own testimony, the
   complaint and the opinion of Dr. Rubinfeld.

26         [7] Plaintiffs' proposed expert has testified that he understands that LCCs have enjoyed steady and

27    continuous growth in recent years and that he has no reason to question the accuracy of Exhibit
   1016.  (Bush Tr. at 75:6-75:15.)

28

1  percent share in Houston.  (Ex. 1024.)  Since 2000, Southwest's share alone has grown from

2  eighteen percent to forty-one percent in Washington, D.C., from thirty-two percent to forty-four

3  percent in Los Angeles, from fifteen percent to forty-nine percent in Denver and from twenty-nine

4  percent to forty-nine percent in San Francisco.  (Ex. 1024.)  Significantly, even after the

5  Delta/Northwest merger, LCCs have realized a 10.2 percent growth in share of passenger departures.

6  (Ex. 1016.)

7          LCCs consider themselves competitive with network carriers (*see, e.g.*, Exs. 1042,

8  1043) and actually compete vigorously with network carriers (Rubinfeld Report ¶¶ 12, 66; Knight

9  Aff. ¶ 18; Tilton Aff. ¶¶ 19-21; Bush Tr. at 81:21-81:24).  They regularly compete for business

10 travelers (Exs. 1013, 1014, 1015; Bush Tr. at 68:25-69:3, 81:12-81:17), and they all have frequent

11 flyer programs (Ex. 1017; Bush Tr. at 78:20-78:23).

12          In this highly competitive environment, there is no plausible basis to conclude that

13 competition from LCCs would be negatively impacted by the merger.[8]  Moreover, as Dr. Rubinfeld

14 has stated, the competitive environment that would characterize the airline industry even after the

15 merger would not be conducive to coordinated behavior.  (Rubinfeld Report ¶¶ 68-81.)[9]

16          In addition to the domestic share loss that network carriers have suffered as a result of

17 competition from LCCs, they have also lost share internationally to very large foreign airlines (often

18 referred to as "mega carriers").  The merger will assist the new United in reversing that trend.

19 (Tilton Aff. ¶ 23.)  In 2000, the top two airlines worldwide (ranked by revenue) were American and

20 United; now Lufthansa and Air France/KLM have taken over the top two spots.  (*Id.*)  United, which

21 was in second place with $19.4 billion in operating revenue in 2000, has fallen to sixth after seeing

22 its revenue decline to $16.3 billion in 2009—barely more than half of Lufthansa's $31.0 billion and

23

24          [8] Notably, plaintiffs do not argue, and their proposed expert has not asserted, that competition
from network carriers would be adversely affected by the merger.

25

26          [9] Plaintiffs' proposed expert has suggested that the merger might make collusion more likely.
(Bush Report at 7.)  But he has done so without any factual support.  And he has conceded a number
of characteristics of the airline industry that Dr. Rubinfeld has testified actually make collusion

27 implausible.  (*Compare* Bush Tr. at 166:23-168:17 *with* Rubinfeld Report ¶¶ 68-81.)

28

DEFENDANTS' JOINT MEM. OF LAW IN                           CASE NO.: 3:10-CV-02858 RS
OPP'N TO PRELIM. INJUNCTION MOT.
                                    -10-

1   Air France/KLM's $29.2 billion.  (*Id.* at Ex. 8.)  The combined 2009 revenue of United and

2   Continental amounts to $28.9 billion—still in third place behind Lufthansa and Air France/KLM.

3   (*Id.*)  Well-funded newcomers such as Emirates and Jet Airways have also begun making inroads on

4   routes from the U.S. to emerging economies in the Middle East and South Asia.  (*Id.* ¶ 24.)

5   International carriers currently account for more than half of all capacity between the U.S. and

6   destinations across the Atlantic Ocean and more than two-thirds of all capacity between the U.S. and

7   Pacific destinations.  (*Id.* ¶ 23.)

8                   <u>United and Continental Would Be Significantly Harmed By an Injunction</u>

9                   As a result of increased competition from LCCs and international carriers, as well as

10   external shocks including the 9/11 terrorist attacks, reductions in demand during public health scares

11   such as SARS and H1N1, unstable fuel prices and the 2008-2009 recession, both Continental and

12   United have struggled financially, with United operating in bankruptcy from December 2002 to

13   February 2006.  (Tilton Aff. ¶¶ 26-28; Smisek Aff. ¶ 4.)  Financial instability has forced United to

14   reduce its workforce from 100,000 employees in 2000 to roughly 46,000 today.  (Tilton Aff. ¶ 11.)

15   If United were to remain a standalone entity, the company's profitability and market share would in

16   all likelihood continue to suffer from strategic gaps in its network position, which United lacks the

17   financial ability to address because of its low profitability.  (Tilton Aff. ¶ 48.)  Continental would

18   face the same problems.  (Smisek Aff. ¶ 8.)  Continuing financial instability would likely result in

19   further job losses and a weakening of employee morale for both companies.  (Tilton Aff. ¶ 52;

20   Smisek Aff. ¶ 4.)

21                   The declining profitability of network carriers has also forced them to abandon

22   marginally profitable routes connecting small communities to network hubs.  (Smisek Aff. ¶ 21.)

23   Since 2000, approximately 104 small communities in the U.S. have lost all airline service.  (Smisek

24   Aff. ¶ 22.)  That trend is likely to continue if network carriers like United and Continental cannot

25   strengthen the depth and breadth of their networks.  (Smisek Aff. ¶¶ 21-24.)

26                   In sum, an injunction would not only deprive consumers of all the benefits discussed

27   above, but it would also cause serious damage to the companies, their employees and shareholders.

28

1

**Argument**

2   **I.   THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A PRELIMINARY**

3           **INJUNCTION.**

4                A preliminary injunction is an "'extraordinary remedy never awarded as of right'".

5   *Alliance for the Wild Rockies v. Cottrell*, No. 09-35756, --- F.3d ---, 2010 WL 2926463, at *3 (9th

6   Cir. July 28, 2010) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. ---, 129 S. Ct. 365,

7   375-76 (2008)).  As the moving party, plaintiffs have the burden of proving the following four

8   factors: "'that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable

9   harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an

10  injunction is in the public interest'".  *Alliance for the Wild Rockies*, 2010 WL 2926463, at *3

11  (quoting *Winter*, 129 S. Ct. at 374).  Plaintiffs cannot demonstrate a single one of the factors—far

12  less all four.

