1  Joseph M. Alioto (SBN 42680)
   Theresa D. Moore (SBN 99978)
2  Joseph M. Alioto, Jr. (SBN 215544)
   Thomas P. Pier (SBN 235740)
3  Angelina Alioto-Grace (SBN 206899)
   ALIOTO LAW FIRM
4  555 California Street, Suite 3160
   San Francisco, CA 94104
5  Telephone: (415) 434-8900
   Facsimile: (415) 434-9200
6  Email: jmalioto@aliotolaw.com

7  Attorneys for Plaintiffs
   [ADDITIONAL COUNSEL LISTED ON LAST PAGE]

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN FRANCISCO DIVISION**

11

| | |
|---|---|
| Michael C. Malaney, Katherine R. Arcell, Keith Dean Bradt, José M. Brito, Jan Marie Brown, Robert D. Conway, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Ted Friedli, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Jay Glikman, Donna M. Johnson, Valarie Ann Jolly, Gail S. Kosach, Rozann Kunstle, Steve Kunstle, John Lovell, Len Marazzo, Lee McCarthy, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Sharon Holmes Reed, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Sherry Lynne Stewart, Wayne Taleff, Gary Talewsky, Annette M. Tippitts, Diane Lynn Ultican, J. Michael Walker, Pamela S. Ward, David P. Wendell, Christine O. Whalen, and Suraj Zutshi,  Plaintiffs,  v.  UAL CORPORATION, UNITED AIRLINES, INC., and CONTINENTAL AIRLINES, INC.  Defendants. | **CASE NO.: CV-10-02858 (RS)**  Date: August 31, 2010 Time: 9:00 a.m. Judge: Hon. Richard Seeborg  **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................ii

STATEMENT OF ISSUE ....................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

I.     INTRODUCTION ...........................................................................1

II.    FACTUAL BACKGROUND ...............................................................1

1.    The Relevant Markets and the Negative Effects of Defendants'
Proposed Merger on the Relevant Markets ....................................3

III.    ARGUMENT ...............................................................................14

1.    The Standard of Review ..............................................................14

2.    At the Very Least, There Are Serious Questions Going to the
Merits of Plaintiffs' Substantive Claim ........................................16

a.    The Merger is Likely to Substantially Lessen
Competition in the Geographic and Product Markets .......18

i.    The Merger is Likely to Lessen Competition in
the Domestic and US-International Geographic
Markets ...............................................................19

ii.    The Merger is Likely to Lessen Competition in
the Airline Industry ...............................................20

b.    At the Very Least, the Balance of Irreparable Harm and
the Balance of the Equities Both Tip Sharply toward
Plaintiffs .............................................................27

c.    The Public Interest will be Served by a Preliminary
Injunction ............................................................28

IV.    CONCLUSION ............................................................................29

1

2

**TABLE OF AUTHORITIES**

3

**Page(s)**

4

CASES

5

*Alliance for the Wild Rockies v. Cottrell,*
  2010 U.S. App. LEXIS 15537 (9th Cir. July 28, 2010).................................. 1, 15

6

*AlliedSignal, Inc. v. B.F. Goodrich Co.,*
  183 F.3d 568 (7th Cir. 1999)...........................................................14, 29

7

8

*American Society of Mechanical Engineers v. Hydrolevel Corp.,*
  456 U.S. 556 (1982).................................................................... 20

9

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009)......................................................14, 28

10

11

*Asseo v. Pan Am. Grain Co.,*
  805 F.2d 23 (1st Cir. 1986) ........................................................... 16

12

13

*Bon-Ton Stores, Inc. v. May Department Stores Co.,*
  881 F.Supp. 860 (W.D.N.Y. 1994) ................................................... 17

14

*Brantley v. Maxwell-Jolly,*
  656 F.Supp.2d 1161 (N.D. Cal. 2009) ................................................ 14

15

16

*Brown Shoe Co. v. U.S.,*
  370 U.S. 294 (1962)...........................................................17, 20, 21, 25

17

*California v. Sutter Home System,*
  130 F.Supp.2d 1109 (N.D. Cal. 2001) ..............................................16, 26

18

19

*Chicago Bridge & Iron Co., N.V. v. F.T.C.,*
  534 F.3d 410 (5th Cir. 2008).......................................................... 26

20

21

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,*
  600 F.Supp. 1326 (E.D. Mich. 1985) ............................................27, 28, 29

22

*De Beers Consol. Mines v. U.S.,*
  325 U.S. 212 (1945).................................................................. 14

23

24

*F.T.C. v. H.J. Heinz Co.,*
  246 F.3d 708 (D.C. Cir. 2001) ........................................................ 26

25

26

*Flynt Distrib. Co. v. Harvey,*
  734 F.2d 1389 (9th Cir. 1984)........................................................ 15

27

28

*FTC v. Procter & Gamble Co.*,
   386 U.S. 568 (1967)................................................................................17, 28

*General Motors Corp. v. Harry Brown's, LLC*,
   563 F.3d 312 (8th Cir. 2009)................................................................ 27

*Heideman v. South Salt Lake City*,
   348 F.3d 1182 (10th Cir. 2003)............................................................ 16

*Hospital Corp. of America v. Federal Trade Comm'n*,
   807 F.2d 1381 (7th Cir. 1986)..........................................................24, 25

*Independent Living Center of Southern California, Inc. v. Jolly*,
   572 F.3d 644 (9th Cir. 2009)................................................................ 28

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. Cal. 2009)......................................................15, 28

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3rd Cir. 2004)................................................................ 16

*Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*,
   636 F.Supp. 1513 (S.D. Ind. 1986)........................................................ 27

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
   51 F.3d 982 (11th Cir. 1995)................................................................ 16

*Perma Life Mufflers, Inc. v. International Parts Corp.*,
   392 U.S. 134 (1968)..........................................................................20, 29

*Piper v. Chris-Craft Industries, Inc.*,
   430 U.S. 1 (1977) ................................................................................ 27

*Sierra Club, Lone Star Chapter v. FDIC*,
   992 F.2d 545 (5th Cir. 1993)................................................................ 16

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989).............................................................. 20

*Ty, Inc. v. GMA Accessories, Inc.*,
   132 F.3d 1167 (7th Cir. 1997).............................................................. 16

*U.S. v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974)............................................................................ 18

*U.S. v. Philadelphia Nat'l Bank*,
   374 U.S. 321 (1963)......................................................................passim

*United States v. Aluminum Co. of America*,
   377 U.S. 271 (1964)......................................................................22, 23, 25

iii

*United States v. Continental Can Co.*,
    378 U.S. 441 (1964)..................................................................................... 23

*United States v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957)..................................................................................17, 20

*United States v. Falstaff Brewing Corp.*,
    410 U.S. 526 (1973)..................................................................................... 25

*United States v. Pabst Brewing Co.*,
    384 U.S. 546 (1966)...................................................................... 17, 20, 24, 25

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972)..................................................................................... 29

*United States v. Von's Grocery Co.*,
    384 U.S. 270 (1966)...................................................................... 17, 23, 24, 25

*University of Texas v. Comenisch*,
    451 U.S. 390 (1981)..................................................................................... 15

*Winter v. Natural Res. Def. Council*,
    --- U.S. ---, 129 S. Ct. 365 (2008) ..........................................................15, 27

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)..................................................................................... 20

