Joseph M. Alioto (SBN 42680)
Theresa D. Moore (SBN 99978)
Joseph M. Alioto, Jr. (SBN 215544)
Thomas P. Pier (SBN 235740)
Angelina Alioto-Grace (SBN 206899)
ALIOTO LAW FIRM
555 California Street, Suite 3160
San Francisco, CA  94104
Telephone:  (415) 434-8900
Facsimile:  (415) 434-9200
Email:  jmalioto@aliotolaw.com

Attorneys for Plaintiffs
[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Michael C. Malaney, Katherine R. Arcell, Keith Dean Bradt, José M. Brito, Jan Marie Brown, Robert D. Conway, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Ted Friedli, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Jay Glikman, Donna M. Johnson, Valarie Ann Jolly, Gail S. Kosach, Rozann Kunstle, Steve Kunstle, John Lovell, Len Marazzo, Lee McCarthy, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Sharon Holmes Reed, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Sherry Lynne Stewart, Wayne Taleff, Gary Talewsky, Annette M. Tippitts, Diane Lynn Ultican, J. Michael Walker, Pamela S. Ward, David P. Wendell, Christine O. Whalen, and Suraj Zutshi,<br><br>                    Plaintiffs,<br><br>        v.<br><br>UAL CORPORATION, UNITED AIRLINES, INC., and CONTINENTAL AIRLINES, INC.,<br><br>                    Defendants. | CASE NO.:  CV-10-02858 (RS)<br><br>Date:   August 31, 2010<br>Time:   9:00 a.m.<br>Judge:  Hon. Richard Seeborg<br><br><br>**PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ........................................................................... ii

I.    DEFENDANTS ARE NOT FAILING COMPANIES ........................................... 1

II.   THE DEPARTMENT OF JUSTICE IS NOT ENTITLED TO DEFERENCE ...... 2

III.  THE DEFENDANTS' ALLEGED CONCERNS ABOUT CLOSING THEIR
      MERGER QUICKLY ARE INCONSISTENT WITH THEIR ACTIONS AND
      INTENTIONS ...................................................................................... 4

IV.   THE DEFENDANTS' SUBMISSIONS FULLY SUPPORT THE NETWORK
      CARRIER MARKET FOR BUSINESS TRAVELERS DEFINED BY THE
      PLAINTIFFS ....................................................................................... 6

V.    THE DEFENDANTS' SUBMISSIONS DO NOT REFUTE OTHER
      MARKETS CLAIMED BY THE PLAINTIFFS ..................................... 9

VI.   THE BALANCE OF HARDSHIPS TIPS DECISIVELY IN PLAINTIFFS
      FAVOR BECAUSE THEY HAVE NO ADEQUATE REMEDY AT LAW ....... 12

1

2                                    **TABLE OF AUTHORITIES**

3                                                                                            **Page(s)**

4    **Cases**

5    *Aro Corp. v. Allied Witan Co.*, 531 F. 2d 1368 (6th Cir., 1976).................................................12

6
     *Bon-Ton Stores, Inc. v. May Department Stores Co.*, 881 F.Supp. 860 (W.D.N.Y. 1994)......14
7
     *Broadcast Music, Inc. v. CBS*, 441 U.S. 1 (1979).................................................................2
8
9    *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ...............................................9, 11, 14

10   *California v. Am. Stores Co.*, 495 U.S. 271 (1990).................................................................13

11   *California v. Sutter Home System*, 130 F.Supp.2d 1109 (N.D. Cal. 2001) ..............................14

12   *Citizen Publishing Co. v. United States*, 394 US 131 (1969) ....................................................1

13
     *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir., 1991).........................................12
14
     *Continental Oil Company v. Frontier Refining Company*, 338 F. 2d 780 (10th Cir.,1964)......15
15
16   *Hawaii v. Standard Oil Co.*, 495 U.S. 251 (1972) ....................................................................14

