Katherine B. Forrest (NY Bar No. 2381457)
Max R. Shulman (NY Bar No. 1473982)
Stuart W. Gold (NY Bar No. 1639434)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700
Email:  kforrest@cravath.com
        mshulman@cravath.com
        sgold@cravath.com
Admitted *Pro Hac Vice*

Attorneys for Defendants UAL Corporation and United Air Lines, Inc.

Paul L. Yde (D.C. Bar No. 449751)
Timothy J. Coleman (D.C. Bar No. 436415)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
701 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20004
Telephone:  (202) 777-4500
Facsimile:  (202) 777-4555
Email:  paul.yde@freshfields.com
        tim.coleman@freshfields.com
Admitted *Pro Hac Vice*

Attorneys for Defendant Continental Airlines, Inc.

[Names and Addresses of Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Michael C. Malaney, et al.,<br><br>                              Plaintiffs,<br><br>vs.<br><br>UAL CORPORATION, UNITED AIR LINES, INC., and CONTINENTAL AIRLINES, INC.,<br><br>                              Defendants. | CASE NO. 3:10-CV-02858-RS<br><br>DEFENDANTS' JOINT RESPONSE TO PLAINTIFFS' PRE-HEARING MEMORANDUM IN SUPPORT OF THE MOTION FOR A PRELIMINARY INJUNCTION<br><br>Dates:          August 31- Sept. 1, 2010<br>Time:           9:30 a.m.-  4:30 p.m.<br>Judge:          Hon. Richard Seeborg<br>Courtroom:    3 |

# TABLE OF CONTENTS

Page

Preliminary Statement...................................................................................... 1

Argument ......................................................................................................... 3

I.     PLAINTIFFS FAIL TO MAKE A "STRONG SHOWING" OF
LIKELIHOOD OF SUCCESS ON THE MERITS ................................. 3

     A.     Plaintiffs Rely Upon Outdated Caselaw ....................................... 3

     B.     Plaintiffs Fail to Demonstrate A Substantial Lessening of
Competition................................................................................... 6

II.     PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE
HARM.................................................................................................... 12

     A.     Plaintiffs' Alleged Harm Can Be Remedied By Money
Damages......................................................................................... 12

     B.     Plaintiffs Fail to Demonstrate Antitrust Injury ............................ 14

III.     PLAINTIFFS FAIL TO DEMONSTRATE THAT THE BALANCE
OF EQUITIES TIPS IN THEIR FAVOR OR THAT THE PUBLIC
INTEREST WOULD BE SERVED BY AN INJUNCTION ................. 14

DEFS. JOINT RESP. TO PLS.             CASE NO. 3:10-CV-02858 RS
MEM. IN SUPPORT OF PRELIM. INJ.

-i-

1

2

3

## TABLE OF AUTHORITIES

4
**Page(s)**

**Cases**

5

6
*Advocacy Org. for Patients and Providers v. Mercy Health Servs.*,
    987 F. Supp. 967 (E.D. Mich. 1997)....................................................1

7
*Alliance for the Wild Rockies v. Cottrell*,
8
    No. 09-35756, --- F.3d ---, 2010 WL 2926463 (9th Cir. July 28, 2010) ................................3

9
*Am. Ad Mgmt, Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ....................................................13

10

11
*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)....................................................13, 14

12
*Brown Shoe Co. v. U.S.*,
13
    370 U.S. 294 (1962)....................................................4

14
*Cargill, Inc. v. Monfort of Colo.*,
    479 U.S. 104 (1986)....................................................14

15
*Gonzales v. RN Connie G.*,
16
    No. C 09-3550, 2010 WL 144814 (N.D. Cal. Jan. 11, 2010) ....................................................8

17
*Lambtek Yogurt Machs. v. Dreyer's Grand Ice Cream, Inc.*,
18
    No. CIV. 96-20959 SW, 1997 WL 108718 (N.D. Cal. Mar. 3, 1997)....................................................6

19
*Phototron Corp. v. Eastman Kodak Co.*,
    842 F.2d 95 (5th Cir. 1988) ....................................................1

20

21
*Reilly v. MediaNews Group, Inc.*,
    No. C 06-04332, 2006 WL 2419100 (N.D. Cal. July 28, 2006)....................................................12

22
*Santa Cruz Med. Clinic, Derjjan Assoc., Inc., v. Dominican Santa Cruz Hosp.*,
23
    No. C93 20613, 1994 WL 619288 (N.D. Cal. Oct. 26, 1994)....................................................13

24
*Thurston v. Schwarzenegger*,
    No. 1:08-cv-00342-AWI-SMS, 2008 WL 2020393 (E.D. Cal. May 9, 2008) ....................................................8

25
*U.S. v. Aluminum Co. of Am.*,
26
    377 U.S. 271 (1964)....................................................4

27

28

*U.S. v. Baker Hughes Inc.,*
    908 F.2d 981 (D.C. Cir. 1990) .......................................................................4, 5, 6

*U.S. v. Cont'l Can Co.,*
    378 U.S. 441 (1964) ...........................................................................................4

*U.S. v. Gen. Dynamics Corp.,*
    415 U.S. 486 (1974) ...................................................................................4, 5, 7

*U.S. v. Int'l Harvester Co.,*
    564 F.2d 769 (7th Cir. 1977) ...........................................................................5

*U.S. v. Oracle Corp.,*
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) .......................................................5, 6

*U.S. v. Pabst Brewing Co.,*
    384 U.S. 546 (1966) ...........................................................................................4

*U.S. v. Phila. Nat'l Bank,*
    374 U.S. 321 (1963) ...........................................................................................4

*U.S. v. Syufy Enterps.,*
    903 F.2d 659 (9th Cir. 1990) ...........................................................................5

*U.S. v. Von's Grocery Co.,*
    384 U.S. 270 (1966) ...........................................................................................4

*U.S. v. Waste Mgmt., Inc.,*
    743 F.2d 976 (2d Cir. 1984) .........................................................................5, 6


**Statutes & Rules**

15 U.S.C. § 15.............................................................................................................13


