**\*E-FILED 9/27/10\***

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Michael C. Malaney, et al.,

                              Plaintiffs,

        vs.

UAL CORPORATION, UNITED AIR
LINES, INC., and CONTINENTAL
AIRLINES, INC.,

                              Defendants.

CASE NO. 3:10-CV-02858-RS

**ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION**

# I. INTRODUCTION

Forty-nine individual plaintiffs seek a preliminary injunction under the Clayton Antitrust Act, pending a trial on the merits, to enjoin the merger of defendants UAL Corporation, United Air Lines, Inc. ("United") and Continental Airlines, Inc. ("Continental"), scheduled to close on October 1, 2010.  The merger would create the largest domestic airline as measured in revenue, revenue passenger miles ("RPMs") and available seat miles ("ASMs").[1]  Defendants have received all necessary regulatory approvals from the Department of Justice ("DOJ"), the Department of Transportation and the European Commission, as well as the approval of their respective shareholders.  The parties have submitted a thorough record by way of a two-day evidentiary hearing, post-hearing closing arguments, and extensive briefing.  After careful consideration of the record and arguments presented, the Court finds that plaintiffs have failed to satisfy the requirements for the extraordinary remedy of preliminary injunctive relief and therefore their motion must be denied.

# II. BACKGROUND

A. Factual Background

1. *Defendants*

United and Continental are major airline carriers with extensive domestic and international operations.  Both are considered "network carriers," characterized as airlines operating on a "hub-and-spoke" business model, and also "legacy carriers," which consist of airlines that existed prior to the 1978 deregulation of the airline industry. Tr. 238:16-19; Smisek Dep., 43:25-44:16.  In the hub-and-spoke model, hub airports serve as transfer points through which travelers move between connecting flights as opposed to flying directly point-to-point.  The network carriers, United, Continental, Delta Airlines, American Airlines, USAir and to some extent Alaska Airlines, are able

---

[1] RPMs equal the number of miles flown by passengers, and are commonly used to measure airline size.  One ASM equals one seat flown one mile, regardless of whether or not a passenger occupies that seat.  ASMs are a common measurement of airline capacity.

1    to serve both large and small communities through their extensive route networks, and are

2    distinguished from "low cost carriers" ("LCCs"), which traditionally have operated on a point-to-

3    point basis, focusing on high density routes rather than small communities and utilizing a single

4    aircraft type.  Southwest Airlines, jetBlue, Spirit Airlines, Virgin America, Allegiant, AirTran

5    Airways, Frontier Airlines and Sun Country Airlines, among others, are categorized as LCCs.[2]

6    Despite the historical delineation separating the network carrier and LCC business models, a number

7    of LCCs, such as AirTran and Frontier, have begun developing "hubbing networks" that resemble

8    those of a network carrier, and some LCCs have begun to serve small community routes.  Rubinfeld

9    Report ¶ 12; Knight Aff. ¶ 7.

10          Since the passage of airline deregulation, capacity and output in the industry has increased

11   significantly.  The number of ASMs has grown from approximately 259 billion in 1978 to over 756

12   billion in 2007, decreasing to 681 billion in 2008 and 2009 due to poor economic conditions.

13   Rubinfeld Report ¶ 13.  Similarly, RSMs grew from 161 billion to 602 billion in 2007, before falling

14   back to 551 billion in 2009.  *Id*.  During that time, inflation-adjusted airline fares have fallen.  While

15   a number of factors have contributed to this pattern of fare decline, a significant reason, according to

16   Dr. Daniel Rubinfeld, defendants' expert, has been the entry and expansion of LCCs in the industry.

17   *Id*. ¶ 16.  As the evidence adduced during the hearing demonstrated, LCCs have significantly

18   expanded the number of routes and cities that they serve, and have taken a correspondingly increased

19   share of origin and destination ("O&D")[3] passengers, growing from 19.9% in 1998 to 37.7% in 2009.

20

21          [2] Plaintiffs request that the Court take judicial notice pursuant to Rule 201 of the Federal Rules
     of Evidence of an announcement reported in the media on this date that two LCCs - Southwest and

22   AirTran - intend to merge.  While the Court will take judicial notice of that fact, it does not alter the
     analysis or result herein.  In addition, plaintiffs request that the Court take judicial notice of a

23   number of media reports concerning the current condition of the airline industry.  The Court finds
     that those reports are outside the scope of Rule 201, and therefore plaintiffs' additional requests for

24   judicial notice are denied.

25          [3] O&D passengers are those who are boarding or deplaning at a particular stop, as distinct from
     those remaining on the plane in order to continue to another destination.

26

1    Ex. 1020; Bush Dep. Tr. 86:4-17; Rubinfeld Rebuttal ¶ 19.  Indeed, while a merged United and

2    Continental (the third and fourth largest domestic carriers by RPMs and revenue, respectively)

3    would be the largest domestic airline based upon it projected RPMs, revenue and ASMs, both parties

4    agree that Southwest (an LCC) is the largest domestic carrier by O&D passenger share, a position it

5    would continue to occupy after consummation of the merger. Ex. 1012; Bush Dep. Tr. 64:6-65:6.

6          United's domestic hubs are located in Los Angeles, San Francisco, Denver, Chicago O'Hare

7    and Washington Dulles, while Continental operates domestic hubs in Houston (Bush International),

8    Cleveland and Newark.  In other words, of the eight domestic hubs that the merged entity will

9    operate, none currently overlap between United and Continental.  Of the extensive networks

10   operated by the two airlines (the merged entity would serve 347 destinations, 889 nonstop domestic

11   routes, and a substantial connecting route network), there are fifteen domestic non-stop city-pair

12   overlaps, each of which is served by airline carriers other than defendants (including LCCs), and 113

13   connecting city-pair overlaps, only three of which would be served by only a single competitor

14   following the merger, with the remainder facing competition from one or two other airlines.  Knight

15   Aff. ¶¶ 17, 19; Rubinfeld Report ¶ 104, Ex. 32.[4]

16         In their complaint, Plaintiffs make three claims regarding concentration at the airport and city

17   level that will result from the merger.  Compl. ¶¶ 72-80.  First, they allege that there will be

18   increased market concentration in four metropolitan areas (*i.e.*, Washington, D.C., New Orleans, San

19   Diego, and Seattle).  *Id*. at ¶ 72.  Second, they identify seventeen airports that will experience

20   excessive concentration.  *Id*. at ¶ 73.  Third, they allege that the merger will create monopolies,

21   duopolies and oligopolies at a number of unnamed airports.[5]  *Id*. at ¶¶ 76-80.  In addition, Professor

---

22

23   [4] Dr. Rubinfeld identified connecting city-pair overlaps by focusing on airports where United
     and Continental each have at least ten percent of O&D passengers, have at least forty percent of
24   O&D passengers on a combined basis, and where at least five passengers travel per day in each
     direction on the city pair.  He considered another carrier to be a competitor if it had at least ten
     percent of annual O&D passengers.