13               Pursuant to Section 16 of the Clayton Act, private parties asserting claims under the

14  statute are entitled to an injunction only if they can satisfy the traditional requirements for such

15  relief, which include proving:

16
17              "(1) that is has suffered an irreparable injury; (2) that remedies
                available at law, such as monetary damages, are inadequate to
18              compensate for that injury; (3) that, considering the balance of
                hardships between the plaintiff and defendant, a remedy in equity is
19              warranted; and (4) that the public interest would not be disserved by a
                permanent injunction".

20
21  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Antoninetti v. Chipotle Mexican Grill,*

22  *Inc.*, No. 08-55867, 2010 WL 2891005, at *6 (9th Cir. July 6, 2010); *Ashker v. Schwarzenegger*,

23  No. 05-03286, 2010 WL 1029102, at *3 (N.D. Cal. Mar. 18, 2010).  Plaintiffs have no likelihood of

24  meeting that standard.

25               Under the Ninth Circuit's "sliding scale approach", a court may also grant an

26  injunction where the plaintiff can demonstrate both that "serious questions going to the merits were

27  raised" (rather than a "likelihood of success on the merits") and that "the balance of hardships" "tips

28

1    sharply in the plaintiff's favor". *Alliance for the Wild Rockies*, 2010 WL 2926463, at *4.  However,

2    where, as in this case, the balance of the hardships does *not* "tip[]" at all in plaintiffs' favor (let alone

3    "sharply" as the caselaw requires), merely raising a "serious question" is legally insufficient.  *See,*

4    *e.g.*, *id.*

5         **A.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits.**

6              Plaintiffs must make a "strong[] showing" of a likelihood of success on the merits.

7    *See Alliance for the Wild Rockies*, 2010 WL 2926463, at *4.  In the context of a Section 7 claim, that

8    requires a "strong showing" both (1) of the relevant product and geographic market and (2) that the

9    effect of the merger "may be substantially to lessen competition".  *See* 15 U.S.C. § 18; *see also Cal.*

10   *v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1117-18 (N.D. Cal. 2001) ("To establish a prima facie

11   case under Section 7 of the Clayton Act, a plaintiff must first define the relevant market, and then

12   establish that the proposed merger will create an appreciable danger of anticompetitive

13   consequences").  The Section 7 analysis, which follows the analysis in the Horizontal Merger

14   Guidelines (*see* Horizontal Merger Guidelines ("Merger Guidelines") § 10, *available at*

15   http://www.justice.gov/atr/public/guidelines/hmg-2010.html), further mandates that any adverse

16   impact on competition that might result from a merger be weighed against the merger's

17   procompetitive benefits.   Plaintiffs do not—and cannot—show that the merger here will

18   substantially lessen competition.

19        **1.    Plaintiffs Have Not Alleged and Do Not Support a Plausible Relevant**

20              **Market.**

21              As a threshold matter, plaintiffs have failed to assert—and they offer no evidence to

22   support—a plausible relevant market.  That is a remarkable but clearly tactical failing.  It is

23   remarkable because, had they alleged "city pairs" as the relevant market, they could have had a

24   substantial basis in the economic literature analyzing airline competition.[10]  It is most likely tactical

25

26              [10] The term "city pair" routes refers to routes that have an origin in one city and a destination in

27   another city—*e.g.*, New York to San Francisco—and includes all local airports that serve each city
     (*e.g.*, LaGuardia, JFK and Newark in New York).

28

because plaintiffs must now understand (if they did not when they drafted paragraph eighty-five of their complaint that appears to assert a relevant market of "city pairs") that, based upon the very small number of overlapping United/Continental city pairs and the competitive characteristics of each of those city pairs, they cannot show a substantial lessening of competition (indeed, as discussed below, even based upon overlapping "airport pairs", there is not a substantial lessening of competition).

Plaintiffs are actually quite schizophrenic about what the "relevant market" supposedly is.  In their complaint, they first seem to allege a "national" market.  (*See* Compl. ¶ 29.) However, the complaint later makes the contradictory allegation that competition will be reduced along various "airport pairs".  (*See id.* ¶¶ 73, 106.)  Then, in a further inconsistency, the complaint contains a paragraph alleging that competition occurs on a "city pair" level.[11]  (*See id.* ¶ 85.)  Those conclusory, unsupported and mutually inconsistent allegations are legally inadequate on their face.[12]

Plaintiffs' proposed expert has simply ignored the complaint's contradictory averments and has claimed that the relevant market is "airport pairs".  He has asserted that there are thirteen nonstop overlapping airport pair routes that "the Antitrust Division [of the DOJ] will likely examine".  (Bush Report at 7.)  However, he too has then contradicted himself by stating that airline competition can also be analyzed properly on a "city pair" basis.  (Bush Report at 7 n.10.)  And he

---

[11] Plaintiffs also allege an "international" market.  (Compl. ¶ 29.)  However, that allegation is legally insufficient because, in 2009, the United States government granted defendants antitrust immunity with respect to coordination on international fares, schedules and capacity.  (*See* Ex. 1039.)  And, in any event, plaintiffs' proposed expert has testified that he is offering no opinion on any alleged competitive impact in an "international" market.  (Bush Tr. at 154:1-154:4.)

[12] Plaintiffs' so-called "national" market is flawed for the additional reason that their "national" Herfindahl index calculations (referred to as the "HHI", which is an index used to measure concentration in a market) are defective.  For example, certain major competitors (such as LCCs) are left out (*see* Compl. ¶ 94)—even though plaintiffs' proposed expert has acknowledged that LCCs compete with network carriers, including for business travelers.  (*See, e.g.,* Bush Tr. at 68:25-69:3.) Factoring LCCs into the calculation would reduce the "national" market post-merger HHI to well below 1500 (*i.e.,* below the DOJ's proposed presumptively anticompetitive HHI) (*see* Merger Guidelines § 5.3).  (*Compare* Rubinfeld Report Ex. 29 *with* Compl. ¶ 94.)

DEFENDANTS' JOINT MEM. OF LAW IN
OPP'N TO PRELIM. INJUNCTION MOT.

CASE NO.: 3:10-CV-02858 RS

-14-

1    has conceded that he is unaware of a single Section 7 case or DOJ challenge in which airport pairs

2    were used as the relevant market.  (Bush Tr. at 114:6-114:10.)[13]

3            There is, in fact, no support for airport pairs as the relevant market.  Plaintiffs'

4    proposed expert has testified that he has neither done his own analysis nor reviewed any analysis by

5    others seeking to determine whether there is substitutability among various local airports within a

6    particular city—an analysis that would be necessary to test the assertion that airport pairs (rather

7    than city pairs) constitute a relevant market.  (Bush Tr. at 90:19-90:25, 109:17-109:22, 117:7-119:9.)