**STATUTES**

15 U.S.C. § 26 ............................................................................................... 27

**STATEMENT OF ISSUE**

Whether the Court should issue a preliminary injunction, pursuant to the "serious questions" test endorsed by *Alliance for the Wild Rockies v. Cottrell*, 2010 U.S. App. LEXIS 15537 (9th Cir. July 28, 2010), preliminarily enjoining the merger between defendants United Airlines, Inc. ("United") and Continental Airlines ("Continental") during the pendency of this action until such time as trial on the merits of plaintiffs' claim may be had.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

United and Continental seek to merge to create the world's largest airline. Their merger will reduce the number of mainline network airlines in the country to just four and will effectively force two of those four, American Airlines and US Airways, subsequently to merge to have any hope of competing with defendants' behemoth airline and the current world leader, Delta Airlines. The result of the merger will be monopolies at every level of the airline industry: in the network carrier market for commercial or business travelers; on direct and connecting flights; at defendants' combined eight hub cities; and at the airport level. The consumer will bear the brunt. There will be less capacity, more concentration, diminished quantity and quality of service, and higher prices. Accordingly, on the basis of bedrock Supreme Court antitrust law, plaintiffs move for a preliminary injunction against the merger until trial on the merits of their Section 7 claim may be had.

**II. FACTUAL BACKGROUND**

Plaintiffs in this action are persons who have purchased airline tickets from one or both of United and Continental, and each plaintiff expects to continue to purchase tickets from one or both of defendants or their merged airline in the future. (Compl. ¶ 6.)[1]

Defendant United is engaged in the business of transporting passengers and cargo and has approximately 43,700 employees. (*Id.* ¶ 9.) It is the world's fourth largest airline and the third

---

[1] In conjunction with the hearing, plaintiffs will submit declarations confirming these allegations of the Complaint.

largest domestic carrier, logging more than 108 billion revenue passenger miles ("RPMs"[2]) in 2008. (*Id.* ¶ 9.) United operates domestic hubs in Los Angeles, San Francisco, Denver, Chicago, and Washington, DC. (*Id.* ¶ 12.) It serves European, Latin American, and African cities and operates a foreign hub in Tokyo to serve its Asia-Pacific route system. (*Id.* ¶¶ 13-16.) United is a founding member of Star Alliance®, a global airline alliance with defendant Continental and twenty-four other airlines that flies a combined 19,700 daily flights to 1,077 airports in 175 countries. (*Id.* ¶¶ 17-18.) In addition, United has agreements with eight domestic feeder/regional carriers and is a member of United Express®, along with seven other airlines. (*Id.* ¶¶ 19-20.)

Defendant UAL Corporation ("UAL") is the holding company that owns and operates United. (*Id.* ¶ 8.) Glenn Tilton is the chairman, president, and CEO of UAL. If the merger is consummated, Tilton will serve as non-executive chairman of the new airline's Board of Directors. (*Id.* ¶ 42.)

Defendant Continental is the world's fifth largest airline and the fourth largest domestic carrier, with more than 80 billion RPMs in 2008. (*Id.* ¶ 22.) It has more than 40,000 full-time employees. (*Id.* ¶ 28.) Like United, Continental is in the business of transporting passengers and cargo worldwide. (*Id.* ¶ 27.) Continental operates hubs in Houston, Cleveland, Newark, and Guam. (*Id.* ¶ 25.) Together with its subsidiaries and divisions, Continental has more than 2,700 daily departures through the Americas, Europe, and Asia, serving 132 domestic and 137 international destinations. (*Id.* ¶ 23.) Continental, along with United, is a member of Star Alliance®, which membership extends Continental's service to an additional 750 destinations. (*Id.* ¶ 24.) Continental, with its partners and alliances, carries about 63 million passengers each year. (*Id.* ¶ 26.) Jeffrey Smisek, Continental's chairman, president, and CEO, will be CEO of the new merged airline. (*Id.* ¶ 41.)

On May 3, 2010, defendants announced that they had agreed to combine in an all stock transaction, valued at more than $8 billion, combining United and Continental to create the world's largest airline, flying under the United name. (*Id.* ¶ 1.) Leading up to the announcement

---

[2] RPMs are the commonly accepted measure of airline sizes in the industry. One RPM equals one passenger flown one mile. (Compl. ¶ 10.)

of the merger, Mr. Smisek and Mr. Tilton met on more than one occasion in secret, private

meetings.  (*Id.* ¶¶ 44-45.)  They also exchanged e-mails and held telephone calls.  (Shulman

Dec.[3] Ex. A, B, C.)  They discussed the purposes and effects of the proposed merger, including

airfares; the frequency of flights; the elimination or curtailment of the use of hubs; the

curtailment of capacity;  charging passengers for services previously provided free of charge;

potential fare increases in monopoly and duopoly submarkets after the merger; and the possible

combination of American Airlines and US Airways.  (Compl. ¶¶ 46-56.)

## 1.  The Relevant Markets and the Negative Effects of Defendants' Proposed Merger on the Relevant Markets.[4]

The relevant product and geographic markets at issue in this litigation are the

transportation of airline passengers in the United States and the transportation of airline

passengers to and from the United States on international flights  (*id.* ¶ 29), as well as a third

market or submarket established by the evidence, the network carrier market for business

travelers.  Jeffrey Smisek, CEO of Continental and CEO-designate for the new merged United,

testified that defendants also specifically compete in a network carrier market for business

travelers, in which low cost carriers do not compete:



(Smisek

Dep. [29:16]-[29:20].)[5]                                                          (*Id.*, [36:10]-

[36:11].)  As Mr. Smisek testified:

---

[3] Citations to "Shulman Dec. __" refer to the Declaration of Daniel R. Shulman and the
applicable exhibit(s) thereto.

[4]  Much of the following discussion on the anticompetitive effects of defendants' proposed
merger comes from the report of plaintiffs' expert economist, Professor Darren Bush of the
University of Houston Law School, and the deposition testimony of Continental's President
and CEO, Jeffrey Smisek, who confirms the conclusions in Professor Bush's report,
particularly with regard to the network carrier market for business travelers and the merger's
likely effects in that market.  Citations to "Bush Rpt. __" are provided as appropriate.

[5] Citations to "Smisek Dep." refer to the deposition of Jeffrey Smisek and the applicable page
and line numbers therein.  Cited excerpts from Smisek Dep. are found at Shulman Dec. Ex. D.



(*Id.*, [33:2]-[33:9].)

(*Id.*, [43:25]-[44:16].)

(*Id.*, [45:4]-[46:5].)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

(*Id.*, [60:13]-[60-24].)

(*Id.*, [96:18]-[97:8].)

The network airlines, which include Delta, United, Continental, American, and USAir, offer business travelers features that the low cost airlines do not, including principally a much broader network with many more destinations (*id.*, [53:4]-[53:5]                                    ; (*id.*, [53:20]-[53:21]), with first and business class options; higher                    (*id.*, [54:6]); and frequent flyer programs allowing for free upgrades after the attainment of mileage goals.

The evidence is also clear that, in the network carrier market for business travelers, the defendants' proposed merger is likely to result in a substantial lessening of competition. United is the third largest domestic carrier, and Continental the fourth. Their merger will create the first or second largest carrier, depending on the standard of measurement employed. While this alone is significant, what is even more telling is the testimony of Mr. Smisek that he sought a merger with United out of concern that United would merge with US Airways, the sixth and smallest of the domestic network carriers, an event that Mr. Smisek believed would threaten the very existence of Continental:

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*



(*Id.*, [28:4]-[30:6].)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15 (*Id.*, [35:16]-[37:17].)