17   *Reilly v. The Hearst Corp.*, 107 F. Supp. 2d 1192 (ND Cal, 2000) ....................................3, 14

18   *International Shoe Co. v. FTC*, 280 U.S. 291 (1930)..................................................................1

19   *Lucas Automotive Eng'g v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998).........14

20   *Marek v. Chesny*, 473 US 1 (1985) .........................................................................................12

21
     *People ex rel. Van De Kamp v. Tahoe Regional Plan*, 766 F. 2d 1319 (9th Cir., 1985) ..........15
22
     *U.S. v. Airline Tariff Publishing Co.*, 1994-2 Trade Cases P 70,687 (D.D.C., 1994)..............10
23
24   *U.S. v. AMR Corp.*, 140 F. Supp. 2d 1141 (D. Kan., 2001)......................................................10

25   *U.S. v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963).............................................................14

26   *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) .......................................10, 11

27   *United States v. Pabst Brewing Company*, 384 U.S. 546 (1966).................................................6

28   *Wayne Chemical, Inc. v. Columbus Agcy. Serv. Corp.*, 567 F. 2d 692 (7th Cir.,1977) ............15

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ...................................14

**Federal Rules**

Fed.R.Civ.P. 68 ..................................................................................................................12

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

Plaintiff's above named submit this reply memorandum in support of their motion for a preliminary injunction against the proposed merger of defendants United Airlines, Inc. ("United") and Continental Airlines, Inc. ("Continental"). In their Joint Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("joint memorandum"), defendants make a number of assertions of law and fact that are unfounded, misleading, and inconsistent, to which plaintiffs will respond in this reply.

## I.   DEFENDANTS ARE NOT FAILING COMPANIES

The defendants' joint memorandum is replete with assertions of how much money United and Continental have lost, purportedly as a justification or rationale for their need to merge. Defendants are not failing companies either legally or factually, and their pleas of poverty are wholly irrelevant and entitled to no consideration in these proceedings.

The failing company defense under Section 7 was first recognized by the Supreme Court in *International Shoe Co. v. FTC*, 280 U.S. 291 (1930), and was fully explicated in *Citizen Publishing Co. v. United States*, 394 US 131, 136-37 (1969), in which the Court held that the defense was available only when (1) "the resources of...[the acquired] company were so depleted and the prospect of rehabilitation so remote that 'it faced the grave probability of a business failure,'" and (2) "it is established that the company that acquires the failing company or brings it under dominion is the only available purchaser." United and Continental have made no such showing here.

Nor can they. Kathryn Mikells, the Chief Financial Officer of United, expressly testified in her deposition on August 24, 2010, that ▋▋▋▋▋▋▋▋▋. (Mikells Depo., [39:20]-[40:1]. In his deposition three days later, on August 27, Glenn Tilton, CEO of United, ▋▋▋ Tilton Depo., [25:14-19]. Indeed, they are not. ▋▋▋▋▋▋▋▋▋

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

████████████████████████████████████ *Id.*, [42:3-7].

████████████████████████████ Jeffrey Smisek Depo.,

[156:1-2].

## II.   THE DEPARTMENT OF JUSTICE IS NOT ENTITLED TO DEFERENCE

Defendants argue that this Court should and must defer to the alleged expertise of the Department of Justice in reviewing and closing its investigation of their merger.[1] The law is clear, however, that what the Department of Justice does or does not do in no way binds or governs this Court in a private antitrust challenge. *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 13 (1979) ("Of course, a consent judgment, even one entered at the behest of the Antitrust Division, does not immunize the defendant from liability for actions, including those contemplated by the decree, that violate the rights of nonparties").