**Other Authorities**

Comments of the Dep't of Justice on the Show Cause Order, Jt. Application of Air Canada,
    OST-2008-0234 (Dep't of Transp. June 26, 2009), *available at*
    http://www.justice.gov/atr/public/comments/247556.htm.......................................9

Daniel R. Shulman, *A New U.S. Administration and U.S. Antitrust Enforcement,*
    10 Sedona Conf. J. 1 (Fall 2009) ..............................................................4

Herbert Hovenkamp, *The Antitrust Enterprise: Principle and Execution* (2005) ........................5

James O'Connell, Deputy Asst. Atty Gen., Antitrust Div. U.S. Dep't of Justice, Statement Before the Subcommittee on Aviation (May 14, 2008), *available at* http://www.justice.gov/atr/public/testimony/233151.pdf ......................................................9

Ken Heyer, Carl Shapiro, and Jeffrey Wilder, *The Year in Review: Economics at the Antitrust Division, 2008-2009* Rev. Indus. Org. 349 (2009), *available at* http://www.springerlink.com/content/100336/ .........................................................9

Horizontal Merger Guidelines, *available at* http://www.justice.gov/atr/public/guidelines/hmg-2010.html ...................................................5

Order Granting Exemption, Docket DOT-OST-2010-0165 (Aug. 30, 2010)..............................1

Defs. Joint Resp. To Pls.
Mem. In Support of Prelim. Inj.

Case No. 3:10-CV-02858 RS

-iv-

**Preliminary Statement**

On Friday, August 27, 2010, the DOJ publicly announced clearance of the United/Continental merger—*i.e.*, that the DOJ did not have any "concerns regarding the competitive effects" of the merger.  (*See* Ex. 1073.)  The DOJ found, after "conduct[ing] a thorough investigation", that the "proposed merger would combine the airlines' largely complementary networks, which would result in overlap on a limited number of routes where United and Continental offer competing nonstop service".  (*See* Ex. 1073.)  In other words, after reviewing the millions of pages of documents and gigabytes of data produced by defendants and after meeting with United and Continental on numerous occasions, the DOJ concluded—contrary to what plaintiffs are claiming in this lawsuit—that the merger would have *no* anticompetitive effect.  In its approval, the DOJ adopted the precise argument that defendants make here—*i.e.*, that because United and Continental have highly complementary networks and few overlapping nonstop routes, there will *not* be a substantial lessening of competition as a result of the merger.[1]

As mentioned in our opening memorandum, plaintiffs must now prove that—despite the DOJ's expertise and experience (as conceded by plaintiffs' proposed expert)—the DOJ got it wrong.  (*See* Defs. Mem. at 3, 16.)  Such a result would be completely unprecedented.  (*Id.* at 16.)  What the court said in *Advocacy Organization for Patients and Providers v. Mercy Health Services*, 987 F. Supp. 967 (E.D. Mich. 1997), applies with equal force here:  "[P]laintiffs are not likely to succeed on the merits because neither the DOJ nor the FTC has challenged the merger.  This is a telling sign that the merger raises no significant anticompetitive concerns."  *Id.* at 974; *see also Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95 (5th Cir. 1988) (reversing the district court's injunction of a merger following FTC approval).  Plaintiffs' pre-hearing memorandum does not even come close to demonstrating that they can do what no one else has ever been able to do.  Indeed,

---

[1] In addition to DOJ clearance, the merger today received approval from the U.S. Department of Transportation ("DOT"), which was the final remaining federal regulatory approval that it needed. The DOT order allows the merger to close subject to certain post-closing conditions.  *See* Order Granting Exemption, Docket DOT-OST-2010-0165 (Aug. 30, 2010) (Ex. 1076).  Thus, the two federal agencies charged with protecting the public interest in relation to airline mergers have approved this transaction.  None of plaintiffs filed a comment in the DOT proceeding—or in any of the many regulatory fora worldwide in which the merger has been reviewed and approved.

1    rather than solving any of the serious substantive problems that plaintiffs have with their case, their

2    memorandum actually exacerbates them.

3              *First*, plaintiffs offer fragmented and unsupported definitions of the relevant market.

4    Even if they could establish a "national" market or a market for "airport pairs" (and they cannot),

5    their claim that fares will rise and capacity will fall in those markets is contradicted by their own

6    proposed expert—as well as by defendants' proposed expert, by the history of the airline industry

7    and by defendants' documents.  Their newly posited submarket—*i.e.*, the network carrier market for

8    business travelers—also does not work because it ignores the substantial entry of LCCs and their

9    vigorous competition for business travelers.  In fact, not only has plaintiffs' proposed expert

10   acknowledged that LCCs compete for business passengers, but also individual plaintiffs themselves

11   have testified that they have witnessed first hand competition from LCCs for such travelers—

12   including LCC competition that has caused network carriers to reduce significantly prices charged to

13   business travelers on specific routes.  In short, plaintiffs cannot establish a likelihood of success on

14   the merits under Section 7.

15             *Second*, plaintiffs' argument that money damages are not available is wrong as a

16   matter of law.  It ignores Section 4 of the Clayton Act, which provides private parties with a

17   damages action when they are harmed economically by a proposed merger.  Moreover, these

18   particular plaintiffs themselves will, in any event, suffer no injury at all—irreparable or otherwise—

19   from the merger.  With a single exception, each of the five "designated plaintiffs"—whom the

20   parties have stipulated would represent all forty-nine plaintiffs—has testified that he or she (a) has

21   never flown any of the thirteen airport pair routes identified by plaintiffs' proposed expert and does

22   not expect to do so in the future and/or (b) has not paid for airline tickets and does not expect to do

23   so in the future.[2]  Without such proof, plaintiffs are unable to establish injury.

24

25   _____

26       [2] The one exception is plaintiff D'Augusta, who has testified that she has flown from San
     Francisco (SFO) to Newark (EWR).  (D'Augusta Tr. at 55:25-56:2.)  But, except for a $50 service
27   fee, she has never paid cash for her travel on that route (*id.* at 55:25-60:20, 68:13-70:19)—and any
     issue of concentration at Newark has now been resolved by defendants' transfer of slots at Newark
28   Liberty to Southwest Airlines as part of the DOJ clearance process (*see* Ex. 1073).