25
     [5] Notwithstanding the allegations in their complaint, plaintiffs provided no explanation for, or
26   evidence to suggest why, concentration at *airports* as opposed to *airport-routes* was significant.

CASE NO. 3:10-CV-02858-RS

Darren Bush, plaintiffs' expert, identified thirteen airport-pair overlaps at which United and Continental is each present that he believes would become highly concentrated as a result of the merger. Bush Report at 3. Of the four identified metropolitan areas, the merged United/Continental entity would carry fewer than twenty percent of O&D passengers, with Southwest or Alaska Airlines controlling the largest market share in each. Rubinfeld Ex. 30. Of the seventeen airports identified in the complaint and the thirteen airport-pairs identified by Professor Bush, each will be served by multiple other carriers, including LCCs.[6]

2. *Plaintiffs*

The plaintiffs in this action are forty-nine individuals, some of whom are retired while others remain actively employed. Each of the plaintiffs submitted an identical affidavit, which reads:

> I am a plaintiff in the action captioned above.
> In the past 5 years I have purchased commercial air travel for my personal use.
> I anticipate that I will purchase commercial air travel for my personal use in the future, and I have no reason to believe that I will not.
> I anticipate that if the proposed merger between United Airlines and Continental Airlines is consummated, the result will be higher ticket prices, reduced capacity, fewer flights, fewer origin and destination cities, decreased levels of service, and increased fees for fuel, baggage, in-flight service and other items.

*See, e.g.,* Malaney Aff.

Additionally, plaintiffs Jan Marie Brown, Rosemary D'Augusta, Michael Malaney, Clyde Stensrud, and Dana Robinson were each deposed, with all except Ms. D'Augusta later providing live testimony at the evidentiary hearing. Of the forty-nine plaintiffs, there are none whose nearest airport is served to a substantial degree by United or Continental (*i.e.*, with at least ten percent of the

---

Indeed, plaintiffs appear to have abandoned any focus on airports alone, as the arguments presented in the briefing and at oral argument focused primarily on the anticompetitive effect of the merger on specific routes.

[6] Defendants' combined O&D passenger shares is less than ten percent at fifteen of the seventeen identified airports. Each of the seventeen airports, and the thirteen identified airport-pairs, has at least one nearby airport that offers competing service from other airlines, including LCCs. Of the 669 domestic airports, United and Continental each have at least a ten percent share of O&D passengers at only four. Rubinfeld Ex. 32.

1    passengers).  Seven plaintiffs reported having flown on a United/Continental overlap route, but only

2    one (Ms. D'Augusta) recounted flying more than one trip on such a route.  Rubinfeld Report ¶¶ 98,

3    106.  Ms. D'Augusta was also the sole plaintiff to testify (by deposition) that she had flown on any

4    of the thirteen airport-pairs identified by Professor Bush, or to express any intention to fly any of

5    those specific routes in the future.  While some of the plaintiffs continue to work, none of them

6    testified that they have traveled or plan to travel for business to any significant extent or to any

7    particular destination.  Each of the plaintiffs who provided live or deposition testimony testified that

8    they work in, have worked in, or have some economic interest in the travel agency business, but

9    none testified that a merger between United and Continental would have any specific economic or

10   other impact on their businesses.[7]

11        B. Procedural History

12        After United and Continental announced their plans to merge on May 3, 2010, plaintiffs filed

13   this action on June 29, 2010, alleging a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C.

14   § 18 and seeking injunctive relief under Section 16 of the Act, 15 U.S.C. § 26.  On August 9, 2010,

15   plaintiffs moved for a preliminary injunction seeking to block the merger pending a trial on the

16   merits of their Section 7 claim.  The parties each filed opening and reply memoranda with the Court

17   prior to a scheduled evidentiary hearing, which was conducted on August 31 and September 1, 2010.

18        Prior to the evidentiary hearing, the parties also submitted numerous exhibits, witness

19   declarations, expert reports and designations of deposition transcripts as their direct testimony.[8]  As

20   stated above, each of the forty-nine plaintiffs' submitted nearly identical short affidavits.  In

21

22        [7] Mr. Stensrud testified that he owns a travel agency but is not involved in the day-to-day
23   operations of the business.  Ms. Robinson testified that she owned a travel agency, but has since sold
     the business and retired.

24        [8] Other than defendants' limited objections as to the deposition testimony of Glenn Tilton,
25   Zane Rowe and Kathryn Mikells, which the Court need not address in making its ruling on the
     preliminary injunction, and plaintiffs' objection to the Passengers Against Mergers Agreement,
26   which is addressed below, neither party objected to the other's evidentiary submissions.

1    addition, defendants designated certain portions of the deposition testimony of Ms. Brown, Mr.

2    Malaney, Mr. Stensrud, Ms. Robinson and Ms. D'Augusta to be admitted into the record.[9]  The

3    defendants direct testimony consisted of written declarations from Jeffrey Smisek, Chairman of the

4    Board, President and Chief Executive Officer of Continental and the CEO-designate of the new

5    merged entity, Glenn Tilton, United's Chief Executive Officer who will serve as a non-executive

6    Chairman for the new merged entity, and Kevin Knight, United's Senior Vice President for

7    Planning.  Additionally, the parties each designated to be admitted into the record certain portions of

8    the deposition testimony of Mr. Smisek, Mr. Tilton, Mr. Knight, Vaughn Cordle (a security analyst

9    and former United pilot), Kathryn Mikells (United's Chief Financial Officer), and Zane Rowe

10   (Continental's Chief Financial Officer).

11          Each party further submitted expert testimony as to the relevant markets impacted by the

12   merger and its effect on those markets.  This expert testimony consisted of a report and rebuttal

13   report by Dr. Rubinfeld prepared on behalf of defendants, and a report and rebuttal report prepared

14   for plaintiffs by Professor Bush.  Dr. Rubinfeld, who received a Ph.D. in economics from the

15   Massachusetts Institute of Technology, served as the Deputy Assistant Attorney General and chief

16   economist for the Antitrust Division of DOJ in 1997 and 1998.  He presented his findings after

17   conducting extensive economic analysis and modeling of the airline industry.  Professor Bush, who

18   received a J.D. and a Ph.D in economics from the University of Utah, served as a junior staff

19   attorney for the Antitrust Division of DOJ prior to becoming an associate law professor at the

20   University of Houston.  He conducted no econometric or quantitative analysis of the anticompetitive

21   effects of the merger on the airline industry, finding instead that such analysis is not required when

22

23

24   _____

25        [9] Defendants did not originally designate Ms. D'Augusta's entire deposition testimony because she was listed as a live witness.  However, because Ms. D'Augusta did not testify at the evidentiary hearing due to illness, defendants later designated her entire deposition transcript.