8    His airport pair relevant market is based solely upon his unsupported (and untested) belief that there

9    are some time sensitive business or leisure passengers who might, under certain circumstances, find

10   airports within a particular city not substitutable.  (Bush Tr. at 112:4-113:22.)  But he has conceded

11   that he does not know whether any of the forty-nine plaintiffs in this case is such a traveler; and he

12   has done no analysis (and is aware of none) with regard to whether business and leisure travel

13   actually do constitute separate cognizable antitrust markets for the routes at issue.  (*See* Bush Tr. at

14   7:15-7:17; 71:13-74:18.)

15           The caselaw is clear that when (as here) a plaintiff does not adequately allege and

16   support a relevant market, the plaintiff's antitrust claim fails as a matter of law.  *See, e.g.,*

17   *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978) ("Plaintiffs' contentions

18   must fail because of their failure adequately to define and to prove the relevant market, which is 'a

19   necessary predicate' for evaluating claims under [Section 7 of the Clayton Act]"); *Delco LLC v.*

20   *Giant of Maryland, LLC*, Civil No. 07-3522, 2007 WL 3307018, at *19 (D.N.J. Nov. 8, 2007) ("The

21   Court accordingly finds that [the plaintiff] has failed to define the relevant product market and

22   geographic market in this case.  Because defining the relevant market is an essential requirement in

23   order for [the plaintiff] to prevail on his remaining antitrust claims [under Section 7 of the Clayton

24   Act], the Court determines he has not demonstrated likelihood of success on the merits").

25

26   ────────────

27        [13] Significantly, plaintiffs' proposed expert does not even attempt to suggest a so-called "national" relevant market.

28   DEFENDANTS' JOINT MEM. OF LAW IN                                     CASE NO.: 3:10-CV-02858 RS
     OPP'N TO PRELIM. INJUNCTION MOT.
                                           -15-

1

      **2.**      **Plaintiffs Cannot Demonstrate a Substantial Lessening of Competition.**

2

      "The standard for showing the lessening of the competition under Section 7 of the

3

Clayton Act is based on probabilities, not possibilities". *Go-Video III v. Matsushita Elec.*, No. CIV

4

90-1864-PHX-RCB, 1990 WL 259684, at *1 (D. Ariz. Dec. 20, 1990); *see also Oracle Corp.*, 331 F.

5

Supp. 2d at 1109 ("Congress used the words '*may* be substantially to lessen competition' (emphasis

6

supplied) to indicate that its concern was with probabilities . . ." (quotation marks omitted)).

7

Plaintiffs fail to come even close to demonstrating a probability that the merger here will

8

substantially lessen competition.

9

      As mentioned above, the DOJ—with its concededly very experienced and highly

10

skilled staff (*see* Bush Tr. at 16:17-16:20, 20:15-21:8, 22:21-23:4)—is currently undertaking an

11

extensive review of the same issues that have been raised in this case.  United and Continental are

12

fully cooperating in that effort.  (Tilton Aff. ¶ 2; Smisek Aff. ¶ 3.)  In addition, the transaction has

13

been the subject of four Congressional hearings.  If the DOJ clears the merger, then plaintiffs would

14

have to make a strong showing that the federal agency with responsibility and expertise in this area

15

got it wrong.  Put another way, plaintiffs would have to demonstrate a substantial lessening of

16

competition when the DOJ, after a thorough investigation, concluded otherwise.  That is implausible.

17

Indeed, it is more than that.  An injunction in a private Section 7 challenge, in the face of DOJ

18

clearance, would be completely unprecedented.  *See, e.g.*, *Advocacy Org. For Patients and*

19

*Providers v. Mercy Health Servs.*, 987 F. Supp. 967, 974 (E.D. Mich. 1997) ("Finally, plaintiffs are

20

not likely to succeed on the merits because neither the DOJ nor the FTC have challenged the merger.

21

This is a telling sign that the merger raises no significant anticompetitive concerns"); *Pearl Brewing*

22

*Co. v. Miller Brewing Co.*, Civ. No. SA-93-CA-205, 1993 WL 424236, at *3 (W.D. Tex. Mar. 31,

23

1993) ("The proposed acquisition has been submitted to the DOJ and FTC who have elected to take

24

no action to prevent the acquisition.  The fact that these agencies, who presumably have obtained a

25

significant measure of expertise in these matters, have raised no objection to the acquisition is

26

entitled to some consideration by the Court"); *Town of Norwood v. New England Power Co.*, 202

27

F.3d 408, 423 (1st Cir. 2000) ("A different reason for doubt as to the antitrust claim is that FERC

28

DEFENDANTS' JOINT MEM. OF LAW IN               CASE NO.: 3:10-CV-02858 RS
OPP'N TO PRELIM. INJUNCTION MOT.

1   itself found, after a regulatory analysis, that the sale would not enhance market power.  . . .  FERC's

2   ultimate finding, if right, probably dooms Norwood's Clayton Act claim.  There is no indication that

3   FERC's test of competition (applying the same guidelines as the Department of Justice and Federal

4   Trade Commission) is weaker or significantly different than that of the Clayton Act" (citations

5   omitted)).[14]

6            Although, as stated above, plaintiffs have not adequately alleged, let alone supported,

7   a relevant market, for purposes of this motion only we will assume three relevant markets:  (a) a

8   national market; (b) a market defined by overlapping nonstop airport pairs; and (c) a market defined

9   by overlapping nonstop city pairs.  In none of those markets can plaintiffs make the necessary

10  showing of a substantial lessening of competition.

11                     **a.     National market.**

12           The impact of the merger on competition in a national market is *de minimis*.  The

13  competitive assessment of such a market has to include competition among and between network

14  carriers and LCCs.  (*See supra* at 8-11.)  Dr. Rubinfeld has calculated that when concentration in the

15  airline industry is measured on a national basis, considering all LCCs and network carriers, the HHI

16  is below the threshold in the Merger Guidelines that would cause the DOJ to investigate.  (*See*

17  Merger Guidelines § 5.3; Rubinfeld Report Ex. 29.)  Plaintiffs' proposed expert has testified that he

18  has no reason to question Dr. Rubinfeld's HHI calculation relating to "all carriers" in a national

19  market—and he has not himself done an HHI calculation for a national market.  (Bush Tr. at

20  150:19-150:25.)