16          Obviously, if a merger of the third and sixth largest network carriers would threaten the

17 long-term viability of the fourth largest, Continental, then a merger of the third and fourth would

18 pose an even greater threat to the survival of the second and sixth, American and US Airways.

19 By his own testimony, Mr. Smisek implicitly admits that the defendants' merger is likely to have

20 a substantial anticompetitive effect on defendants' smaller network rivals.

21          The merger is also likely to result in a substantial lessening of competition from the low

22 cost carriers, inasmuch as the merged company's increased profits from the network carrier

23 business traveler market will allow it to subsidize its competition against low cost carriers for

24 leisure travelers, as Mr. Smisek readily admits.

25

26

27

28

1

2

3

4

(*Id.*, [217:10]-[217:23].)

5   In addition to a lessening of actual competition from defendants' merger, there will also

6 be a lessening of potential competition.  Each major domestic passenger airline, including United

7 and Continental, has the ability and the financial capacity to offer competitive flights between

8 any two major cities in the United States, without regard to whether the airline is currently

9 offering such flights.  Similarly, United, Continental, and the other major domestic airlines, have

10 the ability and  financial capacity to establish a competitive presence in any of the major airports

11 located in the United States by, *inter alia*, leasing or otherwise utilizing terminal slots, hiring

12 employees, and directing more flights to and from any given airport.  (Compl. ¶¶ 101-102.)  All

13 major airlines, including defendants, also have the managerial and industry expertise to offer

14 flights to and from any major city in the country.  (*Id.* ¶ 103.)  As Mr. Smisek  testified,

15 (Smisek Dep. [306:4]-

16 [306:5]; emphasis added.)

17   That a potential competitor may "enter into almost any route in the United States" "very

18 eas[ily], constrains competition.  As Mr. Smisek testified,

19

20 (*Id.* [306:25]-[307:10].)  Mr. Smisek also agreed that

21 and that

22 (*Id.* [307:11]-[307:24]; Shulman Dec. Ex. O.)  In

23 fact, Mr. Smisek admits that

24 (Smisek

25 Dep. [308:17]-[308:23].)

26   Once merged, United and Continental will have more than 203 billion RPMs per year,

27 which will comprise 21 percent of all domestic capacity, trumping the current domestic leader,

28 Delta Air Lines, Inc. ("Delta"), which has a 20 percent market share, or 189 billion RPMs, in

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

2009.  (*Id.* ¶ 58.)  The new combined airline will surpass Delta as the largest domestic airline for flights across the Atlantic ocean and will control 53 percent of all traffic on Pacific routes.  (*Id.* ¶¶ 59, 61.)  After the merger, the United States will be left with just three international airlines; namely, the new United, plus Delta and American Airlines.  US Airways will trail a distant fourth, with a market share less than one-third of that held by American.  (*Id.* ¶ 62.)

Defendants' merger is also likely to reduce airline capacity.  J.P. Morgan estimates that, if United and Continental combine, the new airline will reduce its capacity by 8 percent.  (*Id.* ¶ 64.)  Lower capacity means fewer seats in the sky, which, for consumers, means higher ticket fares.  (*Id.* ¶ 63.)  The General Accounting Office ("GAO") has also found that defendants' proposed merger will reduce capacity:

> [G]AO's analysis of 2009 ticket data showed that combining these airlines would result in a loss of one effective competitor (defined as having at least 5 percent of total traffic between airports) in 1,135 markets (called airport pairs) affecting almost 35 million passengers while creating a new effective competitor in 173 airport pairs affecting almost 9.5 million passengers.

(Shulman Dec. Ex. E.)

The capacity reduction that will likely occur on defendants' merger will take place in an environment where the network carriers, including United and Continental, are already reducing their capacity.  As United's CFO, Kathryn Mikells, recently stated publicly, "[c]apacity constraints have been one of the cornerstones fueling our performance, and we've remained committed to it."  (*Id.* Exs. F, L.)  To the extent that defendants may assert that the level and uncertainty of jet fuel prices dictate their alleged need to cut capacity, that argument is refuted by facts showing that low cost carriers and carriers outside the United States are not similarly ratcheting back capacity.  (*Id.* Exs. F-K.)

If defendants merge, competition between them will also be reduced or eliminated on the non-stop routes that both currently serve.  Because most airline passengers prefer non-stop service, the loss of a competitor on a non-stop route is more significant than with connecting flights.  (Compl. ¶ 82; Shulman Dec. Ex. E, p. 17)  Non-stop service is particularly important to

1   business travelers and other time-sensitive passengers that do not view connecting flights as

2   viable options.  (Bush Rpt. 5-7.)

3        United and Continental currently have non-stop flights on thirteen airport pair routes in

4   the some of the nation's largest markets; namely, 1. Los Angeles-Houston; 2. Los Angeles-

5   Honolulu; 3. San Francisco-Newark/New York City; 4. San Francisco-Houston; 5. Dulles

6   (Washington, D.C.)-Cleveland; 6. Dulles-Newark/New York City; 7. Dulles-Houston; 8. Chicago

7   O'Hare-Cleveland; 9. O'Hare-Newark/New York City; 10. O'Hare-Houston; 11. Denver-

8   Cleveland; 12. Denver-Newark/New York City; and 13. Denver-Houston.  (*Id.* 7.)  There are

9   currently **no** other competing airlines for seven of these overlapping non-stop routes (generally

10   between a United hub and a Continental hub).  (Compl. ¶ 83; Shulman Dec. Ex. E, p. 17.)

11        After merger, competition between United and Continental will also be reduced or

12   eliminated on the hundreds of domestic connecting routes on which they now compete, and will

13   eliminate the potential competition opportunities between the defendants.  (Compl. ¶ 92; Bush

14   Rpt. 9.)  The new United will have incentive to eliminate frequencies on certain routes because it

15   will have fewer competitors that can offer viable connections.  (*Id.* 8.)  Only certain connections

16   make sense to passengers, depending on geography.  The more circuitous the route, the more

17   expensive the ticket and the less likely the option will be chosen by passengers who do not fly

18   direct.  For example, if United and Continental merge, travelers making connections between

19   points east of Colorado in the Midwest and the East Coast may have only the defendants' hubs or

20   Delta/Northwest hubs as reasonable connections options.  After defendants' merger, hard on the

21   heels of the Delta/Northwest merger, passengers in the Midwest may likely face increasingly

22   limited choices for connecting flights from the Midwest to the East Coast.  Specifically, their

23   choices may be limited to the hubs of the new combined United and the combined

24   Delta/Northwest hubs, which are found at O'Hare, Cleveland, Cincinnati, Minneapolis/St. Paul,

25   Memphis, and Detroit.  (*Id.*)

26        Defendants' merger will take place in and further concentrate an already highly

27   concentrated market, characterized by multiple mergers since 1982.  (Compl. ¶ 90.; *Id.* Ex. A.)

28   The most recent merger in 2006 between Delta and Northwest Airlines resulted in Delta's

becoming the world's largest airline, a title that Delta will pass to United if defendant's merger is consummated. (Compl. ¶ 66.) Northwest itself was the product of a merger between Northwest and Republic Airlines in 1986. (*Id.* ¶ 69.) United and Continental are no strangers to mergers since both are products themselves of mergers and acquisitions.