Moreover, the respect, approaching awe, shown by defendants for the Antitrust Division is not universally shared. This is, after all, the same Department of Justice that in 2008 approved the Delta-Northwest merger, which Continental CEO Smisek testified ████

██████████████████████████████████████████████

████████████████████████████ Smisek Depo., [74:8-18];

Exhibit 88. During the Congressional review of that merger, Representative John Conyers had these prescient comments about the Division's merger review process:

> And since airline deregulation first took effect some 30 years ago, we've gone from a highly competitive structure to an oligopoly. Most of this has occurred under the Department of Transportation's watch, but the Department of Justice also has to come in for its share of responsibility, as literally scores of airline mergers have been approved.
> Consumers have been prejudiced, as delays are on the increase, services in decline, and prices are rising. And we've fallen into a culture where business executives have opted frequently to the

---

[1] A DOJ press release on Friday, August 27, disclosed that it was closing its investigation of the merger because defendants agreed to lease 18 slots at Newark airport to Southwest, although numerous state attorneys general continue to investigate the merger.

2

resort of bankruptcy as a means of avoiding their labor obligations while enhancing their own personal incomes.

All too often executives of Chapter 11 debtors receive extravagant bonus and stock option compensation packages while workers are forced to accept pay cuts or even job losses and retirees lose hard-won pensions and health benefits.

Example: Glenn Tilton, CEO of United Airlines, former Chapter 11 debtor, last year received $39.7 million compensation package. During the course of the bankruptcy case, however, pension plans for 120,000 workers were terminated, and many others had to make significant wage concessions.

    \*     \*     \*

This is the context in which we come together this morning, ladies and gentlemen. We have an antitrust division that approves mergers left and right, frequently overturning judgments of the career staff at the Department of Justice.

The department has not attempted to block or modify any major merger over the last seven years, including some of the largest, most controversial mergers among direct competitors. Remember Whirlpool- Maytag, AT&T-BellSouth, XM-Sirius. The department's hands-off approach has even encouraged companies with questionable merger justifications to give it a try.

And some analysts have stated that the government has nearly stepped out of the antitrust enforcement business, leaving companies to mate with whom they wish.

There has been a 59 percent decline in merger investigations over the past four years of this administration compared to the last four years of the Clinton administration. And with respect to merger challenges, the last four years reveal a 75 percent decline to the last four years of the Clinton administration.

So all I'm suggesting is that we need to consider where this merger will take us. I'm concerned that if this merger is approved it will simply result in a cascade of other mergers, such as Continental-United, American and US Airways. We might end up a situation where we have three mega-carriers operating through hubs competing with a handful of low-cost carriers.

Original Source: Political Transcript Wire
HOUSE COMMITTEE ON THE JUDICIARY ANTITRUST TASK FORCE AND COMPETITION POLICY HOLDS A HEARING ON AIRLINE COMPETITION APRIL 24, 2008

In *Reilly v. The Hearst Corp.*, 107 F. Supp. 2d 1192, 1211(ND Cal., 2000), Chief Judge Walker of this District found it regrettably necessary to observe, with respect to the DOJ's review of the merger before the Court, that he was "astonished and disappointed that DOJ would allow itself to be put in a position where the inference can be so easily drawn that its

1   action or inaction in this case was political favoritism masquerading as law enforcement."[2]

2   Finally, the Merger Guidelines under which the Department of Justice operates are in

3   no sense law or binding on the Courts, even though the defendants' expert, Dr. Rubinfeld,

4   ████████████████████████████████████████████████████████ "

5   Rubinfeld Depo., [84:1-2]. They are not even unanimously endorsed by the enforcement

6   authorities. Federal Trade Commissioner J. Thomas Rosch has observed about the latest

7   version of the Guidelines, issued August 19, 2010, that "these Guidelines are still flawed both

8   as a description of how the staff (at the Commission at least) conducts ex ante merger review

9   and *what the Agencies should tell courts about merger analysis*." STATEMENT OF

10  COMMISSIONER J. THOMAS ROSCH ON THE RELEASE OF THE 2010 HORIZONTAL

11  MERGER GUIDELINES (emphasis added), available at

12  http://www.ftc.gov/speeches/rosch/100819horizontalmergerstatement.pd .