*Third*, plaintiffs fail to rebut defendants' showing that the balance of equities tips strongly in defendants' favor and that an injunction would not serve the public interest.  An injunction would delay defendants' realization of billions of dollars in synergies, would leave them vulnerable to financial shocks that could undermine their viability, would threaten job security for thousands of their employees, would deny the flying public the merged carrier's broad network and might deprive small communities of continuing airline service in the future.  In contrast, plaintiffs' possible alleged harm from an injunction is speculative, minuscule and fully compensable by money damages.

For all these reasons—as discussed more fully below and in our opening memorandum—plaintiffs' motion for a preliminary injunction should be denied.

<u>Argument</u>

I.   **PLAINTIFFS FAIL TO MAKE A "STRONG SHOWING" OF LIKELIHOOD OF SUCCESS ON THE MERITS.[3]**

A.   **Plaintiffs Rely Upon Outdated Caselaw.**

Plaintiffs re-imagine the state of Section 7 law.  They argue that cases "interpreting Section 7 of the Clayton Act in the first half-century after its passage"—which are the sole ones that they cite—are "bedrock" that only "certain factions" would dispute.  (*See* Pls. Mem. at 1, 18, 20-26.) Those "factions," however, include the Supreme Court itself, the Ninth Circuit, the Northern District of California, the federal agencies tasked with examining the competitive effect of mergers and leading antitrust scholars.  Perhaps the most insightful comment about plaintiffs' cases has been made by plaintiffs' counsel himself:  "One would be hard pressed to find a lower court decision

---

[3] Plaintiffs argue that they need show only "serious questions" going to the merits of their claim. (*See* Pls. Mem. 1, 16, 25.)  But under the Ninth Circuit's "sliding scale" approach, plaintiffs' "success on the merits" burden is reduced *only* if they can demonstrate that "the balance of equities" "tips *sharply* in [their] favor".  *Alliance for the Wild Rockies v. Cottrell*, No. 09-35756, --- F.3d ---, 2010 WL 2926463, at *3-4 (9th Cir. July 28, 2010) (quotation marks omitted) (emphasis added). That is something they do not—and cannot—establish.  The *only* harm that they claim (*i.e.*, "higher fares") is economic injury—compensable by money damages—which (as demonstrated in our opening memorandum (Defs. Mem. at 25-27) and in Section III, *infra*) would be far outweighed by the hardship that defendants would face if the merger were enjoined.  Accordingly, although plaintiffs would fail even under the "sliding scale" standard, in fact their burden is to make a *strong* showing of likelihood of success on the merits.  *Alliance for the Wild Rockies*, 2010 WL 2926463, at *4.

---

1    following any of these cases to enjoin or unwind a merger".  Daniel R. Shulman, *A New U.S.*

2    *Administration and U.S. Antitrust Enforcement*, 10 Sedona Conf. J. 1, 7 (Fall 2009).

3              Plaintiffs suggest that their (outdated) cases sanction an approach that relies

4    exclusively upon the market share impact of a proposed merger.  (*See* Pls. Mem. at 21-25.)

5    Plaintiffs are wrong.  The cases actually consider economic evidence of industry conditions as a

6    critical factor in assessing anticompetitive effects.[4]  Moreover, the Supreme Court now explicitly

7    recognizes that a mere "statistical presentation", like the one which plaintiffs claim is reflected in the

8    early cases, is insufficient to demonstrate likelihood of success under Section 7.  *See, e.g.*, *U.S. v.*

9    *Gen. Dynamics Corp.*, 415 U.S. 486, 511 (1974).  As a three judge panel in the D.C. Circuit

10   (including future-Justices Clarence Thomas and Ruth Bader Ginsburg) has explained, "[a]lthough

11   the Supreme Court has not overruled these section 7 precedents [*i.e.*, those cited by plaintiffs], it has

12   cut them back sharply".  *U.S. v. Baker Hughes Inc.*, 908 F.2d 981, 990 (D.C. Cir. 1990).

13             Significantly, plaintiffs fail even to cite *General Dynamics*.  But that cannot make the

14   case disappear.  There, the Supreme Court refused to follow the approach that plaintiffs assert was

15   taken in the early cases (*i.e.*, the approach that plaintiffs contend is "bedrock").  *Gen. Dynamics*, 415

16   U.S. at 497-98.  In assessing the merger of two coal producers, the Court rejected the argument that

17   "'substantial' lessening of competition" could be measured simply by comparing the companies'

18   combined market share to market shares found to be anticompetitive under Section 7 in the past.  *Id.*

19   Yet that is precisely what plaintiffs (improperly) urge this Court to do.  (*See* Pls. Mem. at 25 ("Each

20   case enjoined a merger where the market share pales in comparison to the market share at issue in

21

22        [4] *See Brown Shoe Co. v. U.S.*, 370 U.S. 294, 344-45 (1962) (considering, *inter alia*, the "history
     of tendency toward concentration in the industry", the number of cities into which the merged entity
23   would expand and the effect of the merger upon "small independent stores"); *U.S. v. Phila. Nat'l
     Bank*, 374 U.S. 321, 366 (1963) (considering evidence "in the record of th[e] case to rebut the
24   inherently anticompetitive tendency manifested by these [market share] percentages", including,
     *inter alia*, testimony regarding the "vigorous" competition after the merger); *U.S. v. Aluminum Co.
25   of Am.*, 377 U.S. 271, 279-81 (1964) (considering the existence of "small but significant
     competitors"); *U.S. v. Cont'l Can Co.*, 378 U.S. 441, 458 (1964) (considering whether the merger
26   "will have probable anti-competitive effects within the relevant line of commerce"); *U.S. v. Pabst
     Brewing Co.*, 384 U.S. 546, 550-553 (1966) (considering "documents, statistics, official records,
27   depositions, and affidavits" regarding, *inter alia*, the "trend toward concentration in an industry";
     that factor is "highly relevant" "in deciding how substantial the anti-competitive effect of a merger
28   may be"); *U.S. v. Von's Grocery Co.*, 384 U.S. 270, 277-78 (1966) (considering the "trend toward
     concentration" between large and small competitors).