26

1    "the anticompetitive effects of a merger are readily apparent."  Bush Rebuttal at 2; Tr. 550:2-

2    551:11.[10]

3           At the evidentiary hearing on August 31 and September 1, 2010, the Court heard live

4    testimony from Mr. Smisek, Mr. Tilton, Mr. Knight, Dr. Rubinfeld, Professor Bush, Ms. Brown, Mr.

5    Malaney, Mr. Stensrud and Ms. Robinson.  The parties then provided post-hearing briefing, followed

6    by final closing arguments on the motion on September 17, 2010.

7                                      III. LEGAL STANDARD

8    A. Preliminary Injunction Standard

9           "A preliminary injunction is an extraordinary remedy never awarded as a matter of right."

10   *Alliance for the Wild Rockies v. Cottrell*, __ F.3d__, 2010 WL 2926463, *3 (9th Cir. July 28, 2010)

11   (quoting *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 376 (2008)).  "A plaintiff seeking a

12   preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

13   suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

14   favor, and that an injunction is in the public interest."  *Id.* (quoting *Winter*, 129 S. Ct. at 374).  While

15   the Supreme Court in *Winter* rejected the Ninth Circuit's prior holding that a "possibility" of

16   irreparable harm was sufficient, in certain circumstances, to warrant a preliminary injunction, it did

17   not, according to *Alliance for the Wild Rockies*, reject the notion of a "sliding scale" approach to

18   preliminary injunctions utilized by this and other circuit courts of appeal.  *Id.* at *3-4.  Under the

19   "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a

20   stronger showing of one element may offset a weaker showing of another."  *Id.* at *4.  The Ninth

21   Circuit has adopted, as articulated in *Alliance for the Wild Rockies*, a version of this approach often

22   referred to as the "serious questions" test.  *Id.*  Under that test, a preliminary injunction is warranted

23
     _____

24        [10] While the Court will not revisit the issue of Professor Bush's qualifications for designation as
     an economics expert, in light of his limited professional background in that field and his failure to
25   conduct any relevant quantitative or other sufficiently thorough analysis, as well as his largely
     unpersuasive hearing testimony, the Court affords his opinion little weight, particularly with regards
26   to his identification of applicable relevant markets.

1    where a plaintiff demonstrates "serious questions going to the merits and hardship balance that tips

2    sharply toward the plaintiff…assuming the other two elements of the *Winter* test are also met." *Id.*

3    B. Clayton Act Standard

4        Section 7 of the Clayton Act proscribes any person who is "engaged in commerce or in any

5    activity affecting commerce" from acquiring "the whole or any part" of a business if the effect of

6    that acquisition "may be substantially to lessen competition, or to tend to create a monopoly." 15

7    U.S.C. § 18. Under Section 16 of the Clayton Act, a private plaintiff may obtain injunctive relief for

8    a violation of Section 7 upon a showing of "threatened loss or damage." 15 U.S.C. § 26. An

9    injunction may be awarded to a private plaintiff, however, only when he or she shows that the

10   antitrust injuries are personal. *U.S. v. Borden Co.*, 347 U.S. 514, 518 (1954) ("The private-

11   injunction action… supplements Government enforcement of the antitrust laws. The Government

12   seeks its injunctive remedies on behalf of the general public; the private plaintiff, though his remedy

13   is made available pursuant to public policy as determined by Congress, may be expected to exercise

14   it only when his personal interest will be served. These private and public actions were designed to

15   be cumulative, not mutually exclusive.") (citations omitted); *see also Cal. v. Am. Stores Co.*, 495

16   U.S. 271, 295 (1990) ("In a Government case the proof of the violation of law may itself establish

17   sufficient public injury to warrant relief…. A private litigant, however, must have standing -- in the

18   words of § 16, he must prove 'threatened loss or damage' to his own interests in order to obtain

19   relief.") (citations omitted).

20       To advance the requisite showing of a likely violation of Section 7, and thereby warrant

21   injunctive relief, a plaintiff must, by a preponderance of the evidence, first show the existence of a

22   relevant market and then establish that the pending acquisition is "reasonably likely to cause

23   anticompetitive effects" in that market. *U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal.

24   2004) (citing *U.S. v. Penn-Olin Chem. Co.*, 378 U.S. 158, 171 (1964)); *Cal. v. Sutter Health Sys.*,

25   130 F.Supp.2d 1109, 1118 (N.D.Cal. 2001) (on a motion for a preliminary injunction, "[t]o establish

26

1  a prima facie case under Section 7 of the Clayton Act, a plaintiff must first define the relevant

2  market, and then establish that the proposed merger will create an appreciable danger of

3  anticompetitive consequences.") (citing *U.S. v. Phila. Nat'l Bank,* 374 U.S. 321, 362 (1963)).

4         In delineating the boundaries of a relevant market, plaintiffs must establish both the relevant

5  product market and the relevant geographic market. *See Oracle*, 331 F. Supp. 2d at 1110; *see also*

6  *E.I. Du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 683 F. Supp 2d 401, 409 (E.D. Va. 2009).

7  The relevant product market is "determined by the reasonable interchangeability of use or the cross-

8  elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. 294,

9  325 (1962). "Reasonable interchangeability of use" means that the products "have 'reasonable

10 interchangeability' based upon 'price, use and qualities,'" *Oracle*, 331 F. Supp. 2d at 1131 (citing

11 *U.S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1954)), while "cross-elasticity of

12 demand" is the degree to which purchasers will accept substitute products based upon changes in

13 characteristics such as price. *See U.S. v. Syufy Enters.*, 712 F. Supp. 1386, 1398-1399 (N.D. Cal.

14 1989). To be part of the same relevant product market, products need only be "viable substitutes,"

15 even if they would not necessarily be a customer's first choice. *Id*. at 1399; *see also Thurman*

16 *Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (product market includes

17 "sellers or producers who have actual or potential ability to deprive each other of significant levels

18 of business.") (citations omitted). Additionally, within a market, a "submarket may be determined

19 by examining such practical indicia as industry or public recognition of the submarket as a separate

20 economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct

21 customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370

22 U.S. at 325. While a relevant product market can include submarkets, "[d]efining a narrow

23 'submarket' tends to require a relatively long laundry list of factors, which creates the danger of

24 narrowing the market by factors that have little economic basis." *Oracle*, 331 F. Supp. 2d at 1119.

25 Therefore, a market definition that is too narrow or excludes relevant competition is misleading.

26

CASE NO. 3:10-CV-02858-RS

1   The relevant geographic market is the "geographic area to which consumers can practically

2   turn for alternative sources of the product and in which the antitrust defendants face competition."