21           Furthermore, the thirteen overlapping nonstop routes that plaintiffs' proposed expert

22  has identified constitute a mere 0.5 percent of all domestic city pair routes of all carriers.  Plaintiffs'

23  proposed expert has agreed that, based upon this almost infinitesimal percentage of overlaps, there is

24  no reason to believe that a single LCC would reduce capacity or exit any route after the merger.

25

26           [14] It is worth noting that every regulatory agency that has examined and publicly ruled on the
    merger—*i.e.*, the European Commission, Canada and Russia—has approved it.  (*See* Exs. 1038,
27  1040, 1041.)

28

1   (Bush Tr. at 99:18-101:2.)  Accordingly, plaintiffs cannot make a showing (let alone a "strong

2   showing") of a substantial lessening of competition in the so-called "national" market.

### b.   Airport pairs.

4              Based upon airport pairs, there would not be a substantial lessening of competition as

5   a result of the merger.  Together, United and Continental fly 925 nonstop routes on an airport pair

6   basis.  (Knight Aff. ¶ 5.)  Plaintiffs have identified only thirteen such pairs (or 1.4 percent of the

7   total) as those which the "Antitrust Division [of the DOJ] will likely examine" and which their

8   proposed expert has asserted would be highly concentrated following the merger.  (Bush Report at 3,

9   7.)  Moreover, there are 387 million passengers who fly domestic nonstop and connecting routes

10  annually.  (Rubinfeld Report Ex. 34.)  In contrast, there are only 4.6 million passengers who fly the

11  thirteen airport pair routes identified by plaintiffs' proposed expert—which constitutes 1.18 percent

12  of the total.  (Rebuttal Report of Daniel Rubinfeld, to be submitted Aug. 25, 2010, Ex. 1.)

13             The record affirmatively demonstrates that there could not be a substantial lessening

14  of competition in this market.  The evidence reveals vigorous and ample competition on each of the

15  thirteen airport pair routes.  Although plaintiffs' proposed expert has asserted that the routes will be

16  highly concentrated, he has failed to present any calculations to support his claim.  And, although he

17  has testified that two of the routes would be "merging to monopoly" (Bush Tr. at 108:12-108:15,

18  115:18-115:19), the record demonstrates that, when analyzed properly on a city pair basis, there

19  would continue to be vigorous competition on each and every one of the routes (*see* Rubinfeld

20  Report Ex. 34).

21             In addition, plaintiffs' proposed expert has conceded that he has done no analysis and

22  is aware of no facts that would indicate that a merged United would increase prices (or could sustain

23  price increases) or would reduce capacity.  (Bush Tr. at 164:6-164:11, 191:6-191:9.)  Those

24  concessions dispositively establish that, on an airport pair basis, plaintiffs cannot make a showing

25  (let along a "strong showing") of a substantial lessening of competition.

26

27

28

1

c.      City pairs.

2          United and Continental provide nonstop service on 889 domestic city pair routes.

3   There is overlapping United/Continental service on only fifteen (or 1.7 percent) of those routes.

4   (Rubinfeld Report Ex. 34.)

5          The record demonstrates that, post merger, there will be substantial competition on

6   each of the fifteen city pair routes.  Considering connecting competition, eleven of the routes will

7   have five or more competitors, nine will have six or more competitors and six will have seven or

8   more competitors.  No route will have fewer than three competitors.  (Ex. 1019.)  Considering only

9   nonstop competition, there will be at least one such competitor on each route after the merger—and

10  often three, four or five nonstop competitors.  (*See* Rubinfeld Report Ex. 34.)  On eight of the routes,

11  at least one LCC provides nonstop service and has a significant passenger share.  (*Id.*)  There are just

12  four city pairs currently served by United and Continental in which there is only one other existing

13  competitor—and, in every case, that airline is an LCC that competes vigorously on price.[15]  (*Id.* ¶ 93

14  and Ex. 30.)  As Dr. Rubinfeld has stated, "Even on these non-stop overlaps, sufficient competition

15  will remain post-merger that the danger of anticompetitive effects from the merger is very low".

16  (Rubinfeld Report ¶ 103.)

17         Finally, not a single individual plaintiff in this case would face a substantial lessening

18  of competition on the city pair routes.  For twenty-two plaintiffs, neither United nor Continental

19  serves their home airports "to a substantial degree".  (*Id.* ¶ 98.)  Only seven of the plaintiffs have

20  flown any of the fifteen overlapping routes and only one plaintiff has flown an overlapping route

21  more than once (*i.e.*, San Francisco-New York).  (*Id.* ¶ 106.)  After the merger, there will be four

22  other nonstop competitors (including two price "disciplining" LCCs) on the New York-San

23  Francisco route.  (*Id.*)  Assessing the entirety of plaintiffs' traveled city pairs since 2005, only 2.6

24

25

26         [15] The four city pair routes are Washington-Houston, Los Angeles-Houston and
    Denver-Houston (all served by Southwest) and Denver-Cleveland (served by Frontier).  Each city
27  pair is also served on a connecting basis by at least three other airlines.  (Rubinfeld Report ¶ 121.)

28  DEFENDANTS' JOINT MEM. OF LAW IN                              CASE NO.: 3:10-CV-02858 RS
    OPP'N TO PRELIM. INJUNCTION MOT.
                                          -19-

1   percent of the routes that they have flown (*i.e.*, seven out of 267) were overlapping routes.  (*Id.*)

2   That is *de minimis* at best.[16]

3          Adverse competitive effects are measured by an ability to increase price or reduce

4   output.  (Merger Guidelines § 1.)  As discussed earlier, plaintiffs have conceded that they cannot

5   demonstrate such an ability here.  For all the above reasons, plaintiffs cannot make a strong showing

6   of a substantial lessening of competition in any relevant market.  Hence, their motion should be

7   denied.

8          **3.      The Merger's Significant Benefits Far Outweigh Any (Speculative)**

9                 **Adverse Competitive Effect.**

10          According to both caselaw and the Merger Guidelines, the consumer benefits (or

11  "efficiencies") of a merger must be weighed against any adverse competitive effect.  *See FTC v.*

12  *Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999) ("the district court should nonetheless

13  have considered evidence of enhanced efficiency in the context of the competitive effects of the

14  merger"); *U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1110 (N.D. Cal. 2004) ("Arguments related to

15  efficiencies resulting from the merger may also be relevant in opposing plaintiffs' case"); *see also*

16  Merger Guidelines § 10 ("a primary benefit of mergers to the economy is their potential to generate

17  significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which

18  may result in lower prices, improved quality, enhanced service, or new products"; "Cognizable

19  efficiencies are merger-specific efficiencies that have been verified and do not arise from

20  anticompetitive reductions in output or service").