The new combined airline will operate in an even more highly concentrated market. The Herfindahl-Hirschman Index ("HHI") for the United States airline industry will increase from 2251 to 2790 for the network carriers. When the network carriers are considered with Southwest Airlines, the HHI will increase from 1912 to 2343. (*Id.* ¶ 94.) Defendants' merger will result in increased market concentration at the city level, including in their eight combined hubs and in four of the 100 largest U.S. cities; namely, Washington, D.C., San Diego, Seattle, and New Orleans. (*Id.* ¶¶ 71-72.)

In addition, the merger will also cause undue increases in market concentration at seventeen domestic airports. The most egregious increases will occur at Houston International (new United will control 64% of the market and have monopoly on routes to Dulles); Newark (United will have a 55% market share on domestic routes, a 65% share on international travel, and a monopoly on routes to Newark); San Francisco (United will have 40% of the market and a monopoly on service to Houston and Newark); and at Chicago O'Hare (United will control 35% of the market). Los Angeles International, New Orleans, Cleveland Hopkins (including monopolies on service to Denver and Dulles); Denver; San Diego; Orange County; Honolulu; Ontario, California; Las Vegas; Tampa; Sacramento; Yampa Valley, Colorado; and Vail will also suffer increased concentration if defendants merge. At the end of the day, the merger will create ten monopolies, 20 duopolies, and 530 oligopolies at airports. (*Id.* ¶¶ 73, 76-81.)

Defendants' merger is likely to lead to even more mergers that will further concentrate the market. Follow-on mergers occur because the competitors of the merging parties perceive that there is some potential advantage to merger and consolidation. (Bush Rpt. 12.) As shown, Mr. Smisek testified that he viewed a potential merger between United and US Airways as harmful to Continental:

1

2

3

4

5

6



7

(Smisek Dep. [29:2]-[29:14].)

8

9

10

11

12

13

14



(*Id.* [97:23]-[98:10].)

15

16      If defendants merge, American, which, prior to the Delta-Northwest merger, was the

17  largest domestic airline, will likely combine with another carrier, such as US Airways, in an

18  effort to compete with the new behemoth United.  In fact, Glenn Tilton, United's CEO, stated

19  publicly that only three airlines will be flying in the future.  (Shulman Dec. Ex. M.)  The CEOs of

20  American and US Airways also have publicly stated their approval of capacity reductions and

21  their desire to concentrate the airline industry further  (Compl. ¶ 98; Bush Rpt. 21 n. 45.)  Once

22  an industry is concentrated, as the airline industry already is, follow-on mergers raise serious

23  issues, including further reduction in nonstop and connecting service, the effects of which are

24  discussed above.  (*Id.* 12.)  The obvious result will be increased fares.  (Compl. ¶ 98.)

25      With increased concentration also comes more opportunity for collusion, particularly in

26  the non-stop airport pairs where the airlines remaining after defendants' merger can readily

27  collude to raise fares.  (Bush Rpt. 7.)  The potential for increased collusion following defendants'

28  merger is significant, as evidenced by their previous collusion to fix prices for fares, surcharges,

and cargo prices, and to fix other terms and conditions of transportation and travel.  (Compl. ¶ 95.)  In fact, the airline industry has a history of collusion, the most recent example of which is Northwest Airlines' guilty plea to a felony charge of price-fixing for cargo, for which it agreed to pay a $38 million fine.  (*See, e.g.*, http://www.reuters.com/article/idUSTRE66T47D20100730, last visited August 13, 2010.)

Defendants' merger will add to the already significant barriers to entry in the relevant market, which has a history of a lack of successful new entry.  In fact, the market has been characterized by exit, rather than entry, of airlines.  (Compl. ¶ 96.)  The American Antitrust Institute's comments about the effects on entry by the Delta/Northwest merger are even more applicable to defendants' proposed merger since, of course, the instant merger follows and exacerbates the barriers to entry created by the Delta/Northwest merger:

> Empirical evidence supports the notion that LCCs [low cost carriers] could be expected to serve as a competitive restraint only on high-density routes.  LCC entry into smaller markets served more efficiently by hub-and-spoke networks of the network carriers like Delta and Northwest would undermine the cost-effectiveness of their existing point-to-point networks.  Delta/Northwest are thus unlikely to face a competitive threat from LCCs on more thinly-traveled routes.  And on high-density routes, **the proposed merger creates the most egregious increases in concentration**, making entry on a viable scale by LCCs that do not currently operate in those markets even less probable (and less attractive).  Moreover, there is a compelling argument that because airlines face each other in several markets, the fear of retaliation in one market diminishes the incentive to compete vigorously in another.

(Bush Rpt. 13; emphasis added.)

Here, entry will only become more difficult after defendants' merger, particularly in  the new United's ten hubs, where the start-up costs of entry for gates, ground operations, and ticketing facilities are prohibitive.  (*Id.* 13-14.)  Even if a low cost carrier attempts to enter a market monopolized by the new United, United is likely to match the low cost carrier's fares, add capacity in the market, or take other action to eliminate the low cost carrier's ability to compete.  (*Id.* 13-14, 17.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

In the end, it is the consumers who will be harmed by defendants' merger. Consumers, including the plaintiffs in this case, will pay higher fare prices and will experience a reduced number of flights or the elimination of flights on particular routes. In other words, consumers will pay more for less. (Compl. ¶ 97.) The GAO's report on defendants' proposed merger agrees:

> Capacity reductions in certain markets after a merger could also serve to generate additional revenue through increased fare on some routes. Some studies of airline mergers and acquisitions during the 1980s showed that prices were higher on some routes from the airline's hubs soon after the combination was completed. Several studies have also shown that increased airline dominance at an airport results in increased fare premiums, in part because of competitive barriers to entry.

(Shulman Dec. Ex. E, p. 8.)

The likely negative effects on competition in the airline industry that will be brought about by defendants' merger – at the network level, on non-stop and connecting flights, on domestic and international routes, and at the airport level – all will be borne by the consumers, including plaintiffs in this action. For all of these reasons, plaintiffs now move the Court for a preliminary injunction enjoining defendants' merger.

## III. ARGUMENT

### 1. The Standard of Review.

The decision to grant a preliminary injunction is "a matter of the district court's discretion." *Brantley v. Maxwell-Jolly,* 656 F.Supp.2d 1161, 1169 (N.D. Cal. 2009), citing *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945). "The purpose of a preliminary injunction is to minimize the hardships to the parties pending the ultimate resolution of the lawsuit." *AlliedSignal, Inc. v. B.F. Goodrich Co*., 183 F.3d 568, 573 (7th Cir. 1999) (granting preliminary injunction to enjoin merger pending trial on Section 7 claims) (quotation and citations omitted).

To succeed on a motion for preliminary injunction, the moving party must satisfy the following well-known standard:

> [T]hat he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Winter v. Natural Res. Def. Council*, --- U.S. ---, 129 S. Ct. 365, 374 (2008) (citations omitted).