13  The law of mergers is the law of the Supreme Court and the lower courts applying what

14  the Supreme Court has said, not what employees of federal agencies may think, no matter how

15  qualified and well-intentioned they may be.[3]

16  ### III.  THE DEFENDANTS' ALLEGED CONCERNS ABOUT CLOSING THEIR MERGER QUICKLY ARE INCONSISTENT WITH THEIR ACTIONS AND INTENTIONS

17  The defendants stress the alleged urgency of being able to consummate their merger

18  because of the uncertainty and risk created by these proceedings and the deleterious

19  consequences of delay. If this is so, they should have agreed to plaintiffs' offer to consolidate

20  the hearing on the preliminary injunction motion with trial on the merits, which they refused.

21  That offer still stands, as does plaintiffs' readiness to proceed quickly to trial on the merits

22  following this hearing.

---

[2] The timing of the DOJ's action on Friday, August 27, in this case, given the imminence of the preliminary injunction hearing, invites similar conjecture.

[3] One is of course also tempted to wonder just how fulsome defendants' praise of the Antitrust Division would be if the DOJ had not closed its investigation of their merger.

Among defendants' professed concerns is, ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████    Testimony of Jeffrey A. Smisek, p. 8.  Defendants ignore, however,

that following the consummation of their merger, their intended firings and layoffs will dwarf

any claimed pre-merger loss of employees.

The Testimony of Kevin N. Knight, United Senior Vice President – Planning, lays out

in detail what defendants intend.  Defendants' projected "cost synergies" or cost savings

include ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████  Page 9.  ████████████████████████████████
████████████████████  (Tilton Testimony, p. 3);  ████████████████████  (Smisek

Testimony, p. 3)).  A ████████████████████████████  on a work force of 87,600

yields 13,095 lost jobs.  Defendants thus seem to be telling this Court that it needs to approve

their merger as quickly as possible so that the delay doesn't cause their employees to leave

before defendants have a chance to fire over 13,000 of them.[4]

Certainly, in the current economy, the public interest favors preserving the status quo

until the Court can try and decide this case on the merits, when 13,095 jobs hang in the

balance.[5]

---

[4] Paragraphs 41-51 of Mr. Knight's Testimony provide further detail on where defendants
intend to achieve their "labor" synergies.
[5] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962):
> A company's history of expansion through mergers presents a different economic
> picture than a history of expansion through unilateral growth. Internal expansion
> is more likely to be the result of increased demand for the company's products and
> is more likely to provide increased investment in plants, more jobs and greater
> output. Conversely, expansion through merger is more likely to reduce available
> consumer choice while providing no increase in industry capacity, jobs or output.
> It was for these reasons, among others, Congress expressed its disapproval of

5

## IV.   THE DEFENDANTS' SUBMISSIONS FULLY SUPPORT THE NETWORK CARRIER MARKET FOR BUSINESS TRAVELERS DEFINED BY THE PLAINTIFFS

Although defendants argue that plaintiffs have failed to define a cognizable relevant market under Section 7, their own submissions fully support the existence of the network carrier market for business travelers claimed by plaintiffs.  At the outset, of course, it is black letter law that plaintiffs need not prove that defendants' merger may substantially  lessen competition or tend to create a monopoly in *every* market or *all* markets in which the merged entity will operate.  Plaintiffs need show only that the merger is likely to have the proscribed effect in *some* market, *any* market.  *United States v. Pabst Brewing Company*, 384 U.S. 546, 559-60 (1966) ("The language of ... section [7] requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States--'in any section' of the United States.").

Plaintiffs' expert, Professor Darren Bush, opined in his Congressional testimony and his reports in this case that defendants' merger was likely to lessen network competition for time-sensitive travelers or business travelers.  In his deposition testimony, Continental CEO Smisek ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████  Smisek Depo., [29:16]-[29:20], [36:10]-[36:11], [33:2]-[33:9], [43:25]-[44:16], [45:4]-[46:5], [60:13]-[60:24], [96:18]-[97:8].