Defs. Joint Mem. of Law In                                          Case No. 3:10-CV-02858 RS
Opp'n to Prelim. Injunction Mot.

-4-

defendants' merger").)   The bottom line is that the Supreme Court jurisprudence that plaintiffs

purport to advance is no longer (and never was) relevant to a Section 7 analysis:

> "[T]he Supreme Court's last merger decision on the merits appeared more than thirty years ago.  While the Court has strongly warned lower courts that they should not anticipatorily 'overrule' Supreme Court decisions, even if they believe that the Court would do so itself, *this has largely happened in the law of mergers*. . . .  It is not merely that Supreme Court decisions are not followed on technical grounds—*the fundamental ideology of mergers has shifted dramatically over the last three decades* and now embodies values that are *inconsistent at the most fundamental level with those that the Supreme Court last articulated*."

Herbert Hovenkamp, *The Antitrust Enterprise:  Principle and Execution* at 208-09 (2005) (emphasis

added).

The Ninth Circuit and the Northern District of California (and other courts throughout

the country)[5] have heeded the "flexible" approach reflected in *General Dynamics* and have applied a

variety of factors, including the Merger Guidelines, in analyzing Section 7 claims.  Those factors

include, but are not limited to, economic efficiencies, the characteristics of buyers, current

participants in the relevant market and barriers to entry.  (*See* Merger Guidelines §§ 6-10.)

For example, in *United States v. Syufy Enterprises*, 903 F.2d 659 (9th Cir. 1990), the

Ninth Circuit concluded that "low entry barriers" and "other evidence of a defendant's inability to

control prices or exclude competitors" were important factors in determining that the purchase of

movie theaters did not substantially lessen competition.  *Id.* at 664.  In *United States v. Oracle*

*Corporation*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004), this Court scrutinized the efficiencies of the

merger of two software companies in analyzing whether it would substantially lessen competition.

*Id.* at 1173-75.  The Court pointed to the "trend . . . away from the very strict merger decisions of the

---

[5] *See e.g., Baker Hughes Inc.*, 908 F.2d at 984 ("The Supreme Court has adopted a totality-of-the-circumstances approach to the statute, weighing a variety of factors to determine the effects of particular transactions on competition"); *U.S. v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984) (finding no Section 7 violation because "entry into the relevant product and geographic market by new firms or by existing firms in the Fort Worth area is so easy that any anti-competitive impact of the merger before us would be eliminated more quickly by such competition than by litigation"); *U.S. v. Int'l Harvester Co.*, 564 F.2d 769, 774 (7th Cir. 1977) (finding no Section 7 violation because, without a merger, "[the company] did not have sufficient resources to compete effectively").

1960s" (*i.e.*, the very cases upon which plaintiffs rely) and agreed with "[b]oth the Supreme Court and appellate courts" on "the need to adopt a flexible approach in determining whether anticompetitive effects are likely to result from a merger". *Id.* at 1111 (quotation marks omitted).

In sum, contrary to plaintiffs' argument, the Section 7 inquiry today does not follow a strict market share approach, but rather a more holistic assessment of whether the merger would create "anticompetitive effects". *See, e.g.*, *Oracle Corp.*, 331 F. Supp. 2d at 1109 ("To establish a section 7 violation, plaintiffs must show that a pending acquisition is reasonably likely to cause anticompetitive effects"); *Lambtek Yogurt Machs. v. Dreyer's Grand Ice Cream, Inc.*, No. CIV. 96-20959 SW, 1997 WL 108718, at *4 (N.D. Cal. Mar. 3, 1997) ("Every merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons.  But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects" (quotation marks omitted)); *see also Baker Hughes Inc.*, 908 F.2d at 985-86 ("The court's consideration of these factors [*e.g.*, the *General Dynamics* factors] was not only appropriate, but imperative, because in this case these factors significantly affected the probability that the acquisition would have anticompetitive effects"); *U.S. v. Waste Mgmt., Inc.*, 743 F.2d 976, 982 (2d Cir. 1984) ("under *General Dynamics*, a substantial existing market share is insufficient to void a merger where that share is misleading as to actual future competitive effect").  As we demonstrate below (and in our opening memorandum (*see* Defs. Mem. at 13-20)), plaintiffs are unable to show such adverse competitive effects in any of their putative relevant markets.

**B.     Plaintiffs Fail to Demonstrate A Substantial Lessening of Competition.**

Plaintiffs posit three supposed relevant markets (two that they previously asserted and a new one)—*i.e.*, a "national" market (based upon "airport pairs"), an "international" market and "the network carrier market for business travelers".  (*See* Pls. Mem. at 3, 10, 19.)  Plaintiffs, however, fail to demonstrate that any is a plausible relevant market—far less that there would be a substantial lessening of competition in any.[6]

---

[6] As explained in our opening memorandum, plaintiffs' alleged "international" market cannot support a Section 7 claim because the U.S. government has granted defendants antitrust immunity with respect to coordination on international fares, schedules and capacity.  (Defs. Mem. at 14 n.11.)

1          **1.     National Market.**  Plaintiffs start by arguing that the merger would

2   substantially lessen competition in a so-called "national" market because of the tautology that it

3   would eliminate a competitor in that market.  (Pls. Mem. at 25.)  If that were the law, most mergers

4   would fail under Section 7—since almost every merger eliminates a competitor.  But it is not the

5   law.  As discussed above, the holistic approach requires assessment of *all* competitive effects—

6   including procompetitive efficiencies—in the relevant market.  (*See supra* at 4-6.)  Elimination of a

7   rival, by itself, is never enough.  *See, e.g.*, *Gen. Dynamics*, 415 U.S. at 511 ("Irrespective of the

8   markets within which the acquiring and the acquired company might be viewed as competitors for

9   purposes of this § 7 suit, the Government's statistical presentation simply did not establish that a

10  substantial lessening of competition was likely to occur in any market").