3   *Sutter Health Sys.*, 130 F. Supp. 2d at 1120; *see also F.T.C. v. Freeman Hosp.*, 69 F.3d 260, 268-269

4   (9th Cir. 1995).  In other words, rather than a snapshot view of customer choices in a particular

5   community, the geographic market is the area where customers can turn in response to a

6   "hypothetical monopolist" increasing prices.  Horizontal Merger Guidelines § 4.2.1 (Aug. 9, 2010)

7   ("Merger Guidelines"); *see also Sutter Health Sys.*, 130 F. Supp. 2d at 1120, 1128-32 (adopting the

8   Merger Guidelines "hypothetical monopolist" test); *Kolon Indus., Inc.*, 683 F. Supp. 2d at 411

9   ("When framing the geographic market, the examination does not look merely at a snapshot in time

10   of the present market.").

11   In defining anticompetitive effects, "Congress used the words 'may be substantially to lessen

12   competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties."

13   *Brown Shoe*, 370 U.S. at 323.  Although market share and the overall concentration level of the

14   industry are relevant in an antitrust review, these factors are "not conclusive indicators of

15   anticompetitive effects."  *U.S. v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974).  Instead, an

16   analysis of the acquisition must include "further examination of the particular market -- its structure,

17   history and probable future."  *Id.* (quoting *Brown Shoe*, 370 U.S. at 322 n.38).  This requires looking

18   into factors such as the characteristics of the customers, trends towards competition or concentration

19   in the industry, the existence of small but significant competitors, or the barriers to entry into the

20   market.  *See, e.g., Brown Shoe*, 370 U.S. at 344-345; *Phila. Nat'l Bank*, 374 U.S. at 366-367; *U.S. v.*

21   *Aluminum Co. of Am.*, 377 U.S. 271, 279-281 (1964); *U.S. v. Von's Grocery Co.*, 384 U.S. 270, 277-

22   278 (1966); *U.S. v. Pabst Brewing Co.*, 384 U.S. 546, 550-553 (1966); *Syufy Enter.*, 903 F.2d at 664;

23   Merger Guidelines §§ 5-10.

24   Plaintiffs contend that, in order to prove a violation of Section 7, they need only demonstrate

25   that the merger between United and Continental is a non-trivial acquisition of a significant

26

CASE NO. 3:10-CV-02858-RS

competitor.  In support of this, they rely upon a number of cases in which the Supreme Court enjoined mergers involving companies with smaller market shares than those found here.  *See Brown Shoe*, 370 U.S. at 294; *Phila. Nat'l Bank*, 374 U.S. at 321; *Aluminum Co. of Am.*, 377 U.S. at 271; *U.S. v. Cont'l Can Co.*, 378 U.S. 441 (1964); *Pabst Brewing Co.*, 384 U.S. at 546; *Von's Grocery Co.*, 384 U.S. at 270.  They further rely upon *Hosp. Corp. of Am. v. Fed. Trade Comm'n*, in which the Seventh Circuit noted, in dicta, the continued viability of those decisions that "seemed, taken as a group, to establish the illegality of any non-trivial acquisition of a competitor."  807 F.2d 1381, 1385 (7th Cir. 1986).

Of course, while dicta from a Seventh Circuit decision (in which a Federal Trade Commission ruling was subject to clear error review) would not be binding on this Court, in any event, as both defendants and the decision in *Hosp. Corp. of Am.* itself point out, the Supreme Court in *Gen. Dynamics* separately held that market share statistics alone are "not conclusive indicators of anticompetitive effects."  415 U.S. at 498.  Indeed, *Hosp. Corp. of Am.* went on to observe that "[t]he most important developments that cast doubt on the continued vitality of such cases as *Brown Shoe* and *Von's* are found in other cases, where the Supreme Court, echoed by the lower courts, has said repeatedly that the economic concept of competition,… is the lodestar that shall guide the contemporary application of the antitrust laws."  807 F.2d at 1386.  The Court then held that it was prudent for the Commission, which "rather than resting on the very strict merger decisions of the 1960s… inquire[d] into the probability of harm to consumers," to employ an economic approach in its merger review that analyzed competitive effects by considering a number of economic factors. *Id.*; *see also Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) (plaintiff incorrectly argued that "[e]ase of entry and the absence of barriers do not matter if the defendant has a large market share" because "[m]arket share is just a way of estimating market

CASE NO. 3:10-CV-02858-RS

1    power, which is the ultimate consideration.").  Therefore, plaintiffs' proposed approach that any

2    non-trivial acquisition of a significant rival is per se violative of the Clayton Act is wrong.[11]

3                                    IV. DISCUSSION

4            Regardless of whether the Court adopts the standard four-factor test articulated in *Winter*, or

5    the "serious questions" formulation reiterated in *Alliance for the Wild Rockies*, plaintiffs are unable

6    to satisfy the requirements for the "extraordinary remedy" of a preliminary injunction.  As discussed

7    in more detail below, their failure to establish a viable relevant market dooms any effort to show this

8    merger will substantially lessen competition, thereby negating their ability to raise even serious

9    questions, let alone a likelihood of success on the merits.  Moreover, nothing in the record presented

10   to the Court suggests that these forty-nine individual plaintiffs will be irreparably harmed by the

11   merger or, if so, that the balance of hardships would tip at all in their favor.

12   A. Success on the Merits -- Relevant Markets

13           Plaintiffs have identified what they maintain are three alternative relevant markets against

14   which to measure alleged anticompetitive effects flowing from the United/Continental merger.  First,

15   they propose a market limited to network carriers competing for business travelers.  Second, they

16   identify thirteen airport-pairs where they maintain the merger is likely to lessen competition.  Third,

17   they argue that the United States airline industry as a whole can operate as a relevant market and

18   that, given the ease of entry for established carriers into regional markets, the merger would result in

19   anticompetitive effects because it eliminates potential nationwide competition between United and

20   Continental.  Despite a vigorous and forceful attempt, plaintiffs have not carried their burden, under

21

22           [11] Moreover, plaintiffs have presented no authority for the proposition that, upon demonstrating
     that the merger involves the non-trivial acquisition of a significant competitor, they can simply
23   ignore their burden of identifying a viable relevant product and geographic market.  Simply put,
     there is no support for the notion that, merely by removing one competitor, any horizontal merger in
24   the airline industry will be anticompetitive and thereby violate Section 7 even where a plaintiff has
     failed to establish a viable relevant market.  *U.S. v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618
25   (1974) ("Determination of the relevant product and geographic markets is 'a necessary predicate' to
     deciding whether a merger contravenes the Clayton Act.") (citations omitted).
26

1    any injunctive relief merits standard, of demonstrating the existence of a viable relevant geographic

2    and product market.