21          The United/Continental merger would create enormous benefits for the companies,

22  their employees, consumers (both nationally and globally) and shareholders.  (Tilton Aff. ¶¶ 4-11;

23  Smisek Aff. ¶¶ 6-16.)  Those benefits, as described above, include:  more than one thousand new

---

[16] These facts thoroughly undermine plaintiffs' ability to establish that they will fly on any of
the challenged routes in the next year.  (*See* Rubinfeld Report ¶¶ 106-09.)  Without such a showing,
plaintiffs cannot demonstrate a probability that they will suffer future harm in the absence of an
injunction.  *See Am. Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1054-55 (9th Cir.
1999) (courts must consider "the speculative measure of the harm" in assessing the viability of an
antitrust claim).

DEFENDANTS' JOINT MEM. OF LAW IN                    CASE NO.: 3:10-CV-02858  RS
OPP'N TO PRELIM. INJUNCTION MOT.

1   online connections; 116 new destinations system wide (of which ninety-three will serve small

2   communities); twenty-five entirely new merger enabled routes; enhanced flight frequencies and

3   scheduling convenience; a combined frequent flyer program; elimination of double marginalization;

4   a reduction of $400 million in quality adjusted fares; and more than $1 billion in annual steady state

5   revenue synergies and cost savings.  (Rubinfeld Report ¶¶ 32, 46; Tilton Aff. ¶ 5, 7, 32, 36; Smisek

6   Aff. ¶¶ 13-14; Knight Aff. ¶¶ 14, 16, 34-37.)  (*See supra* at 5-8.)

7             Plaintiffs have failed to present any challenge to those benefits.  They far outweigh

8   the speculative and marginal adverse competitive effect that plaintiffs argue would result from the

9   merger.

10            **B.      Plaintiffs Cannot Demonstrate Irreparable Harm.**

11            The *sine qua non* of injunctive relief (preliminary or permanent) is a showing that the

12   conduct at issue, if not enjoined, would cause irreparable harm to the party requesting the injunction.

13   "To establish irreparable harm [plaintiffs] must demonstrate that, but for the grant of equitable relief,

14   there is a substantial likelihood that [they] will suffer an injury for which a monetary award cannot

15   be adequate compensation."  *Mahroom v. Best Western Int'l, Inc.*, No. C 07-2351 JF, 2009 WL

16   248262, at *3 (N.D. Cal. Feb. 2, 2009) (quotation marks and citations omitted).  Plaintiffs cannot

17   make that showing here.

18            It is axiomatic that harm compensable by money damages is not irreparable.  *See Los*

19   *Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1989)

20   ("It is well established, however, that such monetary injury is not normally considered irreparable");

21   *see also American Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1411 (9th Cir. 1995) ("financial losses"

22   of a "week's worth of revenue" "fall[] far short of qualifying as irreparable injury" because "[i]njury

23   of a strictly monetary nature generally is not cognizable as a basis for issuing an injunction"); *Reilly*

24   *v. MediaNews Group, Inc.*, No. C 06-04336, 2006 WL 2419100, at *5 (N.D. Cal. July 28, 2006) ("It

25   is well established . . . that injury that is solely financial and that is compensable by monetary

26   damages cannot constitute irreparable injury"; denying an injunction where the plaintiff failed to

27

28

DEFENDANTS' JOINT MEM. OF LAW IN
OPP'N TO PRELIM. INJUNCTION MOT.

CASE NO.: 3:10-CV-02858  RS

1    demonstrate, *inter alia*, irreparable harm).  Because plaintiffs' alleged injury, if proven, would be

2    fully compensable by money damages, they cannot establish irreparable harm.

3                   As a threshold matter, the Court need look no further than the virtually identical

4    challenge to the Delta/Northwest merger in 2008 by many of the same plaintiffs as in this case.  (*See*

5    Ex. 1046.)  Proceeding under precisely the same theory, represented by the same lawyers, plaintiffs

6    initially sought to enjoin the merger.  (*Id.*)  However, on October 27, 2008 (on the eve of trial),

7    plaintiffs entered into a settlement pursuant to which they agreed to dismiss their lawsuit with

8    prejudice in exchange for payment of $███████.  (Exs. 1044A, 1044B.)  In other words, in the

9    same circumstances, the same plaintiffs believed that money *could* compensate them for their

10   alleged injury.  If that was true then, it is also true now.

11                  Indeed, plaintiffs' complaint itself demonstrates that their claimed injury is fully

12   compensable by money damages.  The complaint alleges that the "probable and planned

13   anticompetitive effects" of the proposed merger "are *increases in prices and fares*".  (Compl. ¶ 3

14   (emphasis added).)  Of course, given the history of price declines after consolidation in the airline

15   industry and the downward pricing pressures discussed above, there is no reason to believe that this

16   particular merger would have an effect that other airline mergers during the past twenty years did not

17   have.  The speculative (and conclusory) allegation that the United/Continental merger will somehow

18   be different cannot support a claim for any type of relief, injunctive or otherwise.  *See, e.g.*,

19   *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007) ("The prospective harm to

20   competition must not, however, be speculative" in a Section 7 action); *Ginsberg v. InBev SA/NV*, No.

21   4:08CV01375, 2008 WL 4965859, at *5 (E.D. Mo. Nov. 18, 2008) (denying a preliminary

22   injunction; "bare allegations of what is likely to occur are insufficient to establish irreparable

23   injury"; "[a]ny speculation as to potential increases in beer prices is 'too remote' to warrant

24   injunctive relief") (internal quotation marks omitted).  Especially is that true where (as here)

25   plaintiffs' proposed expert has conceded that he has no evidence that the merger would lead to fare

26   increases or capacity reductions on any route.  (*Cf.* Bush Tr. at 23:18-23:20, 101:11-101:20.)