At the same time, because, as noted by Justice Ginsburg in her dissent in *Winter*, "flexibility is the hallmark of equity jurisdiction," the Ninth Circuit Court of Appeals continues to recognize a "sliding scale" approach to preliminary injunctions. *Alliance for the Wild Rockies v. Cottrell*, 2010 U.S. App. LEXIS 15537, * 10-11 (9th Cir. July 28, 2010), quoting *Winter,* 129 S. Ct. at 391 (Ginsburg, J., dissenting). The Court of Appeals for this Circuit has held that the sliding scale approach, also known as the "serious questions test," remains viable after *Winter*:

> [T]he "serious questions" approach survives *Winter* when applied as part of the four-element *Winter* test. In other words, serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met.

*Alliance for the Wild Rockies*, 2010 U.S. App. LEXIS 15537, at * 10-11 (quotations omitted).

Importantly, the Supreme Court has held that, on motion for preliminary injunction, the required showing does **not** rise to the burden of proof necessary at trial:

> [A] preliminary injunction is customarily granted on the basis of procedures that are less formal and on evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing.

*University of Texas v. Comenisch*, 451 U.S. 390, 395 (1981) (citations omitted)

In keeping with this principal, evidence that may be inadmissible at trial on the merits **is** admissible on a motion for preliminary injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. Cal. 2009) ("district court may … consider hearsay in deciding whether to issue a preliminary injunction") (citations omitted); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do

1    so serves the purpose of preventing irreparable harm before trial").  Other circuits agree.  *See,*

2    *e.g., Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3rd Cir. 2004); *Heideman v. South Salt*

3    *Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d

4    1167, 1171 (7th Cir. 1997); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985

5    (11th Cir. 1995); *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993);

6    *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986).

7           The foregoing is significant here because, although plaintiffs offered to combine the

8    preliminary injunction hearing with trial on the merits, defendants refused, saying they wanted

9    more time to prepare and present a fuller record at trial.  Thus, the lesser evidentiary standards for

10   a preliminary injunction apply here at defendants' own election.  The parties have discussed

11   proceeding to trial on the merits on an expedited, truncated schedule, if the Court grants the

12   preliminary injunction.  The plaintiffs are certainly willing to do so.  Hence, the preliminary

13   injunction would be in place for only a limited time before trial on the merits.

14            **2.   At the Very Least, There Are Serious Questions Going to the Merits of**
15                 **Plaintiffs' Substantive Claim.**

16           To prevail **at trial** on their Section 7 claim, plaintiffs must show that defendants' merger

17   **may** substantially lessen competition.  Plaintiffs need not show that the merger is certain to

18   lessen competition:

19                    Section 7 of the Clayton Act prohibits mergers or acquisitions
20                    in any line of commerce or in any activity affecting commerce
                     in any section of the country, [where] the effect of such
21                    acquisition **may** be substantially to lessen competition or to
                     tend to create a monopoly.  **Section 7 was enacted to prevent**
22                    **anticompetitive mergers in their incipiency.  Therefore, all**
                     **that is necessary [under Section 7] is that the merger create**
23                    **an appreciable danger of [anticompetitive] consequences in**
                     **the future.**  A predictive judgment, necessarily probabilistic
24                    and judgmental rather than demonstrable, is called for.

25   *California v. Sutter Home System*, 130 F.Supp.2d 1109, 1117-18 (N.D. Cal. 2001) (emphasis

26   added) quoting *U.S. v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963) (quotations and other

27   citation omitted).

28

> Competition is so important that mergers or acquisitions that 'may' lessen competition are prohibited. The Supreme Court has specifically recognized that by using the phrase 'may,' **Congress was concerned with probabilities, not certainties.**

*Bon-Ton Stores, Inc. v. May Department Stores Co.*, 881 F.Supp. 860, 867 (W.D.N.Y. 1994) (granting preliminary injunction enjoining merger) (emphasis added), citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323 (1962).

Under Section 7 of the Clayton Act, mergers are prohibited if their result may be a substantial lessening of competition, or a tendency to create a monopoly. Since the thrust of the statute is prospective, designed "primarily to arrest apprehended consequences of inter-corporate relationships before those relationships could work their evil. . . .," a transaction which **may** have the proscribed anticompetitive effects is prohibited. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 597 (1957) ("*Cellophane*") (emphasis added); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962). Thus, if there is a "reasonable probability" that the merger will substantially lessen competition or tend to create a monopoly, it is prohibited under the Act. *Brown Shoe Co. v. United States*, 370 U.S. 294 at 323; *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). By using these terms in Section 7, "which look not merely to the actual present effect of a merger but instead to its effect upon future competition, Congress sought to preserve competition among many small businesses by **arresting a trend toward concentration** in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966); *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) (emphasis added).

Congress was "intense[ly]" concerned, in enacting Section 7, with increasing economic concentration in the United States' economy. *Philadelphia Nat'l Bank*, 374 U.S. at 363. In light of this Congressional concern, certain cases "warrant[] dispensing . . . with elaborate proof of market structure, market behavior, or probable anticompetitive effects." *Id.* This is particularly true where, as in the instant case, the market is already highly concentrated:

> If concentration is already great, the importance of preventing **even slight increases** in concentration and so preserving the possibility of eventual deconcentration is correspondingly great.

17

*Id.* at 365 n. 42 (increase of more than 33% "must be" significant; merger enjoined) (citation

omitted; emphasis added); *see Id*. at n. 41 (listing treatises that describe 20% to 25% of market

control by post-merger company or increase in concentration of 7% to 8% as prima facie

unlawful).

It is important for the Court to be cognizant of this language from decisions interpreting

Section 7 of the Clayton Act in the first half-century after its passage.  These decisions recognize

that Section 7 embodies a Congressional intent to preserve a heterogeneous, multiplicitous

structure in American industries, concerned perhaps not so much with alleged efficiency as with

a diverse marketplace.  Although such Congressional intent may not be politically popular with

certain factions today, it is not for the courts, or anyone other than Congress itself, to change the

law embodied in the statute.  Section 7 must be construed to give effect to its purpose, which the

Supreme Court has clearly articulated, notwithstanding its repugnance to particular economic or

political theorists.

### a.   The Merger is Likely to Substantially Lessen Competition in the Geographic and Product Markets.

Determination of the relevant geographic and product markets "is a necessary predicate"

to deciding whether a proposed merger violates Section 7, although mathematical exactitude is

not required.  *U.S. v. Marine Bancorporation, Inc*., 418 U.S. 602, 618 (1974).  Geographically,

United and Continental compete both domestically and on international flights to and from U.S.

destinations.  (Bush Rpt. 5-14.)  The product market within which they compete is the airline

industry and certain segments thereof, such as the network carrier business traveler market.  (*Id.*)

Each defendant's behavior is currently constrained by actual and potential competition from the

other defendant throughout the markets.  (Compl. ¶¶ 33-36; Smisek Dep. [306:4]--[308:23];

Shulman Dec. Ex. O.)

### i. The Merger is Likely to Lessen Competition in the Domestic and US-International Geographic Markets.

The geographic market is determined by "the area of competitive overlap, [where] the effect of the merger on competition will be direct and immediate.  This depends upon the geographic structure of supplier-customer relations."  *Philadelphia Nat'l Bank*, 374 U.S. at 357 (citations and quotation omitted).  Here, the defendants compete within the entire United States geographic area as well as on routes from the United States to destinations in Europe, the Pacific, and Latin America.  (Compl. ¶ 29.)  Both United and Continental are mainline network carriers operating out of multiple domestic hubs, from which each can send a connecting flight to any other airport.  Each can establish a competitive presence in any of the major airports located in the United States by, *inter alia*, leasing or otherwise utilizing terminal slots, hiring employees, and directing more flights to and from any given airport.  (*Id.* ¶¶ 101-102.)