He also testified ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

successive acquisitions.
Particularly curious, in view of the planned elimination of 13,095 jobs post-merger, is the statement at page 26 of defendants' joint memorandum that "Enjoining the merger would threaten the job security for tens of thousands of United and Continental employees."

1 ███████████████████████████████████████████ *Id.*

2   In their pre-hearing submissions, defendants provide further evidence confirming the

3 existence of this relevant market.  Among the statements made by Mr. Smisek in his written

4 Testimony are that LCCs use ████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8

9 ████████████████████████████████ (P. 6.)  United CEO Glenn Tilton says

10 in his Testimony, █████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████[6]

16

17   Defendants make these statements in the context of an argument that appears to portray

18 their flying to so-called small communities as some type of public service or eleemosynary

19 undertaking, which will be jeopardized if defendants' merger is not approved.  To the contrary,

20 service to these smaller communities lies at the core of their network strategy, their

21 competition for business travelers, and their ability to offer a product with which LCCs cannot

22 and do not compete.  Mr. Smisek described the strategy fully in his deposition: █████████

23 ████████████████████████████████████████████████

24

25 _____

26 [6] Further, no matter how often or vociferously defendants' proclaim their allegedly vigorous competition with Southwest, such protestations are difficult to square with their recent agreement to lease Southwest 18 slots at their Newark hub.  Defendants can hardly fear

27 Southwest as much as they claim, and certainly not in defendants' key market of network carrier competition for business travelers.  Indeed, the decision to lease the slots to Southwest

28 is further, telling evidence that Southwest is not even in this market.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



([29:16]-[29:20].)

(*Id.*, [33:2]-[33:9].)

(*Id.*, [45:4]-[46:5]; emphasis added.)

    Moreover, the reason defendants serve small markets has nothing to do with a sense of civic obligation, and everything to do with the profitability of business travelers, who provide the airlines with a higher yield (*i.e.*, revenue per available seat mile) than do non-business travelers.



(*Id.*, [60:13]-[60-24].)

Hence, when defendants emphasize their service to so-called small communities in their pre-hearing submissions, they are only reinforcing the definition of the relevant market involving network carrier competition for business travelers, although this is undoubtedly not their intention.  Defendants confirm that there is a particular class of customers, business travelers, requiring a specific type of product, a large-scale network with differentiated classes of service and a frequent flyer program permitting upgrades, which only the network carriers, and not LCCs, can provide.

As *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), makes clear,

> The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

The record in this case, as evidenced by the defendants' own testimony, provides just such "peculiar characteristics and uses" of the product (an extensive network, multiple classes of service, frequent flyer programs allowing upgrades); "distinct customers" (business travelers); and "specialized vendors" (network carriers), as *Brown Shoe* identifies as hallmarks of a distinct relevant market.  Defendants have thus admitted this market.

## V.     THE DEFENDANTS' SUBMISSIONS DO NOT REFUTE OTHER MARKETS CLAIMED BY THE PLAINTIFFS

The plaintiffs also will show that the effects of defendants' merger may be substantially to lessen competition or to tend to create a monopoly not only in the 14 overlap airport pairs

9

resulting from the merger, but also in any and every airport pair where one defendant now operates without actual competition from the other.

As to the overlap routes created by the merger, defendants argue that the relevant markets should be city pairs, rather than airport pairs. This means, for example, that rather than considering a relevant market to be flights from San Francisco International Airport to JFK, the Court should consider the relevant market to be flights from the greater San Francisco area, which includes the San Francisco, Oakland, and San Jose airports, to the greater New York area, with JFK, LaGuardia, and Newark airports. Taking the broader market of city pairs, rather than airport pairs, results, not surprisingly, in less competitive foreclosure from defendants' merger than does using airport pairs.