11         Plaintiffs then argue that the merger would reduce capacity and increase fares in the

12  "national" market.  (Pls. Mem. at 8-9.)  For this proposition they (mis)cite the report of the

13  Government Accountability Office ("GAO") related to the merger.  (Pls. Mem. at 14; *see* Pls. Ex.

14  71.)  But in doing so, they ignore the GAO's observation that the merger "will be carefully examined

15  by DOJ" and the GAO's finding that "[a]lthough the airline industry has experienced numerous

16  mergers and bankruptcies since deregulation, growth of existing airlines and the entry of new

17  airlines have contributed to a steady *increase in capacity*, as measured by available seat miles.  . . .

18  Capacity growth has slowed or declined just before and during recessions, *but not as a result of*

19  *large airline liquidations*".  (Pls. Ex. 71 at 2, 5 (emphasis added).)  They also ignore the clear data

20  demonstrating that capacity has *increased* over the past thirty years despite airline consolidation.

21  (Tilton Aff. ¶ 25; Rubinfeld Report ¶ 13 & Exs. 1, 2, 3; Ex. 1023.)  And, although they assert that

22  competition will be eliminated along connecting routes (*see* Pls. Mem. at 10), this is disproved by

23  "the pattern of hub presence suitable" for serving various routes, which establishes that the merged

24  carrier will actually be able to provide more connections.  (Expert Rebuttal Report of Daniel

25  Rubinfeld ("Rubinfeld Rebuttal") ¶ 9 & Ex. 2.)  Even plaintiffs' proposed expert himself concedes

26  the point—*i.e.*, that the United/Continental hub structure will provide greater connecting options for

27  passengers.  (*See* Bush Tr. at 83:22-84:8.)

28

1    Plaintiffs also contend that the merger will eliminate potential competition in the

2    "national" market because (supposedly) United and Continental "can establish a competitive

3    presence in any of the major airports located in the United States".  (Pls. Mem. at 8, 19.)  For this

4    tour de force proposition plaintiffs cite no facts—but only the allegations in their complaint.[7]  The

5    reason that they do not cite the record is because the record actually shows the opposite—*i.e.*, that

6    the financial weakness of both United and Continental in the absence of the merger would

7    undermine their ability to enter new markets as stand alone entities.  (*See* Smisek Aff. ¶ 4 ("This

8    merger comes at a critical juncture for the U.S. aviation industry, which has confronted extremely

9    difficult business challenges for the last decade. . . .  U.S. airlines have lost a total of $60 billion

10   since 2001").)

11   Moreover, right after arguing that entry into new routes would be easy, plaintiffs

12   immediately contradict themselves.  They assert that there are "significant barriers to entry in the

13   relevant market".  (Pls. Mem. at 13.)  They cannot have it both ways.  And their second argument is

14   wrong.  It is flatly disproved by the continuing history of dramatic new entry and success by LCCs.

15   (*See, e.g.*, Rubinfeld Report ¶¶ 18-19; Ex. 1016; Bush Tr. at 75:6-75:15; *see also* Defs. Mem. at

16   8-9.)  Indeed, LCCs now have a significant presence at all United's and Continental's hubs—and

17   Southwest's presence at Newark (one of Continental's hubs) will increase dramatically after the

18   merger.  (*See* Ex. 1074.)

19   Finally, plaintiffs offer the rank speculation that the merger "will effectively force" a

20   merger between American Airlines and U.S. Airways.  (Pls. Mem. at 1; *see also id.* at 3, 12.)  For

21   this, plaintiffs again cite only their complaint.  They ignore the fact that what they say has been

22   directly contradicted by public statements from the CEOs of both American and U.S. Airways—

23

24   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
         [7] Indeed, that approach is common throughout plaintiffs' memorandum.  They often cite only
     their own complaint to support their arguments.  (*See, e.g.* Pls. Mem. at 3, 8, 9, 11, 19.)  Of course, a

25   complaint's averments can never be adequate to establish a basis for a preliminary injunction.  *See,
     e.g.*, *Gonzales v. RN Connie G.*, No. C 09-3550, 2010 WL 144814, at *2 (N.D. Cal. Jan. 11, 2010)

26   ("Although the court is required to liberally construe the allegations of a complaint for purposes of
     evaluating its pleading sufficiency, the court does not engage in that kind of liberal construction

27   when evaluating evidence"); *Thurston v. Schwarzenegger*, No. 1:08-cv-00342-AWI-SMS, 2008 WL
     2020393, at *1 (E.D. Cal. May 9, 2008) (denying a motion for preliminary injunction; "Plaintiff's

28   allegations [in the complaint] do not constitute evidence in support of his motion").

DEFS. JOINT MEM. OF LAW IN                                          CASE NO. 3:10-CV-02858 RS
OPP'N TO PRELIM. INJUNCTION MOT.
                                              -8-

which establish that neither airline is looking to merge.  (*See* April 21, 2010, Conference Call Tr.,

Statement of Gerard Arpey, *available at* http://seekingalpha.com/article/200030-amr-corp-q1-2010-

earnings-call-transcript?part=qanda ("I think we have a strong network today. I am confident in our

corner post strategy because I think our footprint is in the most important business markets in the

United States already and so we are not necessarily threatened by talk of consolidation in the

industry"); *see also* Apr. 27, 2010, US Airways Conf. Call Tr., Statement of Doug Parker, *available*

*at* http://seekingalpha.com/article/201201-us-airways-group-inc-q1-2010-earnings-call-transcript

("To the contrary as evidenced by today's results, we have a very strong standalone airline that's

performing as well and better than our peer hub-and-spoke airlines of every measure; operating

reliability, cost control, financial momentum, absolute financial performance, etc.").)

      **2.**      **Airport Pairs.**  Plaintiffs assert a relevant market consisting of thirteen

specific airport pairs.  (Pls. Mem. at 10.)  However, as shown in our opening memorandum, "airport

pairs" is not a proper relevant market.  (Defs. Mem. at 8 n.6, 14-15.)  Indeed, one of plaintiffs' own

intended trial exhibits acknowledges that the appropriate relevant market is at least "city pairs", not

"airport pairs":  "It is generally preferable, time permitting, to assess city-pair, rather than airport-

pair, changes in competition.  Some larger U.S. cities (New York, Chicago, Los Angeles,

Washington D.C.) have more than one commercial airport that can compete for passenger traffic.