3    1. *Network Carrier Market Catering to Business Travelers*

4            In presenting their proposed network carrier market catering to business travelers, plaintiffs

5    maintain that United and Continental compete for business passengers against each other, Delta,

6    American and USAir, but do not compete against any of the LCCs.  Supporting this argument,

7    plaintiffs assert that network carriers are distinguished from LCCs because, according to plaintiffs,

8    LCCs do not offer the package of services that network carriers provide and which business travelers

9    require.  In particular, plaintiffs contend that LCCs cannot serve the smaller communities where

10   business passengers often need to travel because they lack the extensive hubbing networks and

11   therefore can only fly high density point-to-point routes.  Plaintiffs' evidentiary support for this rests

12   primarily upon deposition testimony from Mr. Smisek, in which he describes the differences

13   between hub-and-spoke and point-to-point business models, and explains why Continental's

14   products are attractive to the business traveler.  Smisek Depo. Tr., 33:2-33:9, 36:10-36:11, 43:25-

15   44:16, 45:4-46:5, 96:18-97:8.  Additionally, plaintiffs maintain network/legacy carriers offer

16   multiple classes of service, a higher frequency schedule, and frequent flyer programs that

17   differentiates them from LCCs and therefore excludes those newer airlines from their proposed

18   network carrier-business traveler market.  While the evidence shows that no one LCC may offer the

19   entire package of services that network carriers provide to the business segment (i.e., a large

20   network, multiple classes of service and frequent flyer programs), plaintiffs have failed to show that

21   LCCs should be excluded when setting the parameters of a relevant market.  Indeed, all of the

22   evidence presented demonstrates that LCCs do in fact compete with network carriers for the business

23   traveler and should be included in that market.[12]

24   _____

25        [12] In their post-hearing briefing, plaintiffs cite to an article by Peter C. Carstensen that discussed the emergence of airline competition on a network basis using something called "contestability theory."  Peter C. Carstensen & Susan Beth Farmer: Airline Mergers -- Second Best Results in a

26   Changed Environment: *Competition Policy and Mergers Analysis in Deregulated and Newly*

As an initial matter, both Professor Bush and Dr. Rubinfeld provided evidence supporting the inclusion of LCCs into a market for business travelers. Dr. Rubinfeld testified that, while LCCs have differing models, they do compete with network carriers for all passengers, including business travelers. Tr. 453:9-454:2. Indeed, as noted above, Dr. Rubinfeld explained in his report that LCCs have continued to increase their presence by entering new routes and new cities and have increased their market share such that Southwest (an LCC) is now the largest airline measured by O&D passengers. Rubinfeld Report ¶¶ 18-20, 80; *see also* Smisek Aff. ¶¶ 17-18. Currently, approximately seventy percent of all airline passengers travel on routes where LCCs compete and, with the exception of Alaska Airlines, all network carriers have at least fifty percent of their revenue exposed to LCC competition.[13] Rubinfeld Report ¶ 17. United and Continental themselves each face significant competition from LCCs, with sixty-six percent of United's domestic passengers and seventy-one percent of Continental's domestic passengers traveling on routes where at least one LCC has ten percent or more market share. *Id.* ¶ 66. Additionally, with some LCCs adopting a hub-and-spoke model and others significantly increasing their nonstop routes originating out of hubs or focus cities (Southwest, for example, now serves 64 cities and originates seventy-four percent of its routes from hubs), LCCs have been able to serve most routes that domestic passengers fly. Rubinfeld Report ¶ 12; Rubinfeld Rebuttal Report ¶ 11.

While Professor Bush testified to the existence of a network market in which he believed there would be anticompetitive effects resulting from the merger, Tr. 546:24-550:1, he also testified

---

*Competitive Industries* (Edward Elgar Publishing Ltd., 2008). As defendants pointed out during closing arguments, however, Professor Carstensen is a law professor and not an economist, his findings relied on sources that were ten, nineteen and twenty-two years old, and he acknowledged that "[c]onstestability analysis must be applied with care… because networks may, or may not, constitute alternatives for specific travel points of origin and destination." *Id.* Accordingly, to the extent this reference was meant to support the notion that network carriers do not compete with LCCs (many of whom entered the market after the sources upon which Professor Carstensen relied were published), it fails to achieve that objective.

[13] According to Dr. Rubinfeld, network carrier revenue is exposed to an LCC if an LCC has at least ten percent of O&D passengers on a route.

that there are certain categories of business traveler that would fly LCCs, that LCCs and network carriers do compete, and that he had no reason to doubt the accuracy of Dr. Rubinfeld's findings.  Tr. 547:7-11, 573:24-25; Bush Dep. Tr. 141:1-9.  Indeed, Professor Bush testified that there has been significant entry by LCCs into airline routes served by network carriers and that he had no reason to believe any LCCs would exit the market as a result of the merger.  Tr. 578:10-25.  In addition, Dr. Rubinfeld testified that, while there is no LCC that offers the entire range of services traditionally associated with a network carrier, business travelers are able to, and do, choose LCCs based upon services targeted to them specifically as business travelers.  Rubinfeld Report ¶ 66; *see also* Tr. 453:20-24.  Professor Bush agreed.  Tr. 573:14-16 (all LCCs have frequent flyer programs to attract business travelers).

Mr. Smisek and Mr. Tilton, while recognizing that network carriers and LCCs operate on different business models, also both testified that they experience severe competition from LCCs for business travelers.  Mr. Tilton testified, and Professor Bush agreed, that LCCs now compete for eighty percent of all domestic travelers, and over eighty-five percent of passengers traveling nonstop on United or Continental have an LCC alternative.  Tilton Aff. ¶ 20; Exs. 1021, 1030.  According to Mr. Tilton, one way in which LCCs are targeting business travelers in particular is by offering services such as preferred seating or boarding, business or first class seats, and in some instances even adopting a hub-and-spoke model.  Tilton Aff. ¶ 22; Tilton Dep. Tr. 109:7-24, 110:17-111:14.  Mr. Knight further testified that some LCCs are growing significant networks and that all compete aggressively for business travelers every day.  Tr. 331:5-19, 338:11-17.  As a result, as Mr. Smisek testified, LCCs are "a very disciplining factor on price" and have caused "continued downward pressure on fares."  Tr. 159:24-160:5, 161:11-14.

Plaintiffs presented no evidence suggesting that the ability of LCCs to discipline prices would not continue.  Indeed, each of the plaintiffs who testified stated that they, either for themselves or in booking flights for clients through their travel agencies, have chosen LCCs to take

CASE NO. 3:10-CV-02858-RS

1    advantage of better fares or schedules.  Mr. Malaney, for example, testified that, in his home town of

2    Grand Rapids, Michigan, the entry of three LCCs caused a major decline in fares offered by both the

3    LCCs and the network carriers.  Tr. 619:12:623:7.  In short, because the plaintiffs have failed to

4    show why LCCs should be excluded from a market for business passengers - indeed, the substantial

5    evidence suggests that they should not - network carriers catering to business passengers simply does

6    not fly as a viable relevant geographic and product market for purposes of a Section 7 analysis.[14]

7    2. *Airport-Pairs*

8         Plaintiffs' second proposed market comprises the thirteen airport-pairs that Professor Bush

9    contends would experience significant decreases in competition were the merger to be

10   consummated.  *See* Bush Report at 7.  In support of this market, plaintiffs rely primarily on

11   testimony from Professor Bush.  In addition, they cite the Carstensen article, General Accounting

12   Office ("GAO") studies, a statement from J. Bruce McDonald (former Deputy Assistant Attorney

13   General in the Antitrust Division of DOJ), and four district court cases in which DOJ purportedly

14   used airport pairs in support of an antitrust market analysis.  In response, Dr. Rubinfeld persuasively

15   testified that, consistent with the approach favored by both DOJ and GAO, his analysis and

16   experience suggest that city-pairs, and not airport-pairs, is the appropriate parameter for identifying

17   airline markets for antitrust purposes.