27

28

1

But even if the Court were to credit plaintiffs' speculation that the merger will result

2 in higher prices, that would be precisely the type of alleged harm that could be remedied by

3 monetary relief.  Although the complaint variously alleges that the merger would cause "diminished

4 service", "lower capacity", "dominance at [] airports" and generic "harm to consumers", each of

5 those purported categories of injury reduces to allegedly higher ticket prices.  (*See* Compl. ¶ 63 ("If

6 the merger is consummated, it will result in lower capacity; that is, fewer seats in the sky, which, in

7 turn, will result in *higher ticket fares* for consumers" (emphasis added)); *see also id.* ¶ 74 ("The new

8 combined company's dominance at the airports listed in paragraph 21 [*sic*] is substantially likely to

9 result in *higher fare prices* for flights to or from those airports") (emphasis added), ¶ 97 ("The

10 defendants' proposed merger will cause harm to consumers, including the plaintiffs, by generating

11 *higher airfares* . . ." (emphasis added).)  Higher prices are classically remedied through money

12 damages.  *See, e.g.*, *Reilly*, 2006 WL 2419100, at *5.

13

Finally, assuming that the alleged harm might go beyond an increase in ticket prices,

14 any such impact could be fully remedied after the merger closes through divestiture of some or all of

15 the routes served by the combined entity.  *See California v. Am. Stores Co.*, 495 U.S. 271, 281

16 (1990) ("Divestiture has been called the most important of antitrust remedies.  It is simple, relatively

17 easy to administer, and sure.  It should always be in the forefront of a court's mind when a violation

18 of § 7 [of the Clayton Act] has been found" (quoting *United States v. E.I. du Pont de Nemours &*

19 *Co.,* 366 U.S. 316, 329-331 (1961) (footnotes omitted))); *Midwestern Mach. Co., Inc. v. Northwest*

20 *Airlines, Inc.*, 392 F.3d 265, 278 (8th Cir. 2004) ("[D]ivestiture of acquired stock or assets" is the

21 "usual" remedy for a violation of Section 7 of the Clayton Act).  Waiting until after the merger has

22 closed to determine what (if anything) needs to be divested makes eminent good sense.  It would

23 allow the parties and the Court to consider what action (if any) the DOJ has taken and to focus with

24 particularity on whether any alleged anticompetitive effect has actually materialized—and, if so, to

25 address it in a direct and targeted way rather than through the blunderbus of blocking the deal in its

26 entirety.

27

28

1    Such a targeted approach would clearly be preferable, given that the merger has such

2  obvious benefits and the plaintiffs can offer only the speculation that it might also have some

3  undesirable impact.  *See Midwestern Mach. Co., Inc.*, 392 F.3d at 278 (divestiture, even four years

4  after closing, could remedy any purported anticompetitive effect of an airline merger, and the delay

5  would allow the "parties to assess whether the new merged firm is actually enhancing efficiency or

6  lessening competition").  In other words, because "divestiture of the [assets] at issue remains an

7  option", the "threatened injury to plaintiff . . . is not immediate or permanent enough to constitute

8  true irreparable injury".  *Reilly*, 2006 WL 2419100, at *6-7.

9    **C.    Plaintiffs Cannot Demonstrate Antitrust Injury**.

10    There is another dispositively adverse impact upon plaintiffs' case that flows from

11  their concession that they have no evidence:  (a) that prices will increase (or that any price increase

12  would be sustainable) after the merger; (b) that capacity will be reduced; or (c) that any airline will

13  exit any market or any route as a result of the merger.  (*See supra* at 8, 17-18, 24.)  Those (conceded)

14  facts destroy plaintiffs' ability to prove antitrust injury (*i.e.*, actual or likely injury to competition)—

15  which is an essential element of any Section 7 claim.  *See Cargill, Inc. v. Monfort of Colo.*, 479 U.S.

16  104, 113 (1986) (to secure injunctive relief under Section 7 of the Clayton Act, a plaintiff must

17  establish "antitrust injury"—*i.e.*, injury "of the type the antitrust laws were intended to prevent and

18  that flows from that which makes defendants' acts unlawful"); *see also Los Angeles Mem'l Coliseum

19  Comm'n*, 634 F.2d at 1201 (quotation marks omitted) (plaintiffs "must demonstrate a significant

20  threat of injury from an impending violation of the antitrust laws").  For this additional reason,

21  plaintiffs' Section 7 claim lacks merit and their motion for injunctive relief should be denied.

22    **D.    Plaintiffs Cannot Demonstrate That the Balance of Hardships Favors an

23       Injunction.**

24    The movant for a preliminary injunction must demonstrate a "balance of hardships

25  favoring that party".  *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1203; *see also, e.g.*, Wright,

26  Miller & Kaye, 11A Fed. Prac. & Proc. Civ. § 2948.2 (2d ed.) (the court balances "the severity of the

27  impact on defendant should the temporary injunction be granted and the hardship that would occur

28

1   to plaintiff if the injunction should be denied").  On the sliding scale standard outlined in *Alliance*, if

2   the balance of hardships tips strongly against plaintiffs—as it does here—the Court would be well

3   within its discretion to deny injunctive relief.

4          This is a case brought by a group of forty-nine individuals.  It is not a class action.

5   The forty-nine plaintiffs represent 0.00008 percent of airline passengers nationwide and 0.0005

6   percent of all United/Continental passengers.  None of them regularly flies on either airline.  (*See*

7   Rubinfeld Report Ex. 33.)  In the past year, none has flown on any of the thirteen nonstop

8   overlapping routes identified by plaintiffs' proposed expert.  And only one has flown United or

9   Continental on any of the nonstop overlapping routes in the past five years—and that was a single

10  time five years ago.  (Rubinfeld Report ¶ 106 & Ex. 33.)  There is no evidence to support the

11  inference that any of these plaintiffs intends to fly a single one of the thirteen nonstop overlapping

12  routes in the next year—or even in the next three years.  In other words, at best, plaintiffs have

13  asserted a claim for speculative (and minor) economic injury.

14         Against that claim, the Court should weigh the damage that issuing an injunction

15  would cause to defendants.  As then-Justice O'Connor, sitting as Circuit Justice, observed in

16  reversing the Ninth Circuit's stay of an airline merger, "[t]he cost of enjoining this huge undertaking

17  only hours before its long awaited consummation is simply staggering in its magnitude, in the

18  number of lives touched and dollars lost.  To assume that enjoining the merger would do no more

19  than preserve the 'status quo,' in the face of this upheaval, would be to blink at reality."  *Western

20  Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1309 (1987).  For the same reasons,

21  enjoining the merger in this case would cause far greater injury to defendants than the marginal and

22  speculative economic harm that it would ostensibly prevent.

23         The merger's substantial benefits have already been discussed.  They include, as an

24  initial matter, $1.47 billion in annual synergies.  (*See* Knight Aff. ¶ 34.)[17]  Losing those synergies—

25  and, for each day that the merger is enjoined, the combined company could be deprived of more than

26

27         [17] *See also* Knight Aff. ¶¶ 39-73 (individualized breakdown of synergies).