Even if the relevant market is determined to be airport pairs or some other market smaller than the domestic and US-international airline industry, plaintiffs do not need to show that defendants' merger is likely to lessen competition in every one, or even the majority, of those markets.  Instead, plaintiffs need show only that the merger may tend to create a monopoly or restrain competition in **any** market where the defendants **actually or potentially** compete:

> The language of … section [7] requires merely that the Government prove the merger may have a substantial anticompetitive effect **somewhere** in the United States--'in any section' of the United States.  This phrase does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground.  The Government may introduce evidence which shows that as a result of a merger competition may be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in **one or more** sections of the country.  In either event a violation of § 7 would be proved.  Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant "economic" or "geographic" market is not an adequate ground on which to dismiss a § 7 case.

*United States v. Pabst Brewing Company*, 384 U.S. 546, 559-60 (1966) (emphasis added);[6] *see also United States v. Philadelphia National Bank*, 374 U.S. 321, 355 (1963) ("The statutory test is whether the effect of the merger 'may be substantially to lessen competition' 'in any line of commerce in any section of the country'") (citation omitted).

                ii.  <u>The Merger is Likely to Lessen Competition in the Airline Industry.</u>

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (citation omitted). "[C]ommodities reasonably interchangeable by consumers for the same purposes make up [the relevant market]." *Cellophane*, 351 U.S. at 395; s*ee also Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (product market includes "sellers or producers who have actual or potential ability to deprive each other of significant levels of business") (citation omitted).  Importantly, defining the relevant product market is not an end in itself, but rather the means to deduce the effect of a proposed merger on the product market identified.

That the relevant product market is defined by an "outer boundar[y]" encompassing "reasonably interchangeable" products "for the same purposes" in no way means that every product within the relevant market must be fungible or have precisely the same end use.  In fact, a long line of Supreme Court cases, all of which are good law and binding on the Court, instructs just the opposite.  These cases, summarized below, demonstrate that the relevant product market is a fact-based determination based on the real world indicia of the industry at issue; here, the airline industry as a whole.  *Cellophane*, 351 U.S. at 404 ("The 'market' which one must study to

---

[6] Although the quoted language expressly refers to government actions, the Supreme Court has long recognized the equal importance of the private antitrust action.  *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 569 (1982); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139 (1968) ("[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter antitrust violations") (quotation and citation omitted); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) ("Moreover, the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

determine when a producer has monopoly power will vary with the part of commerce under consideration"). Moreover, in each of the cases, the Court enjoined a merger between entities whose market shares are dwarfed by those found here: a combination of the nation's third and fourth largest domestic carriers creating the world's largest airline.

In *Brown Shoe*, the Supreme Court enjoined the merger, in an already concentrated market, between Brown, the third largest shoe retailer and fourth largest shoe manufacturer, and Kinney, the eighth largest shoe retailer and twelfth largest shoe manufacturer. 370 U.S. at 297, 331. Pre-merger, Brown and Kinney held a 6% and a 0.5% manufacturing share, respectively; the combined company retained just the 6% manufacturing share and acquired a 9.5% share of the domestic retail shoe market. *Id.* at 303, 327, 346. (Shulman Dec. Ex. N.) In enjoining the merger, the Court rejected defendants' argument to parse the product market into fine "age/sex distinctions" because, to the defendants' reasoning, "a little boy does not wear a little girl's black patent leather pump and … a male baby cannot wear a growing boys shoes." 370 U.S. at 327. The Court reasoned that such fine dissection of the market "does not aid … in analyzing the effects of the merger." *Id.* Instead, the Court determined that courts must focus on "practical indicia" of the industry in question:

> [T]he boundaries of the relevant market must be drawn with sufficient breadth **to include the competing products** of each of the merging companies and to recognize competition where, in fact, competition exists.

*Id.* at 325-26 (emphasis added).

On the heels of *Brown Shoe*, the Supreme Court decided *United States v. Philadelphia National Bank*, enjoining the merger between the second and third largest banks in the relevant four-county geographic market, which merger, if consummated, would have created the largest bank, holding 36% of all bank assets, in the relevant geographic market. 374 U.S. 321, 330-31, 364 (1963); (Shulman Dec. Ex. N). As it did in *Brown*, the Court used real world indicia to identify the relevant market, and had "no difficulty in determining the 'line of commerce' (relevant product or service market) * * * [as] the **cluster of products** (various kinds of credit) **and services** (such as checking accounts and trust administration) denoted by the term

'commercial banking,' * * * ."  374 U.S. at 356 (emphasis added).  The Court rejected defendant's arguments to unnaturally parse the commercial banking market into individual "product lines," such as, for example, the checking accounts, credit lines, and trust administration products and services, even though each such "product line" arguably has different consumers. *Id.* at 361.  Instead, the Court recognized the practical truth that banks compete against banks on a variety of products and services sold to a variety of consumers.

In enjoining the *Philadelphia National Bank* merger, the Supreme Court explained its ruling, which is particularly on point to defendants' proposed merger in the increasingly concentrated airline industry:

> **This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects**. Specifically, we think that a merger which produces a firm controlling an **undue percentage share of the relevant marke**t, and results in a significant increase in the concentration of firms in that market **is so inherently likely to lessen competition substantially** that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Id.* at 363-64 (citations omitted) (emphasis added).

Similarly, in *United States v. Aluminum Co. of America*, 377 U.S. 271 (1964), the Supreme Court defined a broad relevant product market of "aluminum conductor" wiring for electrical transmission, comprised of "bare" and "insulated" wiring. *Id.* at 274-75.  Even though "bare" and "insulated" wiring are categorically non-interchangeable – "bare" wire, by definition, is not "insulated" wire, and only "insulated" wire may be used for underground wiring – the Court found that both were "used for the purpose of conducting electricity … ."  *Id.* at 277.

Within this real-world product market, the Supreme Court enjoined Alcoa's acquisition of Rome Cable, even though Alcoa's post-acquisition market share increased only incrementally from 27.8%  to 29.1%.  *Id.* at 278; (Shulman Dec. Ex. N).  The Court explained that competition is best served when there are many competitors and no one competitor controls a significant piece of the market, a truism that counsels strongly against United's and Continental's merger:

The acquisition of Rome added, it is said, only 1.3% to Alcoa's control of the aluminum conductor market. But in this setting that seems to us reasonably likely to produce a substantial lessening of competition within the meaning of § 7. **It is the basic premise of the law that competition will be most vital when there are many sellers, none of which has any significant market share.**

377 U.S. at 280 (emphasis added).

In *United States v. Continental Can Co.*, 378 U.S. 441 (1964), the Supreme Court enjoined a merger between the second largest metal container company in the country, holding a 33% share of the can market, and the country's third largest glass container company, which controlled 9.6% of the glass container market. *Id.* at 445-46; (Shulman Dec. Ex. N). Importantly to the instant case, both the can and glass container markets were dominated by just a few large companies. 378 U.S. at 445-46.