On this issue, there is no legally mandated answer, as the rebuttal report of Professor Bush makes clear in pointing out the split of authority on whether airport-to-airport routes are preferable to city-to-city routes as relevant markets. Rebuttal Report, p. 4, n.5, citing DOJ official Bruce McDonald, *Antitrust For Airlines, available at* http://www.justice.gov/atr/public/speeches/217987.htm.; www.gao.gov/new.items/d02293r.pdf; *U.S. v. Airline Tariff Publishing Co.*, 1994-2 Trade Cases ¶ 70,687 (D.D.C., 1994); and *U.S. v. AMR Corp*, 140 F. Supp. 2d 1141, 1145-1146 (D. Kan., 2001), (discussing allegations of monopolizing airport pair markets), *aff'd* 335 F. 3d 1109 (10th Cir., 2003). The answer depends on the facts of each case. Here, where business travelers are the desired customers, Professor Bush notes that "it is clear that airlines charge higher fares for airports that are likely business destinations than they do secondary airports more likely accessed by leisure passengers." *Id.*, pp. 4-5. He finds this to be true for San Francisco versus Oakland, Houston Intercontinental versus Houston Hobby, and for other cities with multiple airports. *Id.*, pp. 5-7. This leads him to conclude not only that airport pairs are appropriate markets in this case, but also that "to prove for purposes of a preliminary

injunction hearing that airport pairs are relevant markets does not require sophisticated and expensive econometric techniques." *Id.*, p. 7.[7]

The other relevant market issue involves potential competition, as found by the Supreme Court in *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 528-29 (1973), to be a basis for enjoining Falstaff from acquiring Narragansett, a local New England brewer, even though Falstaff contended that it would not enter the market *de novo*. As the Court observed, "Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because entry eliminates a potential competitor exercising present influence on the market." 410 U.S. at 532.

Here, Mr. Tilton states in his Testimony that ████████████████████████ ████████████████████████████████ P. 7.[8] Mr. Smisek testified in his deposition that ████████████████████████████████ ████████████████████████████ Depo., [278:24]-[279:1]. He elaborated: ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████ *Id.*, [208:8-14].

It is hard to imagine a clearer admission that defendants are now potential competitors in every market in which one operates without the other, no matter how the markets are

---

[7] The DOJ's decision to close its investigation on the basis of the divestiture of the Newark gates also suggests, first, that defendants' merger does present likely anticompetitive effects, and, second, that airport pairs, rather than city pairs, are important, in that all of the divestitures took place at only a single one of the three New York airports.

[8] Tilton also states that ████████████████████████ *Id.*

defined. Their merger will obviously eliminate that potential competition and is therefore in violation of Section 7, as *Falstaff* makes clear.[9]

## VI.   THE BALANCE OF HARDSHIPS TIPS DECISIVELY IN PLAINTIFFS FAVOR BECAUSE THEY HAVE NO ADEQUATE REMEDY AT LAW

Defendants argue that the balance of hardships tips in their favor because plaintiffs have an adequate remedy at law in damages, and because divestiture can cure any problems with their merger. Neither argument has merit.

First, defendants premise their damages argument on the settlement of prior litigation challenging the Delta-Northwest merger, in which the plaintiffs in that case accepted a cash payment in exchange for a dismissal with no equitable relief. Even if settlement of prior unrelated litigation were relevant to any issue in this case—and it is not—one cannot make the leap of logic to assume that the settlement in any way constitutes a measure of the plaintiffs' damages in that case. The defendants cannot point to a single item of evidence in the record in the Delta-Northwest case, and have not done so, indicating either a claim for damages by the plaintiffs or the amount of the claimed damages. Indeed, the suit was solely for equitable relief under Section 16 of the Clayton Act. The amount of the settlement could represent plaintiffs' attorney fees, their cost of suit, the defendants' cost of litigation, a nuisance settlement for the defendants, a payment to eliminate the risk or uncertainty of litigation for either side, or consideration for some other unknown factor. The point is that it is impossible to know and unwise to speculate what the settlement represents.