DOJ generally considers the relevant market to be a city-pair combination".  (Pls. Ex. 71.)

Numerous DOJ documents support a "city pair" relevant market.[8]  Indeed, plaintiffs' proposed

expert has conceded that he is "not aware of any instance in which the Department of Justice has in

litigation adopted an airport pair relevant market".  (Bush Tr. at 114:4-114:20.)

---

    [8] *See, e.g.*, Comments of the Dep't of Justice on the Show Cause Order, Jt. Application of Air Canada, OST-2008-0234, at 17 (Dep't of Transp. June 26, 2009), *available at* http://www.justice.gov/atr/public/comments/247556.htm ("In analyzing airline matters, the relevant markets are no larger than city pairs"); Ken Heyer, Carl Shapiro, and Jeffrey Wilder, *The Year in Review: Economics at the Antitrust Division, 2008-2009*, 35 Rev. Indus. Org. 349, 354-55 (2009), *available at* http://www.springerlink.com/content/100336/ (using city pairs as the relevant market)); James O'Connell, Deputy Asst. Atty Gen., Antitrust Div. U.S. Dep't of Justice, Statement Before the Subcommittee on Aviation, at 7 (May 14, 2008), *available at* http://www.justice.gov/atr/public/testimony/233151.pdf ("In airline mergers, the definitions of product and geographic market converge:  relevant airline markets are likely to consist of scheduled passenger airline service between a point of origin and a point of destination, generally referred to as city pairs").

Although plaintiffs argue that "[w]ith increased concentration also comes more opportunity for collusion, particularly in the non-stop airport pairs where the airlines remaining after defendants' merger can readily collude to raise fares" (Pls. Mem. at 12), they cite no evidence to show that the merger here would actually have that effect.  They ignore the fact that defendants' proposed expert has explicitly pointed to the heterogeneity in the airline industry as the reason why the merger would *not* lead to collusion (Rubinfeld Report at ¶¶ 68-81)—and the fact that plaintiffs' proposed expert has agreed that those factors do exist in the airline industry and that there is, therefore, not an "opportunity for collusion".  (Bush Tr. at 166:20-168:17.)  Moreover (and perhaps dispositive on this point), as plaintiffs' proposed expert has conceded, prices have not increased and capacity has not declined since the Delta/Northwest merger in 2008.  (Bush Tr. at 23:18-23:20; *see also* Rubinfeld Report Exs. 1, 2.)  In other words, *actual* events in the airline industry disprove plaintiffs' speculative and conclusory theory.

Finally, plaintiffs' contention that the merged carrier will "have a monopoly" on certain airport pair routes (*see* Pls. Mem. at 11; *see also id.* at 10 ("There are currently **no** other competing airlines for seven of these overlapping non-stop routes" (emphasis in original)) is, once again, supported by nothing more than their own complaint (*see e.g.*, *id.* at 11 (citing Compl. ¶¶ 71-72, 94)).  The argument, therefore, is not only meaningless, but also (and equally important) it fails to account for nearby airports that do offer effective competing service.  (Rubinfeld Rebuttal ¶¶ 5-6.)  For example, plaintiffs assert that, after the merger, United would have a monopoly on service from Cleveland Hopkins to Washington Dulles.  (Pls. Mem. at 11.)  But this ignores other Washington airports—which is particularly problematic since only eight percent of passengers who fly between Cleveland and Washington fly from Hopkins to Dulles.  (Rubinfeld Rebuttal ¶ 6.)  The same is true for other airport pair routes that plaintiffs' proposed expert highlights; they are often not the preferred routes for most passengers.  (*See* Rubinfeld Rebuttal Ex. 1.)

The ultimate nail in the coffin of the alleged "airport pair" relevant market is perhaps placed by the individual plaintiffs themselves.  For instance, one travel agent plaintiff has booked tickets to Newark, John F. Kennedy and LaGuardia airports for clients who fly to New York City (Brown Tr. at 11:6-11:15)—thereby directly undermining plaintiffs' claim that Newark alone is

1    properly part of a relevant airport pair route (*see* Pls. Mem. at 11).  Another plaintiff testified that,

2    although she lives "eight minutes" from the San Francisco airport, she has also flown into the airport

3    at Oakland.  (D'Augusta Tr. at 19:2-19:5, 72:4-72:6.)  And on her numerous trips from San

4    Francisco to New York, she has flown to Newark, LaGuardia and John F. Kennedy.  (*See, e.g.*,

5    D'Augusta Tr. at 55:25-56:2, 61:16-61:21, 71:16-71:20.)  In other words, plaintiffs' proposed expert

6    creates a metric that plaintiffs themselves reject.

7           **3.**     **Network Carrier Market for Business Travelers.**  Plaintiffs argue for "a

8    network carrier business traveler market, in which the five network carriers compete for business

9    travelers on the basis of the scope and size of their networks and accompanying features".  (Pls.

10   Mem. at 26.)  The argument fails.

11          On the most basic level, even plaintiffs' proposed expert himself has conceded that

12   LCCs compete for—and have successfully attracted—business travelers.  (Bush Tr. at 68:25-69:3;

13   81:12-81:17; *see also* Exs. 1013, 1014, 1015.)  LCCs have made a point of appealing to business

14   travelers by offering promotions geared towards the business community.  (Rubinfeld Rebuttal

15   ¶¶ 15-16.)  And it has worked.  Indeed, plaintiff Michael Malaney (a travel agent) has seen LCCs

16   exert "[e]xtremely significant" downward pressure on prices for business travelers.  (Malaney Tr. at

17   17:12-20:16.)  At his deposition, Mr. Malaney described a situation in which Delta, a network

18   carrier, had been charging business travelers "four, five, $600" for service between Grand Rapids,

19   Michigan, and Baltimore, Maryland; then AirTran (*i.e.*, an LCC) entered the market and started

20   charging $198 for service on the same route; this forced Delta to match that the $198 fare; and

21   business travelers began traveling the route on both Delta and AirTran.  (Malaney Tr. at

22   18:12-20:16.)  Mr. Malaney testified to a similar effect on the Grand Rapids to Orlando, Florida,

23   route.  Delta was charging $350 on that route; Allegiant Air (*i.e.*, an LCC) entered the market and

24   started charging $198 for the same route; that caused Delta to match the $198 fare; and both carriers

25   offered that fare to business travelers.  (Malaney Tr. at 25:18-27:19.)  As Mr. Malaney testified,

26   these steep fare reductions for business travelers were a "pretty obvious" result of the LCCs' entry

27   into the market.  (Malaney Tr. at 20:11-20:16.)