18        As an initial matter, plaintiffs' proffered evidence provides no support for the notion of an

19   airport-pair market.  As noted above, Professor Carstensen's article has little if any bearing on the

20   current competitive conditions in the market in that it relies on sources that largely pre-date the

21   influence of LCCs.  While some GAO studies refer to both airport-pairs and city-pairs, the GAO

22

23        [14] To the extent plaintiffs propose a market divided even further to include only routes serving
     business passengers traveling to small communities, the Court finds this market too narrow.  *See*
24   *Brown Shoe*, 370 at 325; *see also*, *Oracle*, 331 F. Supp. 2d at 1119.  Additionally, plaintiffs have not
     shown which communities would constitute such a market or why, based upon the evidence
25   presented going to the growth of the LCCs, those carriers would not be able to fill a void in any
     market exited by one or other defendant by virtue of the merger.
26

1  report for this merger specifically noted that "[i]t is generally preferable, time permitting, to assess

2  city pair rather than airport pair changes in competition."  Ex. 71.  Mr. McDonald, who said that

3  passenger markets are "occasionally airport pairs," went on to clarify in the course of that same

4  speech, "[i]t is competition in particular city pair markets that is relevant for passengers" and

5  "[r]eviewing any particular merger, we first identify the city pairs in which the merging carriers both

6  provide service."  *See* http://www.justice.gov/atr/public/speeches/217987.htm.  Moreover, the cases

7  that plaintiffs rely upon fail to support the proposition that DOJ has delineated airport-pairs as a

8  relevant market in the airline industry. [15]

9          Indeed, the airport-pair versus city-pair question is where Professor Bush's failure to conduct

10  any significant economic or other analysis highlights the problems with plaintiffs' proposed relevant

11  market.  While Professor Bush suggested that there are "time-sensitive passengers" who are willing

12  to pay more to fly out of a preferred airport (Tr. 544:4-15), he provided no supporting analysis,

13  economic or otherwise.  He never defined "time-sensitive passengers" in terms of who they are or

14  what fares they are willing to pay, nor has he evaluated the airfares for any of the identified thirteen

15  airport-pairs or studied the number of passengers that prefer one airport over another within any of

16  the regions containing such an airport-pair.  Tr. 562:10-13, 559:4-6.  Instead, he relied upon a

17

18  [15] In *U.S. v. AMR Corp.*, the court granted summary judgment in favor of defendant airlines
where DOJ alleged predatory pricing on routes out of the Dallas-Fort Worth Airport and referred to
19  both city-pair and airport-pair markets.  140 F.Supp.2d 1141 (D. Kan. 2001).  However, that case, in
focusing on price fixing of routes coming in and out of a single airport, is markedly different from
20  the action brought here, which addresses a merger's effect on competition in the airline industry and
its relevant markets.  *AMR Corp.*, in sum, provides no support for the contention that airport-pairs
21  represent an appropriate market when evaluating the merger of two airlines.  In *In re Northwest
Airlines Corp. Antitrust Litigation*, contrary to plaintiffs' assertion in their post-hearing briefing, the
22  district court denied a motion to exclude expert testimony that applied city-pairs. 197 F.Supp.2d 908
(E.D. Mich. 2002).  In other words, the applicable market in that case was city-pairs and not, as
23  plaintiffs suggest, airport-pairs.  Lastly, plaintiffs cite two cases in which DOJ entered into consent
decrees where the terms city-pairs and airport-pairs were both used.  *See U.S. v. Airline Tariff Pub.
24  Co.*, 1994 WL 502091 (D.D.C. Aug. 10, 1994); *U.S. v. Airline Pub. Co.*, 1993 WL 527923 (D.D.C.
Nov. 1, 1993).  Nothing in either of these cases, however, suggests that airport-pairs provides an
25  appropriate market when evaluating the airline industry for antitrust purposes.  Moreover, as these
were consent decrees, final judgment was entered in both without trial or adjudication of any issue of
26  fact or law.

snapshot view of customer choices, consisting of airfares on a single day for airports in nine randomly selected metropolitan regions. Bush Rebuttal Report App. A. As Professor Bush concedes, however, airfares are not static when considering different fare classes. Tr. 537:18-25. Therefore, his snapshot of customer choices on a single day lends no support to the notion that price differentials between airports within the same metropolitan area suggest that there are "time-sensitive passengers" who will pay more for access to a preferred airport. *See Kolon Indus., Inc.*, 683 F. Supp. 2d at 411. In short, none of Professor Bush's testimony can support the idea that airport-pairs are a viable relevant market when conducting a Section 7 analysis.

In contrast, Dr. Rubinfeld testified that airport-pairs are an inaccurate market because they "miss out on some of the important sources of competition that come from [] the fact that many customers fly from alternative airports." Tr. 449:7-9. Dr. Rubinfeld contends that the more appropriate market would be city-pairs because they take into account the effect that substitutable airports have on price, in large part because of the competitive impact of LCCs. Tr. 440:24-441:11, 461:3-4; *see Freeman Hosp.*, 69 F.3d at 269 (a relevant geographic market includes locations where customers could possibly go and not simply where they actually go). Dr. Rubinfeld pointed out that twelve of the thirteen airport-pairs cited by Professor Bush are subject to competition from adjacent airports[16] (Rubinfeld Rebuttal Ex. 1), which Mr. Smisek confirmed when he testified that Continental does not set its pricing on an airport-pair basis.[17] Tr. 195:9-197:3. Indeed, as Dr. Rubinfeld explained, even if some passengers would not use an alternative airport, city-pairs remains the appropriate market because those passengers "would be protected [from a price increase] by other people who would be willing to switch [to a substitutable airport]." Tr. 461:3-4.[18] Professor

---

[16] Indeed, according to Dr. Rubinfeld, "[n]early 40 percent of San Francisco-Houston passengers use an airport other than the one cited by Professor Bush." Rubinfeld Rebuttal ¶ 5.

[17] Mr. Smisek testified that, for example, an LCC offering service between JFK and Oakland would affect Continental's pricing of a flight between Newark and San Francisco. Tr. 196:3-24.