28  DEFENDANTS' JOINT MEM. OF LAW IN                              CASE NO.: 3:10-CV-02858  RS
    OPP'N TO PRELIM. INJUNCTION MOT.

1   $3 million (*i.e.*, net synergies divided by 365) in merger-enabled synergies—would cause serious

2   (and perhaps irreparable) harm to defendants.  *Cf. FTC v. Tenet Health Care Corp.*, 186 F.3d 1045,

3   1054 (8th Cir. 1999) (reversing the district court's preliminary injunction pursuant to Section 7 of

4   the Clayton Act on the ground that, *inter alia*, "the district court should nonetheless have considered

5   evidence of enhanced efficiency in the context of the competitiveness of the merger").

6         But the harm to defendants from an injunction would not be limited just to lost

7   synergies.  Both companies' profitability and market share have trended downward and likely will

8   continue to do so if the merger is enjoined.  (Tilton Aff.¶ 48; Smisek Aff. ¶¶ 18-20.)  Without the

9   merger, the companies would remain highly vulnerable to the types of unforeseen external shocks

10  that have depressed passenger traffic in the past (*e.g.*, the 9/11 terrorist attacks, SARS and H1N1, the

11  2010 Icelandic volcanic eruption) and unexpected economic changes such as spikes in the price of

12  oil and global recession.  (*See* Tilton Aff. ¶ 53; Smisek Aff. ¶ 5.)

13        Furthermore, as standalone entities, United and Continental are likely to continue to

14  lose ground to international carriers.  (*See* Tilton Aff. ¶ 50; Smisek Aff. ¶ 20.)  According to a report

15  by the Government Accountability Office related to the merger, "Many industry experts believe that

16  the United States will need larger, more economically stable airlines to be able to compete with the

17  merging and larger foreign airlines that are emerging in the global economy".  (*Airline Mergers:*

18  *Issues Raised by the Proposed Merger of United and Continental Airlines Before the S. Comm. on*

19  *Commerce, Science, and Transportation*, 111th Cong. 19 (2010) (Statement for the Record by Susan

20  Fleming, Director, Physical Infrastructure Issues, Government Accountability Office), *available at*

21  http://www.gao.gov/new.items/d10778t.pdf.)

22        Enjoining the merger would also threaten job security for tens of thousands of United

23  and Continental employees.  Consolidated carriers promise more stability to employees and to the

24  communities that benefit from the combined strength of their respective balance sheets.  (Tilton Aff.

25  ¶¶ 51-52; Smisek Aff. ¶¶ 21, 22, 25.)  The merger will counteract the work force reductions that both

26  United and Continental have suffered in the past ten years—*i.e.*, a reduction from 100,000

27

28

1    employees to 46,000 for United and from 54,300 to 41,300 for Continental.  (*See* Tilton Aff.

2    ¶¶ 11, 52; Smisek Aff. ¶¶ 4, 25.)

3               For all these reasons, the injunction that plaintiffs seek would cause far greater harm

4    to defendants than the limited, speculative and monetarily compensable harm it would allegedly

5    cause these forty-nine plaintiffs.  To conclude otherwise "would be to blink at reality".  *Western*

6    *Airlines*, 480 U.S. at 1309.

7    **E.      Plaintiffs Cannot Demonstrate That An Injunction Would Serve The Public**

8    **Interest.**

9               Courts "should pay particular regard to the public consequences in employing the

10   extraordinary remedy of an injunction".  *Winter*, 120 S. Ct. at 376-77 (quotation marks omitted).  An

11   injunction here would deprive tens of millions of travelers of the significant benefits that will flow

12   from the merger.  *Cf. FTC v. Butterworth Health Corp.*, 121 F.3d 708, 1997 WL 420543, at *3 (6th

13   Cir. July 8, 1997) (unpublished) ("a direct examination of consumer welfare is an appropriate form

14   of § 7 analysis").

15              The DOJ's comments on the Delta/Northwest merger, which generated benefits

16   similar to (but not as extensive as) those anticipated in this case, are instructive.  When the DOJ

17   approved that transaction, it observed that "[c]onsumers are [] likely to benefit from improved

18   service made possible by combining under single ownership the complementary aspects of the

19   airlines' networks".  (Dep't of Justice, "Statement of the Dep't of Justice's Antitrust Division on its

20   Decision to Close its Investigation of the Merger of Delta Air Lines Inc. and Northwest Airlines

21   Corporation" at 1 (Oct. 29, 2008).)  And after the merger's approval, DOJ economists stated that "if

22   only a fraction of the efficiencies claimed by the parties from combining their large, and largely

23   complementary, networks were found likely to be generated by the merger, these would easily

24   exceed any potential for harm from the deal".  (Ken Heyer, Carl Shapiro, and Jeffrey Wilder, *The*

25   *Year in Review: Economics at the Antitrust Division, 2008-2009*, 35 Rev. Indus. Org. 349, 355

26   (2009), *available at* http://www.springerlink.com/content/100336/.)

27

28
     DEFENDANTS' JOINT MEM. OF LAW IN                          CASE NO.: 3:10-CV-02858 RS
     OPP'N TO PRELIM. INJUNCTION MOT.

1    The United/Continental merger presents an even stronger case of public benefit.  As

2 discussed above, the networks of United and Continental are more complementary than the

3 pre-merger networks of Delta and Northwest—and therefore carry a lower risk of competitive injury

4 and provide greater promise of network improvements.  For nonstop routes, the merger will create

5 new travel options; for connecting routes, the merger will increase scheduling convenience by four

6 percent.  (Rubinfeld Report ¶¶ 34, 35.)

7    Creating a broad network with online access to all destinations served by United and

8 Continental will enable the carriers to reduce prices by eliminating the inefficiencies of interline

9 service.[18]  Combining operations can reduce ticket prices on interline connecting routes by

10 eliminating "double marginalization".  (Rubinfeld Report ¶ 24; *see also* Bush Tr. at 58:2-58:24.)

11    The merger will also benefit small communities, many of which have lost major

12 airline service over the past decade and face further service reductions in the future.  (*See* Smisek

13 Aff. ¶¶ 21-24; Tilton Aff. ¶¶43-47.)  The merged airline will have a combined reach covering at least

14 148 small communities and metro areas and connecting those communities to major centers through

15 a broad integrated network.  (Knight Aff. ¶ 10.)