In finding the merger violated Section 7, the Court again eschewed rigid, unnatural product market boundaries, reasoning that "[i]nterchangeability of use and cross-elasticity of demand are not to be used to obscure competition but to recognize competition where, in fact, competition exists." *Id.* at 453 (quotation and citation omitted). Instead, the Court found that the can industry and the glass container industry, despite the wide and varied uses between metal can and glass containers, together comprised the relevant product market. *Id.* at 439-41. The Court "reject[ed]" the view that "competition protected by § 7 [is limited] to competition between identical products, … ." *Id.* at 452. The Court instead recognized the real world "existence of a large area of effective competition between the makers of cans and the makers of glass containers." *Id.* at 456.

Next, in *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966), the Supreme Court enjoined the merger of Von's, the third largest retail grocer in Los Angeles with a 4.7% market share, with Shopping Bag, the sixth largest grocery store controlling 4.2% of the market. *Id.* at 272, 281; (Shulman Dec. Ex. N). The largest single grocer in the market before the merger controlled 8% of the market. 384 U.S. at 281. After merging, the combined Von's-Shopping Bag was the second largest grocery chain in Los Angeles and controlled just 7.5% of the $2.5 billion market, a market share that pales in comparison to that of the new United. *See Id.* at 272.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

In addition, nowhere in the Court's opinion is there a discussion of the relevant product market or line of commerce under which to analyze the Von's-Shopping Bag merger.  Instead the Court recognized the realities of the grocery store industry: grocery stores compete with other grocery stores.  They do not compete only as to atomized lines of groceries, like, for example, potato chips, vegetables, milk, cereal, or canned goods.  Instead, the Court correctly focused on the realities of the concentrated grocery store industry in Los Angeles, and, in a lesson to be applied in the instant case, reasoned that a merger "certainly" "violate[s] § 7 when it takes place **in a market characterized by a long and continuous trend toward fewer and fewer owner-competitors**, … ."  *Id.* at 277-78 (emphasis added).

Finally, in *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), the Supreme Court enjoined the merger between Pabst and Blatz, the tenth and eighteenth largest brewers, respectively, in the United States.  *Id.* at 550.  Before merging, Blatz was Wisconsin's number one brewer and the sixth largest seller in the Wisconsin, Illinois, and Michigan tri-state area. *Id.* As for Pabst, pre-merger, it was the fourth largest seller in Wisconsin and the seventh largest in the tri-state area.  *Id.*  The merger made Pabst the nation's fifth largest brewer with 4.49% of the total domestic beer sales and the largest brewer in Wisconsin.  *Id.*; (Shulman Dec. Ex. N).  In enjoining the merger, the Court again did not engage in **any** discussion of the relevant product market, reflecting the common sense, industry-based conclusion that brewers compete amongst themselves for a share of the overall beer market.  384 U.S. at 550.  They do not compete in unnaturally parsed markets like, for example, light beer, lager, malt liquor, or ales.

As noted by Judge Posner in *Hospital Corp. of America v. Federal Trade Comm'n*, 807 F.2d 1381, 1385 (7th Cir. 1986), the cases discussed above, taken *in toto*, show that a non-trivial acquisition of a significant competitor, like United's merger with Continental, must be enjoined:

> [The decisions] seemed, taken as a group, to **establish the illegality of any non-trivial acquisition of a competitor**, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing.  The elimination of a significant rival was thought **by itself** to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words "may . . . substantially . . .

lessen competition." **None of these decisions have been overruled.**

*Id.* (emphasis added), citing *Brown Shoe,* 370 U.S. 294; *Alcoa*, 377 U.S. 271 (1964); *Von's Grocery,* 384 U.S. 270; and *Pabst Brewing,* 384 U.S. 546 (other citations omitted).

These cases are binding on the Court and militate strongly in favor of granting the requested preliminary injunction. Each case enjoined a merger where the market share pales in comparison to the market share at issue in defendants' merger. (Shulman Dec. Ex. N.) Each case also recognized practical, reality-based relevant product markets without an undue and contrived parsing of the market. Finally, each case took place in a concentrated industry, that was no more concentrated, and in many instances, less concentrated that the industry at issue here. On this body of law, there can be no doubt that plaintiffs have raised "serious questions" as to the unlawfulness of defendants' merger.

Similarly, but for the merger, defendants would remain potential competitors of the other, operating to constrain competition on any route anywhere in the country. (Smisek Dep. [306:4]--[308:23]; Shulman Dec. Ex. O.) The Supreme Court has held that the loss of such potential competition is **alone** enough to enjoin a merger. In *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), the Court enjoined the acquisition by Falstaff, a regional beer company, of Narragansett, the largest seller of beer in New England. *Id.* at 527-28. At the time of the acquisition, Falstaff did not have a presence in the New England market, but had made clear its intentions to expand to become a national brewer. *Id.* at 528-29. The Court enjoined the merger, reasoning that Falstaff's presence on the "fringe" of the New England beer market may have exerted a "pro-competitive effect" on that market:

> Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because **entry eliminates a potential competitor exercising present influence** on the market.

*Id.* at 532 (citations omitted) (emphasis added).

Here, defendants can ███████████████████████████████████████████ ███████████████ (Smisek Dep. [306:4]-[306:5].) That ability on the part of Continental to enter

1    any route that United currently flies constrains United from raising prices or limiting service on

2    that route.  Continental is likewise constrained on its current routes by United's ability to "very

3    eas[ily]" enter those routes.

4         Moreover, to the extent that defendants assert that their merger comports with the

5    Horizontal Merger Guidelines and the Antitrust Guidelines, those documents are only what they

6    purport to be: guidelines.  They are not adjudicated court decisions, let alone the bedrock

7    Supreme Court antitrust law set out above.  They were written by unnamed person(s) within the

8    DOJ or FTC.  They do **not** have the force and effect of law and are not binding on the Court.

9    *See, e.g. Chicago Bridge & Iron Co., N.V. v. F.T.C.*, 534 F.3d 410, 434 n. 13 (5th Cir. 2008)

10   ("The Merger Guidelines do not guide adjudicative decisions at the agency and court level,

11   because they are merely enforcement policy statements that establish standards for exercising

12   prosecutorial discretion.  Enforcement policy is not binding on the agency and has no force of

13   law") (citations omitted); *accord, F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 716 n. 9 (D.C. Cir.

14   2001); *California v. Sutter Health System*, 130 F.Supp.2d 1109, 1120 (N.D. Cal. 2001).

15        Finally, the evidence clearly establishes the existence of a network carrier business

16   traveler market, in which the five network carriers compete for business travelers on the basis of

17   the scope and size of their networks and accompanying features.  These features include a vast

18   array of destinations, multiple classes of service and amenities, and frequent flyer programs

19   leading to free upgrades.  Significantly, low cost carriers offer neither comparable networks, the

20   multiplicity of destinations, the multiple classes of service, nor the possibility of free upgrades.

21   They simply do not compete in this market.  Within this market, there is no question that

22   defendants' merger, involving the third and the fourth largest domestic network carriers,

23   threatens the continued viability of the remaining smaller network carriers, and hence poses a

24   likelihood of a substantial lessening of future competition, inasmuch as Continental itself felt its

25   long-term survival at risk by reason of United's potential merger with the smallest of the network

26   carriers, US Airways.  In this market alone, plaintiffs have shown not just serious questions going

27   to the merits, but a substantial likelihood of success in establishing that defendants' proposed

28   merger violates Section 7 of the Clayton Act.

b.  **At the Very Least, the Balance of Irreparable Harm and the Balance of the Equities Both Tip Sharply toward Plaintiffs.**

Because similar facts and argument support the conclusion that, on balance, the harms and the equities[7] both tip sharply in plaintiffs' favor, these two prongs of the preliminary injunction analysis are discussed here together.