---

[9] As the Supreme Court said in *Brown Shoe*, 370 U.S. at 346, "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, *particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time.* In the light of the trends in this industry we agree with the Government and the court below that this is an appropriate place at which to call a halt." (Emphasis added.)

To turn a settlement of one case into a reason for denying relief in another unrelated action is further destructive of the strong federal policy to encourage the settlement and extrajudicial resolution of lawsuits, *Marek v. Chesny*, 473 US 1, 10 (1985) (Fed.R.Civ.P. 68 "expresses a clear policy of favoring settlement of all lawsuits"); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir., 1991) (noting "strong judicial policy that favors settlements"); *Aro Corp. v. Allied Witan Co.*, 531 F. 2d 1368, 1372 (6th Cir., 1976) ("Public policy strongly favors settlement of disputes without litigation.") The plaintiffs in this suit and the Delta-Northwest case overlap, but are not totally identical. There is no authority cited by the defendants that would permit this Court to speculate on the basis for the settlement in Delta-Northwest as a ground for denying relief in this wholly equitable action. Nor is there logic, fairness, or justice in doing so.

Equally unsupported is the defendants' argument that, post-merger, damages are readily susceptible of calculation. Once the merger occurs, the harms anticipated include not merely an increase in airfares, but a reduction in output, including elimination of routes, fewer available seats, reduced frequency of flights, and diminished quality of service. Putting a dollar value on the present value of possible future fare increases is difficult enough; indeed defendants will no doubt contend that whatever number plaintiffs come up with is impermissibly speculative. Attaching a number to the remaining items involving reduced output is even more so, so much so that defendants' contention that plaintiffs have an adequate remedy at law in damages is absurd.

As to divestiture, although the remedy may be available to private antitrust plaintiffs, *California v. Am. Stores Co.*, 495 U.S. 271, 281 (1990), the nationwide nature of the violations in this case makes post-merger divestiture particularly inadvisable. Defendants no doubt consider that the only negative outcome of this litigation might be a finding that the effect of their merger is likely to be a substantial lessening of competition on one or more specific

routes, which the Court can then order divested.  To the contrary, the evidence supports not only foreclosure on specific routes, but much broader violations on a nationwide scale, which can be cured only by a complete unraveling of defendants' merger, an undertaking this Court might well be loath to assume post-merger, particularly when it can be avoided by enjoining the merger before its consummation.

These violations include both the likely foreclosure of competition for business travelers by the network carriers, and the likely foreclosure of potential competition between the defendants on every route one defendant flies without the other being present.  Competition in both markets takes place on a nationwide, if not worldwide, basis.  Hence, the likelihood of a substantial lessening of competition in either market or both markets can be cured only by a complete divestiture once the merger has closed, not by a piecemeal divestiture of specific routes.

Defendants also contend that plaintiffs have not suffered "antitrust injury," and therefore are barred from equitable relief.  In doing so, defendants ignore the prospective aspects of both Sections 7 and 16 of the Clayton Act.  Neither requires harm or injury actually to have occurred for equitable relief to be available.  "Section 7 was enacted to prevent anticompetitive mergers in their incipiency.  Therefore, all that is necessary [under Section 7] is that the merger create an appreciable danger of [anticompetitive] consequences in the future." *California v. Sutter Home System*, 130 F.Supp.2d 1109, 1117-18 (N.D. Cal. 2001) (emphasis added) quoting *U.S. v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963) (quotations and other citation omitted). "Competition is so important that mergers or acquisitions that 'may' lessen competition are prohibited.  The Supreme Court has specifically recognized that by using the phrase 'may,' Congress was concerned with probabilities, not certainties." *Bon-Ton Stores, Inc. v. May Department Stores Co.*, 881 F.Supp. 860, 867 (W.D.N.Y. 1994), citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323 (1962).