28

1    Plaintiffs' only purported support for their relevant market is excerpted from the

2    testimony of Continental CEO Jeffery Smisek—and is pulled completely out of context.  (*See* Pls.

3    Mem. at 3-5.)  In the testimony, Mr. Smisek discusses how Continental has tried to attract business

4    travelers in small markets.  Nowhere does he say that Continental does not compete with LCCs for

5    such travelers.  In fact, he says just the opposite—and precisely what plaintiffs' proposed expert and

6    plaintiff Malaney have said:  *i.e.*, that network carriers compete vigorously with LCCs for business

7    travelers.  (*See e.g.*, Smisek Tr. at 56:19-56:24 ("We are in a highly competitive industry with both

8    low-cost competitor competition and network carrier competition for business travelers and leisure

9    travelers.  . . .  [W]e compete with them every day"), 267:12-267:16 ("we compete for the same

10   passengers with LCCs, business and leisure"), 270:22-271:2 ("we are in competition with low-cost

11   carriers . . . for all kinds of passengers, including business passengers").)

## II.    PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM.

### A.    Plaintiffs' Alleged Harm Can Be Remedied By Money Damages.

14   Plaintiffs concede that this lawsuit is about harm compensable by money damages.

15   They identify their alleged injury as "higher fare prices"—*i.e.*, that "consumers will pay more for

16   less".  (Pls. Mem. at 14.)  As discussed in our opening memorandum, "higher prices" is precisely the

17   type of harm that is compensable by money damages and thus is not irreparable.  (Defs. Mem. at

18   21-23.)  *See, e.g., Reilly v. MediaNews Group, Inc.*, No. C 06-04332, 2006 WL 2419100, at *1, 5

19   (N.D. Cal. July 28, 2006) (denying a preliminary injunction because the plaintiff's claim that, *inter*

20   *alia*, "his newspaper subscription rates will increase" did not "constitute true irreparable harm" since

21   the "allegation[] assert[s] ways in which plaintiff will be financially injured").

22   ███████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████

24   ███████████████████████████████████████████████████████████

25   ███████████████████████████████████████████████████████

26   ████████████████████████████████  Plaintiffs were satisfied with money in that

27   case and there is nothing in the record to indicate that money would not be just as satisfactory in this

28   one.

Moreover, the fact of the matter is that the forty-nine individual plaintiffs here almost certainly would suffer no harm at all—irreparable or otherwise—from the merger.  For example, with one exception, in the past five years none of them has even flown the thirteen airport pair routes identified by plaintiffs' proposed expert, nor can any establish that he or she would so in the future.  (*See* Malaney Tr. at 131:22-133:14; Robinson Tr. at 132:25-135:8; Stensrud Tr. at 57:3-58:24; Brown Tr. at 56:22-59:10; *compare* D'Augusta Tr. at 55:25-56:1.)  Also with one exception, none has traveled for business in the last five years.  (*See, e.g.*, Robinson Tr. at 28:12-28:16; Stensrud Tr. at 11:6-11:8; Brown Tr. at 14:6-22:19; D'Augusta Tr. at 62:11-62:13.)  And they rarely, if ever, pay for their own airline tickets.  Thus, Mr. Malaney testified that he has never paid for an airline ticket with his own money, but rather uses "barter" tickets that airlines provide travel agents or has his travel agency buy the tickets—for both his personal and business travel.  (*See, e.g.*, Malaney Tr. at 60:14-124:16; D'Augusta Tr. at 57:2-58:3.)  Accordingly, even if the merger were to have a fare impact—and it will not (*see supra* at 7; Defs. Mem. at 2)—these particular plaintiffs would not feel it.

Plaintiffs try to avoid those dispositive facts by arguing that they simply do not have a damages remedy.  They insist that the "only remedy available to [them] under federal antitrust law" is an injunction—*i.e.*, that "[t]hey cannot obtain damages and, as such, do not have an adequate remedy at law".  (Pls. Mem. at 27.)  Plaintiffs are wrong.  Section 4 of the Clayton Act allows private individuals to recover money damages for Section 7 violations.  *See* 15 U.S.C. § 15.  Section 4 provides, in pertinent part, that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained".  *Id.*  Alleged "higher prices" is just what Section 4 was meant to rectify.  *See, e.g., Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982) (an "increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which section 4 potentially offers redress"); *Am. Ad Mgmt, Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999) (finding that authorized sellers of Yellow Pages advertising could sue under Section 4 for damages caused by higher advertising prices); *Santa Cruz Med. Clinic, Derjian Assoc.,*

1   *Inc., v. Dominican Santa Cruz Hosp.*, No. C93 20613, 1994 WL 619288, at *5 (N.D. Cal. Oct. 26,

2   1994) (quoting *Blue Shield of Va.*, 457 U.S. at 482-83).