[18] According to Dr. Rubinfeld, when ten to twenty percent of customers are willing to switch, a price increase at an adjacent airport will be defeated. Tr. 461:5-10.

CASE NO. 3:10-CV-02858-RS

1    Bush even conceded this point during the hearing when he testified that "for some classes of

2    passengers, it is very much the case that [adjacent] airports are substitutable." Tr. 561:22-24.  Dr.

3    Rubinfeld went on to explain that his preference for city-pair analysis is consistent with the approach

4    taken by DOJ, GAO and a host of top economists who study airlines.  Tr. 442:11-14.  In agreement,

5    Professor Bush testified that he is not aware of any instance in which DOJ employed an airport-pair

6    analysis in litigation (Tr. 562:14-21), and further that the GAO report he himself cites states that

7    airport-pairs is the preferred mode of analysis in an antitrust review.  Tr. 563:8-10; *see* Ex. 71 at 16

8    n.22.

9           Finally, none of the behavior engaged in by the plaintiffs themselves suggests that airport-

10   pairs represent a relevant market.  Ms. Robinson testified that she uses alternatives to Palm Beach

11   International Airport (the airport closest to her), even flying to the hearing in San Francisco from

12   Fort Lauderdale-Hollywood International Airport on Virgin America (an LCC) because she was able

13   to get a nonstop flight.  Tr. 605:8-15.  Similarly, both Ms. Brown and Mr. Malaney testified that they

14   book business travelers into alternative airports in certain metropolitan regions (such as New York,

15   Phoenix and Orlando).  The upshot of this is that plaintiffs' own experiences are consistent with the

16   position taken by defendants - that competition from adjacent airports disciplines pricing and must

17   be considered when defining the relevant market.  Indeed, although defendants need not establish

18   what they believe to be the relevant market on plaintiffs' motion for a preliminary injunction, given

19   the substantial evidence suggesting city-pairs, plaintiffs' effort to establish anything else never

20   leaves the gate.

21   3. *National Market*

22          Plaintiffs' third proposed relevant market is the national airline industry taken as a whole,

23   and can be more quickly dispatched than the two previously discussed alternatives.  First, "[t]he

24   boundaries of a product market are determined by the reasonable interchangeability of use or **1524

25   the cross-elasticity of demand between the product itself and substitutes for it," *Brown Shoe*, 370

26

1   U.S. at 325, and plaintiffs have not shown how, for example, a flight from San Francisco to Newark

2   would compete with a flight from Seattle to Miami.  Indeed, while Professor Bush did no economic

3   modeling to support a national market, Dr. Rubinfeld testified that, not only is a national market

4   inappropriate in that it fails to examine individual markets involving passenger origins and

5   destinations, but when concentration in the airline industry is measured on a national basis, taking

6   into account all LLCs and network carriers, the Herfindahl-Hirschman Index is far below the Merger

7   Guidelines threshold that would trigger DOJ scrutiny.[19]  Tr. 445:2-16, 581:9-11; Rubinfeld Report

8   Ex. 29; *see* Merger Guidelines § 5.3.  Moreover, employing plaintiffs' proposed national market for

9   the proposition that the merger between United and Continental will limit the potential for future

10  competition between the airlines again fails to address the fact that LCCs have continued to

11  demonstrate an ability successfully to enter new routes, increase market share and discipline prices.

12  *See* Rubinfeld Report ¶¶ 12, 18-20, 80.  In short, nothing put forth by the plaintiffs establishes the

13  national airline industry as a viable relevant market against which to evaluate an antitrust claim

14  under the Clayton Act.

15        Having failed to satisfy their burden of demonstrating a viable relevant market (a necessary

16  predicate for injunctive relief under Section 16) plaintiffs cannot show a likelihood of success on, or

17  even a serious question going to, the merits of their claim.  Therefore, their motion for a preliminary

18  injunction, under either merits standard, must be denied.  Moreover, without a viable relevant market

19  by which to measure any purported anticompetitive effects of the merger, the Court cannot address

20  whether it does in fact substantially lessen competition or tend to create a monopoly.  While the

23  _____
    [19] The Herfindahl-Hirschman Index ("HHI") is an index used to measure concentration in a
24  market, which is calculated by squaring the market share of each firm competing in a market and
    then summing the resulting numbers.  DOJ uses HHI numbers to determine thresholds for when an
25  industry is considered highly concentrated or when potential mergers require investigation.

1   deficiency in plaintiffs' merits showing is therefore fatal to the relief they seek, as discussed below

2   they similarly fail to shoulder their burden on the remaining requisites for injunctive relief.

3   B. Irreparable Harm and Balance of Hardships

4          Initially, defendants argue that plaintiffs lack standing because they have not proven that they

5   themselves will suffer "antitrust injury" as a result of the merger.  "Standing under Article III of the

6   United States Constitution demands that the plaintiff have a sufficient interest in the outcome of the

7   controversy to ensure that the court will be provided with a fair presentation of the issues."  *Reilly v.*

8   *Hearst Corp.*, 107 F. Supp. 2d 1192, 1194 (N.D.Cal. 2000) (citing *Northeastern Florida Contractors*

9   *v. Jacksonville,* 508 U.S. 656, 663 (1993) for the requirement that a party seeking to invoke federal

10  jurisdiction demonstrate: (1) injury to a legally protected interest; (2) a causal relationship between

11  the injury and the challenged conduct and (3) a likelihood that the injury will be redressed by a

12  favorable decision).  Additionally, standing in an antitrust action requires that plaintiffs also show

13  that they are subject to injury "of the type the antitrust laws were designed to prevent."  *Cargill, Inc.*

14  *v. Monfort of Colorado, Inc.,* 479 U.S. 104, 111 (1986) (plaintiff must show threatened loss or injury

15  to have standing under Section 16).  Here, each plaintiff submitted an affidavit stating that he or she

16  has purchased, and plans to purchase, commercial airline tickets for personal use, and five plaintiffs

17  provided deposition or hearing testimony as to the specifics of their limited air travel.  As consumers

18  of airline tickets, then, plaintiffs have established standing such that they are permitted to attempt to

19  prove that the proposed merger will substantially lessen competition.  *See Reilly*, 107 F. Supp. 2d at

20  1195.

21         Despite satisfying this low threshold for standing under the Clayton Act, however, plaintiffs

22  fail to establish any significant harm they will personally suffer that would warrant preliminary

23  injunctive relief.  In evaluating plaintiffs' purported irreparable harm as well as the balance of

24  equities, the Court must only consider those injuries plaintiffs advance that are personal to them

25  were defendants to merge, and cannot consider any injuries that plaintiffs allege would be suffered

26

CASE NO. 3:10-CV-02858-RS

by the general air carrier flying public as a whole.  *See Borden Co.*, 347 U.S. at 518 ("The Government seeks its injunctive remedies on behalf of the general public; the private plaintiff… may be expected to exercise [his injunctive remedy] only when his personal interest will be served. These private and public actions were designed to be cumulative, not mutually exclusive.").  Evaluating the purported injury to these specific forty-nine individuals, the record reflects that they have failed to demonstrate any irreparable harm as a result of the merger or that the balance of equities in this case tips at all, let alone sharply, in their favor.  *See Alliance for the Wild Rockies*, 2010 WL 2926463, *3-4.