16    Finally, the merger will generate environmental benefits, including a reduction in the

17 combined carrier's carbon footprint.  The carriers will be able to optimize their combined fleet—

18 reassigning aircraft to ensure that larger, less energy-efficient aircraft are used only on routes with

19 sufficient demand to justify the additional capacity and using smaller aircraft on routes with lower

20 demand.  The greater efficiency realized through fleet optimization will not only save at least $174

21 million per year in reduced operating expenses (*see* Knight Aff. ¶ 54), but it will also cut fuel usage

22 and reduce unnecessary pollution caused by using aircraft that are too large or inefficient for

23 particular routes.  In addition, through the purchase of new aircraft and retirement of older less

24

25    [18] "Interline service" refers to connecting service that builds an itinerary from legs operated by
different carriers.  For example, a passenger flying from Beckley, WV (served by United but not

26 Continental) can currently create an itinerary to Waco, TX (served by Continental but not United)
only by "interlining" between carriers.  After the merger, the same passenger could fly seamlessly

27 from Beckley to Waco on a single carrier.

28

DEFENDANTS' JOINT MEM. OF LAW IN
OPP'N TO PRELIM. INJUNCTION MOT.

CASE NO.: 3:10-CV-02858 RS

-28-

1   efficient models, the combined entity will be able to create one of the youngest and most modern and

2   fuel-efficient fleets in the world.  (*See* Knight Aff. ¶ 25.)

3           At bottom, blocking the merger would harm not just United and Continental; it would

4   also deprive the public of the substantial benefits that the merger will generate.  Those adverse

5   "public consequences" undermine "the extraordinary remedy of an injunction" that plaintiffs seek.

6   *Winter*, 120 S. Ct. at 376-77.

7       **F.      Plaintiffs Cannot Demonstrate a Likelihood of Success Under Section 16 of the**

8           **Clayton Act.**

9           For all the reasons discussed above, plaintiffs have no chance of demonstrating that,

10   as private parties, they are likely to secure an injunction under Section 16 of the Clayton Act.  They

11   cannot show irreparable injury or that monetary damages would be inadequate or that the balance of

12   hardships tips in their favor or that the public interest would be served by equitable relief.  *See eBay*,

13   547 U.S. at 397.  Since plaintiffs cannot establish a likelihood of success on any of those essential

14   elements—let alone all four—they are not entitled to a preliminary injunction.

15   **II.    IF THE COURT GRANTS INJUNCTIVE RELIEF, IT SHOULD REQUIRE**

16       **PLAINTIFFS TO POST A  BOND.**

17           If the Court grants the "extraordinary relief" of a preliminary injunction (and it should

18   not for the reasons discussed above), it should require plaintiffs to post a bond.  Fed. R. Civ. P. 65(c)

19   provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in

20   an amount that the court considers proper to pay the costs and damages sustained by any party found

21   to have been wrongfully enjoined or restrained".  Similarly, the Clayton Act requires that a

22   preliminary injunction be accompanied by "the execution of proper bond against damages for an

23   injunction improvidently granted".  15 U.S.C. § 26.  That safeguard is especially critical because a

24   wrongfully enjoined defendant may have no recourse to recover damages from the plaintiff in the

25   absence of a bond.  *See, e.g., Buddy Sys., Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1167 (9th Cir.

26   1976) ("It is a well-settled rule that there can be no recovery for damages sustained by a wrongful

27   issuance of a preliminary injunction in the absence of a bond").  Courts have generally set bonds at

28

DEFENDANTS' JOINT MEM. OF LAW IN                                    CASE NO.: 3:10-CV-02858  RS
OPP'N TO PRELIM. INJUNCTION MOT.

1  an amount sufficient to cover the defendants' actual damages if it is later determined that the

2  injunction should not have issued.  *See Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d

3  1032, 1038 (9th Cir. 1994) (affirming a bond in favor of the defendant where "every dollar the court

4  awarded to [the defendant] compensated it for the injury it had suffered because of the injunction").

5        Here, the damage that defendants would suffer if the merger were improvidently

6  enjoined could easily exceed $1 billion annually—or more than $3 million per day—in lost steady

7  state revenue synergies and cost savings.  (Knight Aff. ¶ 34; Tilton Aff. ¶ 54; Smisek Aff. ¶ 25.)

8  Accordingly, any bond should equal at least $3 million multiplied by the number of days until a trial

9  on the merits is held.

10  **Conclusion**

11        For the foregoing reasons, the Court should deny plaintiffs' motion for a preliminary

12  injunction.

13

14  Dated:  August 24, 2010            By:              _/s/_
                                             Katherine B. Forrest

15                             Katherine B. Forrest (NY Bar No. 2381457)

16                             Max R. Shulman (NY Bar No. 1473982)
                           Stuart W. Gold (NY Bar No. 1639434)

17                             CRAVATH, SWAINE & MOORE LLP
                           Worldwide Plaza

18                             825 Eighth Avenue
                           New York, NY 10019

19                             Telephone:  (212) 474-1000

20                             Facsimile:  (212) 474-3700
                           Email:  kforrest@cravath.com

21                                               mshulman@cravath.com

22                                               sgold@cravath.com

23                             Admitted *Pro Hac Vice*

24                             Attorneys for Defendants UAL Corporation and United
                           Air Lines, Inc.

25

26

27

28

DEFENDANTS' JOINT MEM. OF LAW IN                CASE NO.: 3:10-CV-02858 RS
OPP'N TO PRELIM. INJUNCTION MOT.

-30-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul L. Yde (D.C. Bar No. 449751)
Timothy J. Coleman (D.C. Bar No. 436415)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
701 Pennsylvania Ave., NW. Suite 600
Washington, DC 20004
Telephone:  (202) 777-4500
Facsimile:  (202) 777-4555
Email:  paul.yde@freshfields.com
        tim.coleman@freshfields.com
Admitted *Pro Hac Vice*

Attorneys for Defendant Continental Airlines, Inc.

Patrick D. Robbins (CA Bar No. 152288)
SHEARMAN & STERLING LLP
525 Market Street, Suite 1500
San Francisco, CA 94105-2723
Telephone:  (415) 616-1100
Facsimile:  (415) 616-1199
Email:  probbins@shearman.com

Attorneys for Defendants UAL Corporation, United Air Lines, Inc. and Continental Airlines, Inc.

DEFENDANTS' JOINT MEM. OF LAW IN
OPP'N TO PRELIM. INJUNCTION MOT.

CASE NO.: 3:10-CV-02858 RS

-31-