Irreparable harm is found where a plaintiff has no adequate remedy at law, typically because monetary damages will not fully redress the plaintiff's injuries.  *See, e.g., General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  Of course, here, the only remedy available to plaintiffs under federal antitrust law is the injunctive relief afforded by Section 16 of the Clayton Act, 15 U.S.C. § 26.  They cannot obtain damages and, as such, do not have an adequate remedy at law.

Moreover, in cases involving mergers that may substantially lessen competition, as here, injunctive relief is especially appropriate to remedy harm **before** it occurs:

> Prospective relief … is a more effective remedy for an unlawful merger than is retrospective relief.  If preliminary relief is not awarded and the merger is subsequently found to be unlawful, it would be extremely difficult, if at all possible, to remedy effectively the unlawful merger.  Once [the merger] becomes consummated it becomes difficult, and sometimes virtually impossible, for a court to "unscramble the eggs."

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 600 F.Supp. 1326, 1330-32 (E.D. Mich. 1985) (finding irreparable harm enjoining merger where combined company would have "commanding 30.7% market share," "dominate wholesale distribution," "increase its market share," and "eventually drive the smaller brewers out of business"), citing *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 41 (1977) (other citations and quotations omitted); *accord Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F.Supp. 1513, 1517 (S.D. Ind. 1986) (finding irreparable harm and inadequacy of remedy at law in the "virtual impossibility of unscrambling" the merger if the party seeking preliminary injunction later prevailed on the merits) (citation

---

[7] Of course, plaintiffs need not show a "sharp" tip in the balance of equities; they need show only that the equities tip in their favor.  *Winter*, 129 S. Ct. at 374.

1   omitted).  Here, defendants propose to combine two already huge carriers (the third and fourth

2   largest in the country), creating a new airline that will leap-frog over its only two other true

3   competitors and become the new largest airline in the world.  (Compl. Ex. C.)  Once the new

4   airline is formed, it will be virtually impossible to "unscramble the eggs" of its monopoly.

5       Defendants assert that various "synergies" and "efficiencies" provide a cost saving

6   justification for their merger.  Not only are such allegations of cost savings in doubt (Bush Rpt.

7   16-20), the Supreme Court has held that alleged cost savings cannot be a basis upon which to

8   approve an otherwise unlawful merger.  *FTC v. Proctor & Gamble, Co.*, 386 U.S. 568, 580

9   (1967) ("Possible economies cannot be used as a defense to illegality. Congress was aware that

10  some mergers which lessen competition may also result in economies but it struck the balance in

11  favor of protecting competition") (citation omitted).

12      Moreover, any hardship the defendants may allegedly incur pales by comparison to the

13  irreparable harm that will be suffered by plaintiffs if the merger is not enjoined now.  At most,

14  defendants will be inconvenienced by postponing their merger until after an expedited trial.

15  *See, e.g., Christian Schmidt Brewing*, 600 F.Supp. at 1332 (minimizing harm to defendant by

16  setting matter for trial within three months of issuance of preliminary injunction).  Both

17  defendants can continue uninterrupted to conduct their regular business activities.  *See*

18  *Johnson v. Couturier*, 572 F.3d 1067, 1082 (9th Cir. 2009) (recognizing some consequences to

19  defendant to be outweighed by likely harm to plaintiff; preliminary injunction granted);

20  *accord American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir.

21  2009).  Quite clearly, the balance of harms and equities tips sharply in plaintiffs' favor,

22  simply by reason of the practical impossibility of unraveling the merger once it is

23  consummated..

24              **c.  The Public Interest will be Served by a Preliminary Injunction.**

25      The public interest prong of the preliminary injunction standard requires the Court to

26  consider "whether there exists some critical public interest that would be injured by the grant of

27  preliminary relief."  *Independent Living Center of Southern California, Inc. v. Jolly*, 572 F.3d

28  644, 659 (9th Cir. 2009) (quotation and citation omitted); *see also Johnson v. Couturier*, 572 F.3d

at 1082 (recognizing Congressional intent in enacting statutes at issue; finding public interest favored preliminary injunction); *Christian Schmidt Brewing*, 600 F.Supp. at 1332-33 (enjoining merger; injunction will not injure and may serve public interest).

To the contrary, here the public interest is served by granting the injunction and maintaining a competitive airline industry. *See, e.g., Philadelphia Nat'l Bank*, 374 U.S. at 366 n 43 (citations omitted) ("The test of a competitive market is not only whether small competitors flourish but also whether consumers are well served"); *AlliedSignal*, 183 F.3d at 577 (recognizing that "[i]f the merger were to lead to noncompetitive prices …, this would be a significant harm to [the plaintiffs], and the public"; preliminary injunction affirmed). After the merger, the public will have fewer choices for non-stop and connecting routes; will be faced with monopolies at the route and airport levels; and will pay the correspondingly higher fares.

Moreover, the public has an interest in vigorous enforcement of the antitrust laws. *United States v. Topco Associates, Inc.*, 405 U.S. 596, 610 (1972) ("Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms"). Similarly, the public has an interest in effective private enforcement of antitrust laws. *See, e.g., Perma Life Mufflers*, 392 U.S. at 139 ("[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat" to deter antitrust violations).

## IV. CONCLUSION

On the basis of the foregoing arguments and authorities, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction.

Dated: August 24, 2010

ALIOTO LAW FIRM
GRAY, PLANT, MOOTY, MOOTY &
   BENNETT, P.A.


By: _/s/ Daniel R. Shulman_____
    Daniel R. Shulman (*Admitted Pro Hac Vice*)

1

**PLAINTIFFS' COUNSEL**

2

Joseph M. Alioto, SBN 42680
3   Theresa D. Moore (SBN 99978)
Joseph M. Alioto, Jr. (SBN 215544)
4   Thomas P. Pier (SBN 235740)
Angelina Alioto-Grace (SBN 206899)
5   ALIOTO LAW FIRM
555 California Street, Suite 3160
6   San Francisco, CA  94104
Telephone: (415)  434-8900
7   Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
8   Email: esexton@aliotolaw.com
Email: tpier@aliotolaw.com
9

Daniel R. Shulman, (MN SBN 100651)
10   *Admitted Pro Hac Vice*
Julie L. Boehmke, (MN SBN 317330)
11   *Admitted Pro Hac Vice*
Jeremy L. Johnson (MN SBN 328558)
12   *Admitted Pro Hac Vice*
GRAY, PLANT, MOOTY, MOOTY &
13     BENNETT, P.A.
500 IDS Center
14   80 South 8th Street
Minneapolis, MN 55402
15   Telephone: (612) 632-3335
Facsimile: (612) 632-4335
16   Email: daniel.shulman@gpmlaw.com
Email: julie.boehmke@gpmlaw.com
17   Email: jeremy.johnson@gpjlaw.com

18

Gil D. Messina (NJ SBN GM5079)
19   *Admitted Pro Hac Vice*
MESSINA LAW FIRM, PC
20   961 Holmdel Road
Holmdel, NJ  07733
21   Telephone:  (732) 332-9300
Facsimile:  (732) 332-9301
22   Email: gmessina@messinalawfirm.com

23

24

25
GP:2831553 v4
26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*