The Supreme Court has articulated the specific basis for obtaining injunctive relief under Section 16 of the Clayton Act in language demonstrating plaintiffs' entitlement here:

> . . . Section 16 of the Clayton Act, 15 U.S.C. § 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of "threatened" injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury . . ., he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). The standing requirements under Section 16 of the Clayton Act to obtain injunctive relief are also different from and less stringent than those under Section 4 applicable to damage claims. *Hawaii v. Standard Oil Co.*, 495 U.S. 251, 261 (1972); *Lucas Automotive Eng'g v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1234 (9th Cir. 1998). Finally, Chief Judge Walker of this District has expressly held that consumers, such as plaintiffs, have standing to challenge anticompetitive mergers. *Reilly v. The Hearst Corp.*, 107 F. Supp. 2d at 1194-95.

The last matter plaintiffs will address is defendants' contention that plaintiffs must post a substantial bond in order to obtain an injunction. Defendants are wrong. This Court has discretion to order a nominal bond, or no bond at all, where the requirement of a bond would effectively deny plaintiffs access to judicial review of their claims. *People ex rel. Van De Kamp v. Tahoe Regional Plan*, 766 F. 2d 1319, 1325-26 (9th Cir., 1985) ("The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review."); *Continental Oil Company v. Frontier Refining Company*, 338 F. 2d 780, 782-83 (10th Cir.,1964); *Wayne Chemical, Inc. v. Columbus Agcy. Serv. Corp.*, 567 F. 2d 692, 701 (7th Cir.,1977). Here, the exercise of such discretion is more than appropriate given that the defendants have declined plaintiffs' offer to consolidate this hearing with trial on the merits, and the disparity in resources between the parties.

1    Dated:  August 29, 2010

2                                    ALIOTO LAW FIRM
                                     GRAY, PLANT, MOOTY, MOOTY &
3                                    BENNETT, P.A.

4

5                                    By: _/s/ Daniel R. Shulman_____

6                                          Daniel R. Shulman (*Admitted Pro Hac Vice*)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*

**PLAINTIFFS' COUNSEL**

Joseph M. Alioto, SBN 42680
Theresa D. Moore (SBN 99978)
Joseph M. Alioto, Jr. (SBN 215544)
Thomas P. Pier (SBN 235740)
Angelina Alioto-Grace (SBN 206899)
ALIOTO LAW FIRM
555 California Street, Suite 3160
San Francisco, CA  94104
Telephone: (415)  434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
        tmoore@aliotolaw.com
        esexton@aliotolaw.com
        tpier@aliotolaw.com

Daniel R. Shulman, (MN SBN 100651), *Pro Hac Vice*
Julie L. Boehmke, (MN SBN 317330), *Pro Hac Vice*
Jeremy L. Johnson (MN SBN 328558), *Pro Hac Vice*
GRAY, PLANT, MOOTY, MOOTY &,   BENNETT, P.A.
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 632-3335
Facsimile: (612) 632-4335
Email: daniel.shulman@gpmlaw.com
        julie.boehmke@gpmlaw.com
        jeremy.johnson@gpjlaw.com

Gil D. Messina (NJ SBN GM5079)
*Admitted Pro Hac Vice*
MESSINA LAW FIRM, PC
961 Holmdel Road
Holmdel, NJ  07733
Telephone:  (732) 332-9300
Facsimile:  (732) 332-9301
Email: gmessina@messinalawfirm.com

Thomas V. Girardi
Stephen G. Larson
GIRARDI KEESE
1126 Wilshire Boulevard
Los Angeles, CA  90017
Telephone:  (213) 977-0211
Facsimile:  (213) 481-1554
Email:  tgirardi@girardikeese.com
        slarson@girardikeese.com

1   Jack W. Lee
    Derek G. Howard
2   Sean Tamura-Sato
    MINAMI TAMAKi LLP
3   360 Post Street, 8th Floor
    San Francisco, CA  94108
4   Telephone:  (415) 788-9000
    Facsimile:  (415) 398-3887
5   Email:  jlee@minamitamaki.com
            ddhoward@minamitamaki.com
6

7

8

9   GP:2839364 v2

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*CV-10-02858 RS*