3         **B.**    **Plaintiffs Fail to Demonstrate Antitrust Injury.**

4         Plaintiffs offer no facts that would establish "antitrust injury".  For example, although

5   they argue that "[t]here will be less capacity" as a result of the merger (*see* Pls. Mem. at 1), their

6   proposed expert has not done any analysis of whether capacity would in fact decline.  (Bush Tr. at

7   23:11-23:17, 163:23-164:5.)  Plaintiffs argue that there will be "more concentration" in the airline

8   industry after the merger (*see* Pls. Mem. at 1), but their proposed expert could not identify a single

9   LCC that would exit any market as a result of the merger.  (Bush Tr. at 129:20-129:24.)  They argue

10  that the merger would cause "diminished quantity and quality of service" (Pls. Mem. at 1), but the

11  record establishes the opposite—*i.e.*, that the cost savings resulting from the merger will not be

12  based upon either lower quantity or lower quality of service (Rubinfeld Report ¶ 30), that the merger

13  will actually yield a broader network for consumers (Rubinfeld Report ¶¶ 34, 35) and that it will

14  benefit underserved small communities (*see* Smisek Aff. ¶¶ 21-24; Tilton Aff. ¶¶ 43-47).  They

15  argue that the merger will cause "higher prices" (Pls. Mem. at 1), but the evidence once again is to

16  the contrary.  It shows that the merger will eliminate "double marginalization" (Rubinfeld Report

17  ¶¶ 24-25), which plaintiffs' proposed expert has conceded can lead to lower fares (Bush Tr. at 58:2-

18  58:24).   Thus, plaintiffs fail to demonstrate any "injury of the type the antitrust laws were intended

19  to prevent and that flows from that which makes the defendants' acts unlawful".  *Cargill, Inc. v.*

20  *Monfort of Colo.,* 479 U.S. 104, 109 (1986).

21  **III.**    **PLAINTIFFS FAIL TO DEMONSTRATE THAT THE BALANCE OF EQUITIES**
            **TIPS IN THEIR FAVOR OR THAT THE PUBLIC INTEREST WOULD BE SERVED**

22          **BY AN INJUNCTION.**

23        Plaintiffs argue that an injunction would cause defendants a mere "inconvenience[]"

24  that "pales by comparison" to the harm plaintiffs supposedly would suffer.  (Pls. Mem. at 28.)  That

25  is nonsense on both fronts.  The consequences of an injunction to defendants would hardly be a mere

26  "inconvenience".  Rather, the consequences would be bleak.  (*See* Defs. Mem. at 24-27.)  They

27  would include billions of dollars in lost synergies, the continuing vulnerability of both companies to

28  catastrophic events and inroads from LCCs and international carriers and the loss of job security for

1    tens of thousands of employees.  (*See id.* at 25-27.)  In contrast, the supposed consequences to

2    plaintiffs if an injunction is denied are ephemeral, marginal and fully compensable by money

3    damages—*i.e.*, allegedly higher fares on routes that none (with one exception) of the forty-nine

4    plaintiffs flies or intends to fly in the future.  (*Id.* at 3; *see also* D'Augusta Tr. at 55:25-56:2.)

5            Plaintiffs' attempt to show a public interest impact is equally absurd.  Their

6    conclusory assertion that the merger would deprive the general public of flight choices and force

7    higher fares (*see* Pls. Mem. at 29) is disproved by both defendants' proposed expert and their own.

8    (*See* Rubinfeld Report at ¶¶ 24, 28; Bush Tr. at 163:23-164:5; *see also* Defs. Mem. at 27-29.)  In

9    contrast, as defendants have shown, an injunction would have a serious adverse public impact—by

10   depriving the public of merger related efficiencies such as lower prices, a broader airline network

11   and the environmental benefits resulting from fleet optimization.  (Defs. Mem. at 28.)  The GAO has

12   recognized those merger related efficiencies in this case, referring to the fact that the merger here

13   would "creat[e] a new effective competitor in 173 airport pairs affecting almost 9.5 million

14   passengers"—and defendants believe that the results will actually be significantly better than that.

15   (*See* Pls. Ex. 71 at i.)

16           Plaintiffs contend that the public has an interest in enforcement of the antitrust laws.

17   (*See* Pls. Mem. at 29.)  This is one place where defendants wholeheartedly agree.  But here the DOJ,

18   after thoroughly considering all the facts, has spoken.  It has concluded that the merger does not pose

19   any antitrust concern.  (Ex. 1073.)  Plaintiffs have failed to show why this Court should not reach the

20   same conclusion.  Issuance of an injunction, in the face of DOJ clearance, would harm both

21   defendants and the general public.

22

23

24

25

26

27

28

1

2  Dated:  August 30, 2010                    By:  _____/s/_____

3                                                  Katherine B. Forrest

4                                             Katherine B. Forrest (NY Bar No. 2381457)
                                              Max R. Shulman (NY Bar No. 1473982)

5                                             Stuart W. Gold (NY Bar No. 1639434)
                                              CRAVATH, SWAINE & MOORE LLP

6                                             Worldwide Plaza

7                                             825 Eighth Avenue
                                              New York, NY 10019

8                                             Telephone:  (212) 474-1000
                                              Facsimile:  (212) 474-3700

9                                             Email:  kforrest@cravath.com
                                                      mshulman@cravath.com

10                                                     sgold@cravath.com
                                              Admitted *Pro Hac Vice*

11
                                              Attorneys for Defendants UAL Corporation and United
12                                            Air Lines, Inc.

13                                            Paul L. Yde (D.C. Bar No. 449751)
                                              Timothy J. Coleman (D.C. Bar No. 436415)

14                                            FRESHFIELDS BRUCKHAUS DERINGER US LLP
                                              701 Pennsylvania Avenue NW, Suite 600

15                                            Washington, DC 20004
                                              Telephone:  (202) 777-4500

16                                            Facsimile:  (202) 777-4555
                                              Email:  paul.yde@freshfields.com

17                                                    tim.coleman@freshfields.com
                                              Admitted *Pro Hac Vice*

18
                                              Attorneys for Defendant Continental Airlines, Inc.
19

20                                            Patrick D. Robbins (CA Bar No. 152288)
                                              SHEARMAN & STERLING LLP

21                                            525 Market Street, Suite 1500
                                              San Francisco, CA 94105-2723

22                                            Telephone:  (415) 616-1100
                                              Facsimile:  (415) 616-1199

23                                            Email:  probbins@shearman.com

24
                                              Attorneys for Defendants UAL Corporation, United Air
25                                            Lines, Inc. and Continental Airlines, Inc.

26

27

28