None of the plaintiffs testified to having flown regularly, and only one (Ms. D'Augusta) stated that when she does fly she is likely to use United or Continental.  Rubinfeld Report Ex. 33.  Moreover, not one of the forty-nine reside near an airport with at least ten percent of the passengers served by United or Continental, and of the seven who reported having flown on a United/Continental overlap route, only Ms. D'Augusta recounted taking such a flight more than once.  Rubinfeld Report ¶¶ 98, 106.  Ms. D'Augusta was also the sole plaintiff to fly on any of the thirteen airport-pairs identified by Professor Bush, or, perhaps more significantly, to express any intention to travel on any of those specific routes in the future.  Tr. 373:10-14 (Ms. Brown has no "set plan" to travel on any of the thirteen routes), 394:12-14 (Mr. Stensrud does not have a "current plan" to fly between the thirteen airport-pairs), 608:1-8 (Ms. Robinson has no plans "to fly any of [the thirteen] routes in the foreseeable future"); Malaney Dep. Tr. 133:11-14 (Mr. Malaney does not think he will fly any of the thirteen routes in the future).  Additionally, none of the plaintiffs established themselves as traveling regularly for business.  Moreover, while each of the plaintiffs who provided live or deposition testimony had connections to the travel agency business, none testified as to any specific effects a merger would have on their particular clients.  Furthermore, all the plaintiffs who testified stated that they had alternate airports and LCCs available to them.  For example, Ms. D'Augusta has flown jetBlue from JFK to Oakland, rather than another carrier to San

CASE NO. 3:10-CV-02858-RS

1   Francisco, even though SFO is her closest airport (D'Augusta Dep. Tr. 71-72), and Mr. Malaney

2   testified that he has offered his business traveler clients the option of flying from Grand Rapids to

3   Phoenix on Allegiant (an LCC) even though that carrier only flies into Chandler, Arizona, twenty-

4   five miles from Phoenix.  Tr. 625:12-626:8.

5          While each plaintiff provided an affidavit stating an unformed hope of future air travel, this

6   speculative and *de minimus* injury (assuming there would be injury) is insufficient to establish

7   irreparable harm or tip the scale in plaintiffs' favor.  Although plaintiffs allege, in their briefing, that

8   this merger will adversely affect consumer choice and purchasing power by resulting in increased

9   airfares, decreased capacity, poorer service, and a constraint on the ability of other network carriers

10  to compete (Pls.' Post-Hr'g Mem. at 14, 33), they still must establish that these alleged effects will

11  be personal to them.  *See Borden Co.*, 347 U.S. at 518.  They have not done so.  Simply put,

12  plaintiffs have not demonstrated in any way that they themselves will suffer any specific harm were

13  preliminary relief denied.

14         Indeed, in the face of such an insufficient showing of harm to the plaintiffs, the Court need

15  not address what defendants argue will be substantial injury to them were the merger preliminarily

16  enjoined.  Suffice it to say that defendants presented evidence that delaying the merger would result,

17  among other things, in the loss of significant revenue synergies and cost savings, in their continued

18  vulnerability to exogenous shocks that a merged entity could withstand, in threatened job security

19  for tens of thousands of employees who will benefit from a more stable employer, and in the

20  continued deferral of capital and technology investments.  While not reaching directly the substance

21  and extent of these proffered hardships, it is fair to observe, as did then-Justice O'Connor, sitting as

22  Circuit Justice, in reversing the Ninth Circuit's stay of an airline merger, "[t]he cost of enjoining this

23  huge undertaking only hours before its long awaited consummation is simply staggering in its

24  magnitude, in the number of lives touched and dollars lost. To assume that enjoining of the merger

25  would do no more than preserve the 'status quo,' in the face of this upheaval, would be to blink at

26

CASE NO. 3:10-CV-02858-RS

reality." *Western Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1309 (1987).[20]  In other words, just as plaintiffs failed to satisfy their burden on the merits, they do not approach what is required to prove irreparable harm or a balancing of equities in their favor.  Therefore, for this reason alone, their motion for a preliminary injunction must be denied.

C. Public Interest

"The public interest analysis for the issuance of a preliminary injunction requires us to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief."  *Alliance for the Wild Rockies*, 2010 WL 2926463, *11 (internal quotations omitted).  The Ninth Circuit has held that courts shall not grant preliminary injunctions "unless those public interests [favoring an injunction] outweigh other public interests that cut in favor of *not* issuing the injunction."  *Id.* (emphasis in original).  The parties here presented widely divergent views on what impact a merger of United and Continental would have on the public interest.  According to defendants, this merger is simply the latest (and not the last) in a long line of airline consolidations that will result in cut capacity, rising airfares, degraded customer service, and labor force reductions.  Defendants, on the other hand, proffer that this merger is necessary to bring stability to a turbulent and ailing industry and that, as a result of a combined United and Continental, consumers will benefit from passed on cost savings, new system wide destinations and routes, increased capacity, and a better overall product, and further that employees will benefit from a

---

[20] Defendants argue that evidence reflecting that a number of these same plaintiffs settled a similar lawsuit attempting to enjoin the Delta Airlines/Northwest Airlines merger for a monetary award is indicative of the fact that, at most, the plaintiffs will suffer economic injuries that are compensable with monetary damages, and therefore not irreparable.  Although the Court required plaintiffs to produce the settlement agreement from the Delta/Northwest case as well as the Passengers Against Mergers Agreement executed prior to filing that lawsuit, the policy of favoring settlement, *see Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), counsels against using the terms of those agreements as evidence in another case.  Accordingly, those agreements will not be considered here on the issue of whether plaintiffs' purported injury is compensable by way of money damages.  Moreover, plaintiffs' failure to demonstrate any injury personal to *them* obviates the need to consider whether their alleged harm could be addressed through a monetary award.

1   healthier and more competitive employer.  Given plaintiffs' failure to shoulder their burden to

2   demonstrate irreparable harm, a balancing of equities in their favor or a likelihood of success on the

3   merits, the Court at this juncture need not reach the relative value to the public interest that would

4   flow from enjoining, or refusing to enjoin, this merger.

5                                        V. CONCLUSION

6          For the reasons stated above, plaintiffs' motion for a preliminary injunction is denied.

7          IT SO ORDERED.

8

9   Dated:  September 27,2010                   _____

10                                             Richard Seeborg
                                               United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26